**No. 26-10419-G**

# In the United States Court of Appeals for the Eleventh Circuit

CHIANNE D., *ET AL.*,

*Plaintiffs/Appellees*,

v.

SECRETARY, FLORIDA AGENCY FOR
HEALTH CARE ADMINISTRATION, *ET AL.*,

*Defendants/Appellants*,

On Appeal From the United States District Court
For the Middle District of Florida
No. 3:23-cv-00985-MMH-LLL

**APPELLANTS' OPENING BRIEF**

Andy Bardos
James Timothy Moore, Jr.
Ashley H. Lukis
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301-1724
Telephone: 850-577-9090

*Attorneys for Appellants*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The district court misconstrued the requirements of procedural due process and entered a far-reaching injunction against two state agencies. Given the complexity and importance of the issues presented, Florida respectfully requests oral argument.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF CITATIONS ....................................................................... iv

JURISDICTIONAL STATEMENT .......................................................... x

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE ..................................................................2

      A.    Medicaid Unwinding. ....................................................................2

      B.    DCF's Notices. ..........................................................................3

      C.    Individualized Information Available to Recipients. ...........................6

      D.    Additional Sources of Information.....................................................10

      E.    The Proceedings Below.................................................................11

      F.    Standard of Review. ...................................................................13

SUMMARY OF THE ARGUMENT .........................................................14

ARGUMENT ...............................................................................16

    I.    DUE PROCESS DOES NOT REQUIRE FLORIDA'S NOTICES TO DISPLAY CASE-SPECIFIC FINDINGS OR CALCULATIONS..............................................16

      A.    The District Court Incorrectly Distinguished This Court's Decision in *Arrington*. ........................................................................16

      B.    The District Court Incorrectly Distinguished This Court's Decision in *Jordan*...............................................................................28

      C.    The District Court Misapplied *Goldberg*. .............................................32

      D.    The District Court Incorrectly Followed Out-of-Circuit Decisions That Did Not Apply the *Mullane* Standard. ..........................................34

      E.    The District Court's Reliance on Out-of-Circuit Decisions That Applied the *Mathews* Standard Was Consequential. ...........................38

II. THE DISTRICT COURT INCORRECTLY CONCLUDED THAT FLORIDA'S NOTICES DO NOT COMMUNICATE THE STATE'S INTENDED ACTION WITH SUFFICIENT CLARITY TO SATISFY DUE PROCESS. .............................40

A. The District Court's Class-Certification Order Did Not Identify the Structural Claim as a Class Claim. ...................................................41

B. The Structural Claim Neither Satisfies Rule 23's Commonality Requirement Nor Reveals a Classwide Injury or Violation. .................45

C. The Notices Are Reasonably Calculated to Communicate Florida's Intended Action. ....................................................................................49

CONCLUSION ......................................................................................................56

CERTIFICATE OF COMPLIANCE ....................................................................57

# TABLE OF CITATIONS

## Cases

*Adams v. Harris*,

    643 F.2d 995 (4th Cir. 1981)........................................................................ 37–39

\* *Arrington v. Helms*,

    438 F.3d 1336 (11th Cir. 2006)................................. 16–19, 22, 26–32, 34–39, 53

*Atkins v. Parker*,

    472 U.S. 115 (1985).........................................................................................27

*Banks v. Trainor*,

    525 F.2d 837 (7th Cir. 1975)...........................................................................36

*Bargeron v. United States*,

    No. 3:09-cr-00156, 2021 WL 1250744 (M.D. Fla. Apr. 5, 2021).........................31

*Barnes v. Healy*,

    980 F.2d 572 (9th Cir.1992)................................................................ 35, 38, 39

*Barry v. Lyon*,

    834 F.3d 706 (6th Cir. 2016).............................................................................36

*Bradshaw v. Federal Aviation Association*,

    8 F.4th 1215 (11th Cir. 2021).............................................................................30

*Dilda v. Quern*,

    612 F.2d 1055 (7th Cir. 1980)...........................................................................36

iv

*Doe v. Drummond Company*,

782 F.3d 576 (11th Cir. 2015)......................................................................42

*Dorman v. Aronofsky*,

36 F.4th 1306 (11th Cir. 2022)....................................................................34

*Drazen v. Pinto*,

106 F.4th 1302 (11th Cir. 2024)..................................................................41

*Dusenbery v. United States*,

534 U.S. 161 (2002)............................................................................... 34, 35

*Febus v. Gallant*,

866 F. Supp. 45 (D. Mass. 1994) ................................................................36

*Garrett v. Puett*,

707 F.2d 930 (6th Cir. 1983)......................................................................36

*Goldberg v. Kelly*,

397 U.S. 254 (1970)................................................................ 18, 29–34, 36, 39

*Grayden v. Rhodes*,

345 F.3d 1225 (11th Cir. 2003)..................................................................34

*Haitian Refugee Center, Inc. v. Nelson*,

872 F.2d 1555 (11th Cir. 1989)..................................................................30

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,

588 F.3d 24 (1st Cir. 2009) ........................................................................42

\* *Jordan v. Benefits Review Board of United States Department of Labor*,

876 F.2d 1455 (11th Cir. 1989).......................... 13, 16, 28–32, 34, 36, 37, 39, 55

*K.A. v. Fulton County School District*,

741 F.3d 1195 (11th Cir. 2013)................................................................13

*Kapps v. Wing*,

404 F.3d 105 (2d Cir. 2005)...................................................................35

*Kelly v. Wyman*,

294 F. Supp. 893 (S.D.N.Y. 1968)..........................................................33

*League of Women Voters of Florida Inc. v. Florida Secretary of State*,

66 F.4th 905 (11th Cir. 2023)................................................................24

*Mathews v. Eldridge*,

424 U.S. 319 (1976)................................................... 14, 29, 30, 34–38

\* *Mullane v. Central Hanover Bank & Trust Co.*,

339 U.S. 306 (1950)...................................................... 14, 30, 34–39

*Ortiz v. Eichler*,

794 F.2d 889 (3d Cir. 1986)..................................................................36

*Powell v. Barrett*,

541 F.3d 1298 (11th Cir. 2008)..............................................................18

*Rodriguez v. Chen*,

985 F. Supp. 1189 (D. Ariz. 1996)..........................................................36

*Schroeder v. Hegstrom*,

590 F. Supp. 121 (D. Or. 1984)......................................................................36

*Simpson v. Dart*,

23 F.4th 706 (7th Cir. 2022)..........................................................................41

\* *United States v. Fritts*,

841 F.3d 937 (11th Cir. 2016)................................................................. 18, 31

*United States v. King*,

849 F.2d 485 (11th Cir. 1988).......................................................................13

*United States v. Lee*,

886 F.3d 1161 (11th Cir. 2018).....................................................................18

*United States v. McKinnon*,

985 F.2d 525 (11th Cir. 1993).......................................................................13

*Wachtel ex rel. Jesse v. Guardian Life Insurance Co. of America*,

453 F.3d 179 (3d Cir. 2006)..................................................................... 41, 42

*Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338 (2011).......................................................................................45

**<u>Statutes</u>**

28 U.S.C. § 1291 .............................................................................................x

28 U.S.C. § 1331 .............................................................................................x

42 U.S.C. § 657(a)..........................................................................................17

42 U.S.C. § 1396-1 ......................................................................................................2

42 U.S.C. § 1396a(a)(10)(A) ......................................................................................2

42 U.S.C. § 1983 ........................................................................................................x

**Rules**

Fed. R. Civ. P. 23................................................................................... 41, 45

Fed. R. Civ. P. 23(a)(2).......................................................................... 15, 45

Fed. R. Civ. P. 23(c)(1)(A) ...........................................................................44

Fed. R. Civ. P. 23(c)(1)(B) ..................................................................... 15, 41, 44

**Regulations**

Fla. Admin. Code R. 65-2...........................................................................26

Fla. Admin. Code R. 65-2.049(2) .......................................................... 8, 9, 27

**Other Authorities**

BLACK'S LAW DICTIONARY (9th ed. 2009) .............................................................41

Brief for Appellants, *Arrington v. Helms*,

   438 F.3d 1336 (11th Cir. 2006) (No. 04-15078), 2005 WL 4814962 ............ 17, 19

Brief for Appellees, *Goldberg v. Kelly*,

   397 U.S. 254 (1970) (No. 69-62), 1969 WL 136924 ..........................................33

MIDDLE DISTRICT OF FLORIDA, HOURS AND LOCATIONS,

   https://www.flmd.uscourts.gov/locations ...........................................................21

WILLIAM B. RUBENSTEIN, 3 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 7:26

(6th ed.) ................................................................................................................41

## <u>JURISDICTIONAL STATEMENT</u>

This appeal is from a final order or judgment that disposes of all parties' claims. Plaintiffs brought this action under 42 U.S.C. § 1983 and alleged violations of the Due Process Clause of the Fourteenth Amendment. Doc. 183. The district court therefore had jurisdiction under 28 U.S.C. § 1331. The court entered a final order and judgment on January 6 and 7, 2026, respectively. Docs. 186, 187. Florida timely filed its notice of appeal on February 5, 2026. Doc. 191. This Court has jurisdiction under 28 U.S.C. § 1291.

x

## STATEMENT OF THE ISSUES

Medicaid provides medical assistance to individuals with low incomes. When a recipient no longer satisfies Medicaid's income requirements, Florida provides the recipient with a notice of its intent to terminate the recipient's benefits. The district court certified a class and concluded that the notices provided to class members violate due process for two reasons: (i) the notices do not display individualized findings or calculations, such as the amount of income that Florida attributed to the recipient; and (ii) the structure of the notices renders it difficult to discern the State's intended action.

The issues presented are:

1. Whether the district court erred in concluding that due process requires Florida's notices to display individualized findings or calculations.

2. Whether the district court's class-certification order failed to identify the structural claim for classwide resolution and therefore whether the district court erred in deciding the structural claim on a class basis.

3. Whether the structural claim satisfied the commonality requirement of class certification and, relatedly, whether the district court erred in concluding that the structure of the notices, which varies from notice to notice, caused a classwide injury or classwide violation.

1

4.      Whether the district court erred in concluding that Florida's notices do not convey the State's intended action with sufficient clarity to satisfy the minimum requirements of due process.

## STATEMENT OF THE CASE

### A.      Medicaid Unwinding.

Florida participates in the Medicaid program. Op. 11.[1] Medicaid is a need-based program that makes health coverage available to low-income individuals. 42 U.S.C. § 1396-1 (appropriating funds for medical assistance provided to individuals "whose income and resources are insufficient"); *id*. § 1396a(a)(10)(A) (establishing income limits).

Florida's Agency for Health Care Administration ("AHCA") is the single state agency designated to administer or supervise the administration of Florida's Medicaid program. Op. 11. The Department of Children and Families ("DCF") is responsible for determining Medicaid eligibility and issuing notices of eligibility determinations. *Id*.

Ordinarily, DCF redetermines each Medicaid recipient's eligibility annually. Op. 28–29 ¶¶ 52–54. However, during the pandemic, Congress suspended eligibility requirements—including income limits—as a condition of States' receipt of enhanced federal funding. Op. 12–13 ¶¶ 10–11. In exchange for enhanced funding, Florida was

---

[1] "Op." refers to the order that Florida appeals. *See* ECF No. 186.

2

prohibited from terminating ineligible individuals from Medicaid. *Id*.; Doc. 128 at 9 ¶ 19.

In December 2022, Congress lifted the suspension of eligibility requirements effective March 31, 2023. Op. 13 ¶ 13. Federal law therefore required States to resume Medicaid redeterminations. Op. 13–14. This process is often called "unwinding." Op. 13.

In Florida, the one-year unwinding period began in April 2023. Op. 14. During unwinding, DCF redetermined the eligibility of more than 4 million recipients. Op. 14.

Plaintiffs filed this class action in 2023. Doc. 1. They alleged that the notices DCF uses to communicate income-based terminations violate procedural due process. *Id*. Plaintiffs sued the Secretaries of DCF and AHCA (collectively, "Florida" or the "State") in their official capacities. Plaintiffs initially claimed that DCF's notices also violate the Medicaid Act, but they abandoned that claim after trial. Docs. 182, 183. At trial, Plaintiffs presented the testimony of four of the more than 4 million recipients whose eligibility DCF redetermined during unwinding. Doc. 143 at 14; Doc. 162 at 181; Doc. 163 at 51, 118.

### B.    DCF's Notices.

For 35 years, Florida has relied on the same mainframe computer system—the FLORIDA system—to determine eligibility for the Medicaid program. Op. 32–33

¶¶ 68–69; Doc. 165 at 122:5–123:20, 211:7–14, 239:14–18, 243:11–21.[2] Despite its age, the FLORIDA system is critical to eligibility determination and is a key source of information about DCF's decisions. Doc. 162 at 10:4–7; Doc. 165 at 120:25–121:4.

The top of each termination notice[3] states: "The following is information about your eligibility." Doc. 155-38 at 1; Doc. 155-68 at 1; Doc. 155-90 at 1. The notice may contain multiple sections, but contains only one Medicaid termination section, which is entitled "Medicaid." Op. 52 ¶ 127. The heading is bolded and underlined. Doc. 155-38 at 8; Doc. 155-68 at 5; Doc. 155-90 at 5. The first sentence beneath the heading states: "Your Medicaid benefits for the person(s) listed below will end on" a specified date. Op. 52 ¶ 127. Below that sentence, the notice names the individual or individuals whose benefits will end. Doc. 155-38 at 8; Doc. 155-68 at 5–6; Doc. 155-90 at 5.

The notice next displays the word "REASON," which is followed by a colon and, in standardized text, a reason for the termination of benefits. Doc. 155-38 at 8; Doc. 155-68 at 5–6; Doc. 155-90 at 5. When a recipient was terminated for income, caseworkers were expected to manually input Reason Code 241, which generates the following text: "YOUR HOUSEHOLD INCOME IS TOO HIGH TO QUALIFY

---

[2] In all transcripts cited in this brief, the page number in the header matches that assigned by the court reporter.

[3] When this brief refers to notices, it refers to notices that inform recipients of their termination from Medicaid because of income.

FOR THIS PROGRAM." Op. 67–68 ¶¶ 166, 168. Soon after trial, the parties stipulated that DCF had put into production a system enhancement designed to automate the display of this explanation on all income-based termination notices. Doc. 172; Op. 68–69.

Medicaid recipients who are terminated for income are simultaneously enrolled in the Medically Needy Program, which is a share-of-cost program. Op. 62 ¶ 155; Doc. 162 at 13:2–6, 180:3–8; Doc. 164 at 120:13–122:22. When this happens, the notice includes a "Medically Needy" section that informs the recipient of his or her enrollment in the Medically Needy Program. Op. 62 ¶ 155; Doc. 164 at 122:23–123:5. The notice explains: "We have reviewed your eligibility for full Medicaid benefits and have determined you are not eligible because your income exceeds the limit for Medicaid." Op. 62 ¶ 155; Doc. 164 at 132:24–133:22, 145:7–148:6; Doc. 155-38 at 3, 5; Doc. 155-68 at 3; Doc. 155-90 at 2. The notice provides an explanation of the Medically Needy Program, which states in part: "Individuals enrolled in the Medically Needy Program have income or assets that exceed the limits for regular Medicaid." Doc. 164 at 135:3–12; Doc. 155-38 at 3, 5; Doc. 155-68 at 4; Doc. 155-90 at 3; Doc. 156-92 at 2.

The notices inform recipients of their fair-hearing rights. Op. 63–66; Doc. 156-92 at 3. Each notice also includes a link to the Medicaid page on DCF's public website, multiple listings of the call-center phone number, a link to information about DCF's

5

office locations, and information about free legal services. Op. 63–66; Doc. 156-92 at 3.

### C.    Individualized Information Available to Recipients.

Outside of the notices, DCF makes other sources of case-specific information available to Medicaid recipients. Any recipient may visit a DCF office location, call DCF's call center, or engage in a case review and conference with a DCF supervisor.

**Family Resource Centers.** DCF operates 40 customer-service offices known as family resource centers. Op. 12, 105. Each office is open from 8 AM to 5 PM on business days and employs at least one self-service representative qualified to assist recipients with questions about their notices. Op. 105–07. Self-service representatives are trained to use the FLORIDA system and to explain individualized information to recipients, such as their income limits and the amount of income that DCF attributed to them. Op. 106–107; Doc. 165 at 187:1–24. Each month, more than 100,000 DCF customers visit family resource centers; of these, about 23 percent make case-specific inquiries. Op. 107.

**DCF's Call Center.** DCF operates a call center that can answer case-specific questions. Op. 12, 84; Doc. 164 at 193:10–14. In April 2024, the most recent month for which data were available in the record, live agents answered 444,319 calls with an average wait time of 20 minutes and 33 seconds. Doc. 164 at 206:7–208:2; Doc. 155-211. Sometimes, callers are advised to call back another time. Op. 91–92 ¶ 240.

Call-center agents are trained to provide case-specific information using the FLORIDA system, such as a recipient's income limit, income on file, and Standard Filing Unit size. Op. 86 ¶ 224; Doc. 162 at 172:1–4; Doc. 164 at 85:8–11, 216:1–18. Call-center agents have access to recipients' applications and case notes and similar resources to assist them in answering case-specific questions. Op. 94 ¶ 249; Doc. 162 at 113:9–13, 171:18–25; Doc. 164 at 214:20–215:9; Doc. 167-10 at 52:3–56:4. All agents are equipped with job aids, policy transmittals, and DCF's Policy Manual. Op. 94–95.

DCF employs different "tiers" of call-center agents to handle calls of differing complexities. Op. 85–87. Tier 3 agents receive the most intensive training and handle the more complex calls. Op. 86–87. DCF monitors the quality of agent performance: supervisors live-monitor agent calls and are available for real-time consultation with agents, while quality-assurance staff review calls after-the-fact and provide feedback. Op. 86–87, 96.

At trial, Plaintiffs' witnesses testified that they utilized the call center. Chianne D. was informed on four calls that her and her daughter's benefits would end because their income was too high; the call center informed her of the exact amount of income DCF used. Doc. 163 at 34:8–20. The call center informed Kimber Taylor that her and her son's benefits were being terminated because of income. Doc. 143 at 53:16–54:12. And when Lily Mezquita called the call center, she was told the amount of income

7

DCF attributed to her. Doc. 155-103 at 7:19–8:38; Doc. 163 at 167:10–18. On another occasion, Ms. Mezquita used the call center to correct an error by DCF and avoid termination of benefits without requesting a fair hearing. Doc. 163 at 147:15–149:19, 171:15-173:21.

Jarvis Ramil, an advocate who helps families with Medicaid eligibility, testified that he had called the call center more than 1,000 times because he found it beneficial. Doc. 164 at 54:18–55:18, 96:9–24. He estimated that he received correct information about income from the call center all but a handful of times. Doc. 164 at 96:25–97:7.

**Supervisory Conferences.** DCF personnel conduct personalized reviews with recipients who request hearings. Once DCF receives a hearing request, a supervisor conducts an in-depth, independent review to assess the correctness of the challenged determination. Op. 115 ¶ 323; Doc. 156-10 at 9; Doc. 165 at 46:16–47:18, 56:20–58:10. After the supervisor completes the review, the supervisor calls the recipient to explain how the decision was made, the reason for the decision, and the individualized facts that support the decision. Op. 116 ¶ 324; Doc. 156-10 at 9–10; Doc. 165 at 44:5–12, 46:16–47:12; Fla. Admin. Code r. 65-2.049(2). The supervisor has a higher-level position and larger knowledge base than the caseworker who participated in the initial decision. Op. 115 ¶ 320.

DCF conducts supervisory reviews to discuss the decision with the recipient and to ensure that DCF took the correct action. Op. 115 ¶ 321. To address a recipient's

concerns and, if necessary, take corrective action, the review and conference occur as soon as possible after the recipient requests a fair hearing. Op. 115 ¶ 322; Doc. 165 at 47:19–48:1.

During the conference, the supervisor discusses with the recipient the facts that support DCF's decision and attempts to answer any questions. Doc. 165 at 45:9–19, 46:16–47:12. If the supervisor concludes that the decision was erroneous, then DCF takes immediate action to rectify the decision. Doc. 165 at 45:9–19; Doc. 156-10 at 9; Fla. Admin. Code r. 65-2.049(2).

During the supervisory conference, the recipient might realize that the State's decision was correct, or DCF might realize that it erred. Doc. 165 at 53:9–21. "Often," recipients withdraw their hearing requests because their benefits are reinstated after the supervisory review. Op. 122 ¶ 345. For example, Ms. Mezquita did not go through with her hearing request because DCF realized its mistake and reinstated her benefits. Doc. 163 at 143:5–7, 145:3–9, 155:5–156:5, 158:14–159:24, 160:24–161:1, 176:13–21.

DCF issues an acknowledgment letter to any recipient who requests a hearing. Op. 120–21. The letter provides the name and contact information of the supervisor assigned to the case, whom the recipient is invited to contact with questions. *Id.*; Doc. 165 at 48:19–49:11, 60:21–61:6, 87:21–89:2.

### D.    Additional Sources of Information.

DCF makes information available to the public regarding Medicaid eligibility. DCF's website discusses eligibility criteria and eligibility categories (such as children and pregnant women) and the Medically Needy Program. Op. 102; Doc. 155-212 (PX-285 at 00:47–00:58); Doc. 165 at 13:14–14:8, 16:2–17:12. It contains such resources as DCF's Policy Manual and Medicaid Fact Sheets, as well as the Medically Needy Brochure, which explains that the Medically Needy Program is for "individuals who would qualify for Medicaid except for having income that is too high." Op. 102–04; Docs. 156-26, 156-27, 156-29; Doc. 162 at 154:11–16, 165:17–24; Doc. 165 at 12:10–15:24, 19:15–20:7.

The Policy Manual contains the Medicaid program's rules of operation and is the chief resource for evaluating the correctness of eligibility determinations. Op. 14–20. It describes income calculations, income limits, eligibility categories, and the composition of each person's household for eligibility purposes. Op. 14–20; Doc. 155-152 at 37; Doc. 156-6 at 33–34; Doc. 162 at 8:10–14, 153:21–154:2; Doc. 165 at 7:14–9:2. Appendix A-7 to the Policy Manual contains the income limits. Op. 16 ¶ 21; Doc. 155-144.

DCF's online Fact Sheets also provide information about Medicaid eligibility and enrollment in the Medically Needy Program. Docs. 156-26, 156-27; Doc. 162 at 165:25–166:7; Doc. 165 at 9:4–10:19, 17:19–19:6; Doc. 155-212 (PX-285 at 11:50–

10

23:13). At trial, one recipient testified that she consulted the Fact Sheets and Appendix A-7 after she found them through a Google search. Doc. 163 at 130:18–131:1, 156:6–16, 168:20–169:7.

### E.    The Proceedings Below.

The district court certified the following class:

> All Florida Medicaid enrollees who on or after March 31, 2023, have been or will be found ineligible for Medicaid coverage based on a finding that the individual or household has income that exceeds the threshold for Medicaid eligibility, and were issued a written notice that does not identify the individualized income used in the eligibility determination or the income standard applied.

Doc. 122 at 40. It also certified a subclass:

> Members of the class whose written notice does not provide a Designated Reason or includes only Designated Reasons that do not identify income as the factor on which the State relied in finding the individuals to be ineligible for Medicaid.

*Id.*

In its class-certification order, the district court identified three issues for class resolution: (i) whether the uniform omission of case-specific information, such as the recipient's income, violates due process; (ii) whether the notice's statement of hearing rights violates due process; and (iii) as to the subclass, whether the use of reason codes that do not refer to income violates due process. Doc. 122 at 39–40, 52, 56–58 & n.18, 63–65.

The case proceeded to a bench trial in July and August 2024. On January 6, 2026, the court entered the order that Florida appeals (the "Injunction"). The court concluded that Florida's notices violate due process on a classwide basis. It reasoned that, to satisfy due process, the notices must recite individualized data on which the State relied, such as the recipient's Modified Adjusted Gross Income and the number of people in the recipient's Standard Filing Unit. Op. 226–228, 264–265, 271–273.

The court separately concluded that the "structure" of the notices obscured the State's intended action and therefore violated due process. Op. 209, 213, 268, 271. It explained that the notice structure "injects ambiguity into the notices" and "obscures the State's ultimate decision on eligibility and the reason for that decision." Op. 209.

The Injunction imposed substantial, costly mandates on the State. It required DCF to develop new income-based termination notices that contain individualized data, discontinue all income-based terminations until the new notices are developed, send corrective notices to more than one million class members, advise all corrective-notice recipients of their right to a fair hearing to challenge DCF's previous eligibility determination, authorize corrective-notice recipients who request hearings to request reinstatement of benefits pending the hearing decision, and reinstate all class members to Medicaid if corrective notices are not sent by May 1, 2026. Op. 271–73; Doc. 198 at 17–18.

Florida requested a stay pending appeal. The district court denied the motion to stay but extended certain deadlines in the Injunction. Doc. 198. This Court denied the State's motion on April 1, 2026.

### F.    Standard of Review.

This Court reviews conclusions of law *de novo*. *Jordan v. Benefits Rev. Bd. of U.S. Dep't of Lab.*, 876 F.2d 1455, 1459 (11th Cir. 1989). For example, whether the district court erred in following out-of-circuit decisions over this Court's precedents is subject to *de-novo* review.

The district court's application of law to the facts is also reviewed *de novo*. *K.A. v. Fulton Cnty. Sch. Dist.*, 741 F.3d 1195, 1204 (11th Cir. 2013); *United States v. McKinnon*, 985 F.2d 525, 527 (11th Cir. 1993). Thus, whether a notice adequately advises recipients of the reason for the State's decision is reviewed *de novo*. *Jordan*, 876 F.2d at 1459.

A district court's "purely factual findings" are reviewed for clear error. *United States v. King*, 849 F.2d 485, 487 (11th Cir. 1988). For example, the court's finding (which the State does not dispute) that DCF operates 40 family resource centers from 8 AM to 5 PM on business days would be reviewed for clear error, while the court's conclusion that this level of public access is so limited as to warrant no consideration under due process concerns the application of law to the facts and is reviewed *de novo*.

Likewise, how notices are structured is a question of fact, but whether, because of that structure, the notices do not communicate the State's eligibility determination with sufficient clarity to satisfy due process involves an application of law to the facts.

## SUMMARY OF THE ARGUMENT

The notices that Florida provides to class members when it terminates their Medicaid benefits because of income comply with the minimum requirements of due process. Specifically, the district court erred in concluding (i) that due process requires income-based termination notices to display individualized findings and calculations, such as the recipient's income; and (ii) that, because of their structure, the notices do not communicate Florida's intended action with enough clarity to satisfy due process.

This Court's precedents make clear that, under the governing *Mullane* standard, due process does not require Florida's notices to display individualized findings and calculations. The district court incorrectly distinguished this Court's precedents and instead followed out-of-circuit precedents that apply the *Mathews* standard (or do not even cite *Mullane*). This Court has cautioned that, when evaluating the sufficiency of notice, out-of-circuit decisions that apply the *Mathews* standard have little persuasive value. The district court erred when it deviated from this Court's binding precedents and instead followed low-value, out-of-circuit decisions that do not apply the *Mullane* standard.

As to the structure of the notices, the court erred for three reasons.

14

*First*, it should not have even reached the question. Its class-certification order identified three claims for classwide resolution, but nowhere in that 70-page order did the court indicate it would decide for all class members whether the notice structure obscures the State's intended action in violation of due process. Because the court did not identify any structural concerns as a class claim in accordance with Federal Rule of Civil Procedure 23(c)(1)(B), it erred when it decided that question on a class basis.

*Second*, the notice structure varies widely from notice to notice according to the number of individuals in the household, the number of public-assistance programs in which those individuals participate, and the number of eligibility determinations the notice communicates. The small number of income-based termination notices in the record reveal significant diversity in their structure. The structural claim does not therefore satisfy Rule 23(a)(2)'s commonality requirement, nor did Plaintiffs establish that the notice structure injures or violates the due-process rights of all class members.

*Third*, the notices communicate Florida's intended action with sufficient clarity to satisfy due process. Each notice that terminates a recipient's Medicaid benefits for income contains a single termination section with a conspicuous heading and clearly explains, in that section's first sentence, that Medicaid benefits will end on a specified date. The notices also explain that the recipient's income exceeds the income limits. Plaintiffs' own witnesses testified that, upon reading the notices, they understood the intended action.

15

Due process does not require perfection—only a notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections. Florida's notices more than satisfy that minimum, threshold standard. This Court should accordingly reverse the district court's judgment and remand with directions to enter judgment for Florida.

## ARGUMENT

### I. DUE PROCESS DOES NOT REQUIRE FLORIDA'S NOTICES TO DISPLAY CASE-SPECIFIC FINDINGS OR CALCULATIONS.

The district court applied an incorrect legal standard. Under this Court's precedents, due process does not require States that terminate public benefits to include individualized details in notices. To conclude otherwise, the district court incorrectly distinguished this Court's precedents, misread an earlier Supreme Court decision, and followed out-of-circuit precedents that applied a legal standard this Court has rejected.

### A. The District Court Incorrectly Distinguished This Court's Decision in *Arrington*.

This Court's decisions in *Arrington v. Helms*, 438 F.3d 1336 (11th Cir. 2006), and *Jordan* are on point and incompatible with the stringent due-process standard the district court applied. The district court should have followed this Court's precedents, but incorrectly distinguished them instead.

*Arrington* concerned welfare benefits. When a welfare recipient receives child-support payments, the State collects the payments, retains a portion to reimburse itself

16

and the federal government for welfare benefits, and pays the balance to the custodial parent. 438 F.3d at 1339. The amount it retains turns on variables outlined in federal law. *Id*.; *see also* 42 U.S.C. § 657(a).

Alabama provided monthly notices that disclosed the amount of child-support payments it collected, retained, and disbursed. 438 F.3d at 1350. The plaintiffs argued that the notices did not enable them to determine whether Alabama correctly allocated the payments it collected. *Id*. at 1349. They insisted that Alabama's "skeleton notice" violated due process and that, to the extent Alabama retains child-support payments, its notice must explain that decision. Br. for Appellants at 5–6, 18, 31–38, 43–46 (No. 04-15078), 2005 WL 4814962.

This Court disagreed. It explained that due process is a "flexible concept" that requires only reasonableness under all the circumstances and that "myriad forms of notice" may suffice. 438 F.3d at 1350. Parents who had "questions or concerns" about the accuracy of Alabama's calculations could call a hotline, fax, write, email, or visit an office. *Id*.

Under *Arrington*, a State's written notice need not enable recipients to replicate the State's calculations—at least where other sources of information, such as a hotline, are available to recipients with concerns or questions. *Arrington* recognized that due process establishes only a minimum requirement—not a rigorous disclosure mandate.

The district court incorrectly distinguished *Arrington* in several ways.

17

**1.** It reasoned that Alabama's notice *did* contain case-specific information that allowed recipients to confirm the accuracy of Alabama's calculations. Op. 229. It did not. It disclosed the amounts collected, retained, and disbursed—not the information necessary to determine whether Alabama correctly calculated the parent's share. 438 F.3d at 1350 (explaining that Alabama's notices disclosed the amount the parent was "purportedly" owed). Parents with questions could call a hotline for more information.

**2.** It reasoned that *Arrington* did not "involve the termination of critical need-based benefits," Op. 230, but it most assuredly did. *Arrington* involved Alabama's attempts to recover welfare benefits it had paid—the same benefits at issue in *Goldberg v. Kelly*, 397 U.S. 254 (1970). And it recouped those benefits from child-support payments, which, to single parents on welfare, are often more critical than Medicaid.

**3.** It reasoned that *Arrington* "does not discuss" *Goldberg*'s precept that a notice must detail the reasons for the proposed termination. Op. 230–31. That is irrelevant. A district court must follow this Court's precedents, even if the district court believes that this Court's precedents were incorrectly decided. *United States v. Lee*, 886 F.3d 1161, 1163 & n.3 (11th Cir. 2018). There is no exception for "overlooked or misinterpreted Supreme Court precedent." *United States v. Fritts*, 841 F.3d 937, 942 (11th Cir. 2016); *accord Powell v. Barrett*, 541 F.3d 1298, 1301–02 (11th Cir. 2008) (en banc).

**4.** It reasoned that—unlike the Alabama county welfare offices in *Arrington*—Florida's family resources centers, call center, and supervisory conferences are of no

18

consequence and are constitutionally insufficient as additional sources of information. Op. 232–35. In doing so, the court in effect nullified *Arrington*'s conclusion that the availability of resources such as a hotline can satisfy due-process notice requirements.

The court's critiques of the additional sources of information that Florida offers are flawed.

*First*, it assumes that these sources are measurably inferior to the sources that Alabama made available in *Arrington*. That is not so. Alabama's hotline was far from perfect. It was often unable to handle call volumes. Br. for Appellants at 14 (No. 04-15078), 2005 WL 4814962. Calls often went unanswered. *Id*. Many computers and phone systems in county offices were obsolete and could no longer be repaired. *Id*. at 25 n.22. The hotline was available only during business hours on weekdays. *Id*. at 25. Agents answered questions only about information provided by the automated voice-response system. *Id*. at 14. And to obtain useful information, callers were expected to know how to request a payment-history printout from specific computer systems. *Id*. at 25.

This Court did not review the evidence of these shortcomings with a captious, fault-finding eye and reject Alabama's hotline as constitutionally insufficient. Quite the opposite. The district court's rejection of the resources that Florida offers nullifies *Arrington*'s conclusion that such resources count toward a State's compliance with due process.

*Second,* the district court's criticisms ring hollow.

**Family Resource Centers.** DCF operates forty family resource centers across Florida. Op. 105. Each is open from 8 a.m. to 5 p.m. on business days. Op. 106. Each employs at least one self-service representative who is trained to assist recipients with questions about notices and to provide recipients with details about their cases. Op. 106–07.

The district court found two problems with family resource centers. The court first opined that Florida's notices do not expressly say that family resource centers can help recipients understand their notices. Op. 233. But the *very section* of the notice that communicates the termination of Medicaid benefits invites the recipient to seek assistance at a family resource center. *See*, *e.g.*, Doc. 155-68 at 5–6 ("To locate a DCF Office, go to www.myflfamilies.com/access-service-centers."). This invitation needs no explanation. It clearly communicates that family resource centers provide customer service.

Recipients visit family resource centers in large numbers. Each month, about 105,000 DCF customers visit family resource centers. Op. 107. Of these visitors, 23 percent make inquiries about their individual cases. *Id*. Mr. Ramil estimated that 500 of his clients had visited family resource centers for assistance. Doc. 164 at 97:23–25.

The district court complained that the "hours and locations" of family resource centers are "so limited as to be impracticable." Op. 233. But family resource centers

20

are open from 8 a.m. to 5 p.m. each business day. Op. 106 ¶ 282. The district court's own hours of operation are comparable. *See* MIDDLE DISTRICT OF FLORIDA, HOURS & LOCATIONS, https://www.flmd.uscourts.gov/locations/jacksonville ("The courthouse is open from 7:30 a.m. to 5:30 p.m. The clerk's office is open 8:30 a.m. to 4:00 p.m.").

As for the number of locations, the court cited no evidence that forty is too few. For millions of people, a family resource center is a short drive away. One is located barely four miles from the Bryan Simpson United States Courthouse, where the trial in this action was held. *See* Doc. 155-212 (PX-290 at 1:25). Some are located in urban areas such as Orlando, while others are located in places like Bonifay, Lake City, and Okeechobee, that promote geographic diversity. Doc. 165 at 188:3–17. Each of the six regions in which DCF operates includes at least four family resource centers. Doc. 165 at 188:18–25.

To the extent some recipients do not live near a family resource center, it is not a classwide issue that affects most or even many class members. The simple fact that 105,000 recipients visit family resource centers *each month* refutes the district court's claim that their accessibility to the public is "so limited as to be impracticable." Op. 233.

**The Call Center.** The court's critiques of the call center are equally misplaced. Op. 233–35.

21

To be sure, some callers must call back later or wait on hold. Some hang up and call back when they can better spare the time. According to the most recent figures in the record (April 2024), the average wait time is a relatively modest 20 minutes and 33 seconds. Op. 91, 100. These facts do not make the call center useless and irrelevant. In *Arrington*, calls to Alabama's hotline often went unanswered. Busy call centers are commonplace.

The district court misunderstood the call-center data and therefore significantly understated the call center's public accessibility. It reasoned that, in April 2024, "only 444,319 callers of the 1.38 million callers (32%) who asked to speak to a live agent succeeded." Op. 100. But these figures—the numerator and denominator—represent *calls*, not unique *callers*. *See*, *e.g.*, Doc. 155-211; Doc. 164 at 205:18–21, 243:17–22, 245:22–246:14, 248:8–10.

This distinction is crucial. If a caller is placed on hold, hangs up, calls back, and then speaks with an agent, then the court's logic would suggest that only 1 of 2 *callers* (50%) ever reached a live agent. In reality, one caller called twice, and no callers were unserved.

Plaintiffs' witnesses spoke with call-center agents on a regular basis. Mr. Ramil has called the call center more than 1,000 times; he continues to call because he finds it beneficial. Doc. 164 at 96:9–24. Chianne D. spoke with live agents on at least four calls that she placed over three days and received a call from a call-center supervisor.

22

Docs. 156-68 to 156-71, 156-72. Her authorized representative, Mr. Ramil, spoke with a live agent the very day she contacted him for assistance. Doc. 164 at 95:2–16. Ms. Taylor and Ms. Mezquita each spoke with a live agent. Doc. 143 at 52:7–53:22; Doc. 163 at 167:15–18. Jennifer V. has reached live agents so often that she has lost count. Doc. 163 at 103:16–104:2.

While it might be inconvenient to call back or wait on hold, it is nonsensical to suppose that recipients cannot reach agents or will forego "critical, need-based, public benefits" to avoid waiting on hold. Op. 219.

The district court also reasoned that "mistakes" are "likely" quite common but admitted that the only *evidence* of mistakes consisted of "two callers out of millions." Op. 234 & n.81. Faced with such limited and cherry-picked evidence against a call center that receives between 1.6 and 2.5 million calls each month, Op. 84, the district court erroneously shifted the burden to Florida to prove that these two instances are *not* representative of the call center's work: "the State presents no evidence to suggest that the mistakes made on these calls were surprising or outside the norm." Op. 234 n.81.

The court erred as a matter of law. It was not Florida's burden to establish that Plaintiffs' hand-selected, anecdotal evidence was outside the norm. It was Plaintiffs' burden to demonstrate that Florida fails to provide adequate notice to class members. Plaintiffs could have surveyed a broader sample of calls, but elected not to. The court

23

incorrectly relied on two instances out of millions to dismiss the call center as useless.

In *League of Women Voters of Florida Inc. v. Florida Secretary of State*, 66 F.4th 905 (11th Cir. 2023), this Court reversed a district court's conclusion that state regulations of ballot drop boxes disparately impacted racial minorities. *Id*. at 932. The district court relied on an analysis of drop-box usage in three counties, two of which had small minority populations. *Id*. at 933. This Court explained that a "small and unrepresentative sample" cannot reliably describe the universe from which it is drawn. *Id*.

The same is true here. The experiences of "two callers out of millions" cannot support the sweeping inference that mistakes are "likely quite common." Op. 234 & n.81.

To support its assumption that mistakes are "likely" common, the district court also passed over the evidence of accurate information provided by the call center. The call center correctly informed Chianne D. on four separate calls that her and her daughter's benefits were being terminated because their income was too high. Doc. 163 at 34:8–20. It even informed Chianne D. of the exact amount of income that DCF attributed to her. *Id*. It correctly informed Ms. Mezquita that her benefits were ending because of income and specified Ms. Mezquita's income. Doc. 155-103 at 7:19–8:38; Doc. 163 at 167:10–18. And it correctly advised Ms. Taylor that her and her son's benefits were ending because of income. Doc. 143 at 53:16–22. Most glaringly, the

court overlooked the fact that, across more than 1,000 calls to the call center, Mr. Ramil received incorrect information about income "only" a "handful" of times. Doc. 164 at 97:3–7.

Finally, to support its conclusion that "mistakes" are "likely" quite common, the district court claimed that Tier 3 agents receive "minimal" training and "limited" supervision. Op. 234. But these subjective characterizations contradict the court's own findings, which reveal the in-depth training and supervision that Tier 3 agents receive.

To become a Tier 3 agent, an agent completes a comprehensive, six- to eight-week training course that includes training on Medicaid. Op. 86. This follows a one- to two-week training the agent completed when the agent became a Tier 2 agent. *Id*. Thus, Tier 3 agents receive *at least* two months of training before they handle a Tier 3 call.

Call-center agents have access to resources on Medicaid policy such as job aids, policy transmittals, and training materials. Op. 95. Call-center supervisors conduct live monitoring of calls to assess agent performance, while quality-assurance support staff review calls and provide feedback to agents and their supervisors. Op. 87. Call-center agents may also use a chat dialogue box to seek support from their supervisors or call a support queue to speak with more experienced agents for guidance. Op. 96.

The district court never explained how Florida's training program is deficient, how much training would be enough, or how any training deficiency contributed to a

mistake made by a call-center agent. Nor could it. The record contains no evidence of the content of the training curriculum and no expert opinion on the "right" amount of training. No witness testified that, if agents were better trained, they would commit fewer mistakes, or would not have committed the few mistakes reflected in the record. The court did not assert that Alabama's agents in *Arrington* received more or better training.

**Supervisory Conferences.** As explained above, once a recipient requests a fair hearing, a supervisor reviews the challenged decision, contacts the recipient, discusses the decision with the recipient, answers the recipient's questions, and, if the decision was erroneous, takes corrective action before a hearing ever takes place. *See supra* pp. 8–9.

The district court brushed this one-on-one conference aside in a footnote. Op. 232 n.80. The court reasoned that recipients are not "informed of the existence of the supervisory review process" and therefore "do not know," before they appeal, that a "supervisor will contact [them] to go over the decision in detail before the hearing." *Id*.

The court was mistaken. As the court correctly found, "[i]nformation about the fair hearing procedures is publicly available in Chapter 65-2 of the Florida Administrative Code." Op. 112 ¶ 308. Those rules expressly state:

> Upon receipt of the Request for Hearing, a supervisory review is mandated. The supervisory review or interview may satisfy the appellant regarding his/her case so that a request for hearing is withdrawn. Should an error be discovered during this process, immediate action shall be taken to rectify it, and the appellant shall be so advised.

Fla. Admin. Code r. 65-2.049(2). DCF's Policy Manual makes the same point. ECF No. 156-2 at 26 ("Supervisors must review hearing requests and provide a Department conference with the individual.").

This Court has made clear that the public is charged with knowledge of hearing procedures set forth in a State's administrative rules and policy manuals. *Arrington*, 438 F.3d at 1352–53; *cf. Atkins v. Parker*, 472 U.S. 115, 131 (1985) ("The entire structure of our democratic government rests on the premise that the individual citizen is capable of informing himself about the particular policies that affect his destiny."). All recipients have actual or constructive knowledge of the supervisory review and conference and of the opportunity it affords to identify and correct errors in the State's decision.

*    *    *

Florida provides many avenues by which recipients with questions can secure additional information. Plaintiffs' witnesses utilized those avenues repeatedly. Under *Arrington*, that is enough.

27

### B.    The District Court Incorrectly Distinguished This Court's Decision in *Jordan*.

Not only *Arrington*, but also *Jordan* stood in Plaintiffs' way. The district court incorrectly distinguished *Jordan* too.

In *Jordan*, an applicant sought benefits under Part B of the Black Lung Benefits Act. His claim was denied, as was his request for reconsideration, and a hearing officer upheld the denial. 876 F.2d at 1457. The applicant then sought benefits under Part C instead. *Id.* That claim was also denied. *Id.* The applicant supplemented his application, the supplemental application was denied, and the challenged notice was issued. *Id.* at 1458. When the applicant failed to seek review timely, and his claim was deemed abandoned, he argued that the challenged notice violated due process. *Id.* at 1459–60.

The notice identified the three eligibility criteria for benefits: the applicant has black-lung disease, the disease was caused by coal-mine work, and the disease caused total disability. *Id.* at 1459. A checklist identified the criterion the applicant failed. *Id.* The notice provided no further, individualized information to explain the decision, but contained a standard guide that discussed the kinds of evidence that might satisfy the criteria. *Id.* This Court held that, even without case-specific findings or calculations, the notice provided "sufficient detail to pass the notice requirement of due process." *Id.*

Thus, in *Jordan*, the notice identified the requirement the applicant failed, but did not explain why the applicant failed that requirement or disclose any case-specific

28

data to support the decision. As in *Arrington*, although the notice alone did not enable the applicant to replicate the government's decision-making, it satisfied due process.

Here, a notice like the one approved in *Jordan* would disclose that a recipient failed the income requirement, but would stop short of disclosing case-specific details or individualized explanations. *Jordan* thus refutes the contention that a notice must recite case-specific findings. Identifying the failed eligibility requirement is enough.

The district court incorrectly distinguished *Jordan*.

**1.** It reasoned that *Jordan* concerned black-lung benefits and not "need-based benefits" such as Medicaid. Op. 226.

*First*, coal miners whose black-lung disease caused total disability would quite plausibly dispute the assertion that Medicaid is need-based but black-lung benefits are not. *See Jordan*, 876 F.2d at 1460.

*Second*, neither reason nor precedent makes the distinction between need-based and other benefits relevant here.

Of course, when a court assesses the adequacy of hearing procedures under the *Mathews* standard, the character of the private interest matters. *Mathews*, 424 U.S. at 341. Thus, a State must provide an evidentiary hearing before it halts welfare benefits, *Goldberg*, 397 U.S. at 264, but not before it terminates disability benefits, since "the disabled worker's need is likely to be less than that of a welfare recipient," *Mathews*, 424 U.S. at 342.

The *Mathews* standard does not apply, however, when a court evaluates the adequacy of a notice. The *Mullane* standard does. *See infra* Part I.D. And the district court cited no authority to suggest that the *Mullane* standard incorporates the first *Mathews* consideration. It offered no justification to distinguish Medicaid from black-lung benefits in this context or to limit *Jordan* to benefits that are allegedly not need-based.

Regardless, *Arrington* implicitly rejected the district court's distinction, since *Arrington* concerned the recovery of welfare benefits—the same need-based benefits at issue in *Goldberg*—and did not require the disclosure of the individualized details the plaintiffs sought.

**2.** The district court also reasoned that *Jordan* involved an applicant for benefits rather than a recipient whose benefits were about to terminate. Op. 226. But the court never explained why that distinction matters.

Like a recipient, an applicant may have a property interest in statutorily defined benefits. *Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1562 (11th Cir. 1989). Whether an individual has a property interest in benefits does not depend on the prior receipt of those benefits, but rather on the existence of statutory criteria that support a legitimate claim of entitlement. *Id.*; *accord Bradshaw v. FAA*, 8 F.4th 1215, 1224–25 (11th Cir. 2021). If applicants have no property interest in Medicaid benefits, then due

process does not entitle them to *any* notice when a State denies their applications for benefits.

The district court never explained why, if both applicants and recipients have property interests in Medicaid benefits, a recipient is entitled to a more detailed notice than an applicant. In any event, *Arrington* implicitly rejected this distinction, since it involved recipients and, like *Jordan*, did not require disclosure of case-specific details.

**3.** The district court also reasoned that *Jordan* "does not apply *Goldberg*," but that too is irrelevant. As explained above, this Court's decisions are binding even if a district court believes that this Court overlooked or misapprehended earlier Supreme Court precedent. *Fritts*, 841 F.3d at 942; *Bargeron v. United States*, No. 3:09-cr-00156, 2021 WL 1250744, at *5 n.6 (M.D. Fla. Apr. 5, 2021) (Howard, J.) (noting that a district court may not "ignore the Eleventh Circuit's decisions," even if those decisions are "arguably inconsistent" with earlier Supreme Court decisions). *Jordan*, moreover, cited *Goldberg* and was therefore familiar with that decision. *See* 876 F.2d at 1459.

Both *Arrington* and *Jordan* recognized that procedural due process establishes a minimum threshold—not a rigorous disclosure mandate. This Court clearly heeded *Goldberg*'s recognition of the "importance of not imposing upon the States . . . in this developing field of law any procedural requirements beyond those demanded by rudimentary due process." 397 U.S. at 267. Florida's notices easily satisfy due process.

The district court incorrectly distinguished *Arrington* and *Jordan*. Both cases approved notices that did not provide case-specific details. Rather than take pains to distinguish those decisions, the district court should have embraced them, as it was duty bound to do. *Arrington* and *Jordan* compel reversal to the extent the district court concluded that Florida's notices must include case-specific findings and calculations.

### C.    The District Court Misapplied *Goldberg*.

Having incorrectly distinguished *Arrington* and *Jordan*, the district court turned to *Goldberg*. In *Goldberg*, the Supreme Court held that due process entitles welfare recipients to an evidentiary hearing before a State discontinues welfare benefits. 397 U.S. at 264. The Court further opined that, before the hearing, the State must provide "adequate notice detailing the reasons for the proposed termination." *Id*. at 267–68. It approved the notices that New York used when it terminated welfare benefits. *Id*. at 268.

The district court's reliance on *Goldberg* was misguided for two reasons.

*First*, *Arrington* and *Jordan* are on point and postdate *Goldberg*. The court was not free to ignore *Arrington* and *Jordan* and follow its own contrary interpretation of *Goldberg*.

*Second*, the district court misread *Goldberg*. It interpreted the word "detailing" to require disclosure of detailed, case-specific facts. Op. 219. But the very notices that New York provided to welfare recipients in 1970—and that *Goldberg* approved—did

32

*not* contain such information. Rather, the notices provided the reasons for termination in standardized language—as Florida's notices do. New York's standard descriptions were sufficient to *detail*—or to *specify*—the reasons for termination. So are Florida's.

The *Goldberg* plaintiffs argued at length that New York's notices provided only a "conclusory statement of the reason." Br. for Appellees at 5 (No. 69-62), 1969 WL 136924; *accord id.* at 3, 5–6, 31–32, 46. The district court agreed and criticized the "very summary form" of the notices as "incomprehensibly vague." *Kelly v. Wyman*, 294 F. Supp. 893, 904 (S.D.N.Y. 1968). Appendix C to the plaintiffs' brief contained New York's list of standard reasons. One example reads: "Employment or increased earnings of father residing in home as part of family unit . . . ." Br. for Appellees at 96 (No. 69-62), 1969 WL 136924.

The Supreme Court approved these stock notices, finding no deficiency in their "content or form." 397 U.S. at 268. The Court observed that recipients had another source of information as well: caseworker conferences. *Id.* The Court passed over in silence the plaintiffs' complaints that caseworkers often provided explanations that diverged from the explanations contained in their notices, Br. for Appellees at 3 (No. 69-62), 1969 WL 136924, or manifested "hostility, annoyance, or altercation," *id.* at 33.

33

*Goldberg* thus rejected the contention that notices must contain case-specific findings and calculations. It approved notices that, like Florida's, state the grounds of ineligibility in standard language.

### D.    The District Court Incorrectly Followed Out-of-Circuit Decisions That Did Not Apply the *Mullane* Standard.

Rather than follow *Arrington* and *Jordan*, the district court ultimately followed out-of-circuit decisions that applied the *Mathews* standard rather than the controlling *Mullane* standard. Op. 220–22. In *Arrington*, this Court cautioned against that precise mistake.

This Court has repeatedly held that *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)—not *Mathews v. Eldridge*, 424 U.S. 319 (1976)—furnishes the appropriate standard when a plaintiff challenges the sufficiency of a notice under procedural due process. *Dorman v. Aronofsky*, 36 F.4th 1306, 1315–16 (11th Cir. 2022); *Arrington*, 438 F.3d at 1349; *Grayden v. Rhodes*, 345 F.3d 1225, 1242–43 (11th Cir. 2003). The Supreme Court likewise applies *Mullane* and not *Mathews* when it determines the adequacy of notice. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002).

The *Mathews* standard requires a court to balance (i) the private interest that will be affected, (ii) the risk of an erroneous deprivation of that interest, (iii) any probable value of additional or substitute procedural safeguards, and (iv) the government's interest, including the burdens that those safeguards would entail. 424 U.S. at 335.

*Mullane*, in contrast, sets forth a "more straightforward test of reasonableness." *Dusenbery*, 534 U.S. at 167. Its specific purpose is to evaluate "the adequacy of the method used to give notice." *Id*. Under *Mullane*, a State's notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314.

In *Arrington*, this Court made clear that, when assessing the adequacy of notice, courts should not look to decisions that apply the *Mathews* standard. The *Arrington* plaintiffs relied on *Barnes v. Healy*, 980 F.2d 572 (9th Cir.1992), which presented the same question raised in *Arrington*: whether a State that recoups welfare benefits from child-support payments must provide case-specific details in its notice. *Arrington*, 438 F.3d at 1349 n.13. The Ninth Circuit applied the *Mathews* standard and held that due process requires California to provide "detailed explanations" of its handling of child-support payments. *Id*.

This Court refused to follow *Barnes*. *Id*. It explained that decisions that apply the *Mathews* standard have "little persuasive value." *Id*.

Here, the district court superficially acknowledged the *Mullane* standard, but it followed out-of-circuit decisions that, like *Barnes*, applied the *Mathews* standard and not *Mullane*. The cases on which the district court principally relied, *see* Op. 220–28, applied the *Mathews* standard. *See Kapps v. Wing*, 404 F.3d 105, 118 (2d Cir. 2005);

35

*Ortiz v. Eichler*, 794 F.2d 889, 893–94 n.4 (3d Cir. 1986); *Rodriguez v. Chen*, 985 F. Supp. 1189, 1194 (D. Ariz. 1996); *Schroeder v. Hegstrom*, 590 F. Supp. 121, 127 (D. Or. 1984). These cases therefore have "little persuasive value." *Arrington*, 438 F.3d at 1349 n.13.

The other two decisions that weighed heavily in the district court's due-process analysis—*Barry v. Lyon*, 834 F.3d 706 (6th Cir. 2016), and *Dilda v. Quern*, 612 F.2d 1055 (7th Cir. 1980)—did not even cite *Mullane*. *Barry* treated an earlier Sixth Circuit decision's *factual* description of certain notices as the articulation of a legal standard. *See* 834 F.3d at 719 (citing *Garrett v. Puett*, 707 F.2d 930, 931 (6th Cir. 1983)). *Dilda* relied on an earlier Seventh Circuit decision—*Banks v. Trainor*, 525 F.2d 837 (7th Cir. 1975)—that misread *Goldberg* in the same manner the district court did here. 612 F.2d at 1057. Finally, *Febus v. Gallant*, 866 F. Supp. 45, 46 (D. Mass. 1994), did not cite *Mullane* either—only a Second Circuit case that applied the *Mathews* standard.

In following decisions that apply the *Mathews* standard, the district court made the precise mistake this Court eschewed in *Arrington*: it relied on out-of-circuit cases with "little persuasive value." 438 F.3d at 1349 n.13. Bound by *Arrington* and *Jordan,* the district court had no discretion to pick and choose out-of-circuit cases that it found "persuasive in this context," Op. 231, but that conflict with this Court's precedents.

36

Tellingly, while it followed out-of-circuit *Mathews* decisions, the district court distinguished an out-of-circuit decision that, consistent with *Arrington* and *Jordan*, applied the *Mullane* standard.

In *Adams v. Harris*, 643 F.2d 995 (4th Cir. 1981), a plaintiff class challenged the adequacy of notices issued to applicants for social-security disability benefits. *Id.* at 996. When a claim was denied, a notice informed the applicant of the reasons for the denial and of the right to reconsideration. *Id.* After reconsideration, the challenged notice set forth the reasons for the denial in combinations of stock paragraphs. *Id.* at 996–97.

The plaintiffs complained that the challenged notices should have contained a "more detailed explanation" and did not provide case-specific reasons for the decision. *Id.* at 998. The court found the notices sufficient, however, explaining that the notices "distinguish between basic reasons for denial of claims." *Id.* at 998–99. Like this Court in *Arrington* and *Jordan*, the Fourth Circuit applied the *Mullane* standard and did not require case-specific information. The district court here was bound to do the same.

Instead, it incorrectly distinguished *Adams*. It reasoned that *Adams* concerned applicants rather than recipients who had already received benefits. Op. 225–26. As explained above, however, applicants, like recipients, have a property interest in stat-utorily defined benefits. Nor has this Court held that applicants, despite their property

37

interest, are entitled to less information than recipients are. Notably, the Fourth Circuit in *Adams* did not rely on any purported distinction between applicants and recipients.

**E.    The District Court's Reliance on Out-of-Circuit Decisions That Applied the *Mathews* Standard Was Consequential.**

*Mathews* and *Mullane* are two different standards designed to answer two different questions. *See supra* Part I.D. As a juxtaposition of *Barnes* and *Arrington* illustrates, the consequence of an incorrect choice between the two standards is significant.

*Barnes* and *Arrington* both concerned the same notices: notices provided when a State recoups welfare benefits from child-support payments. In both cases, the plaintiffs argued that the notice must enable custodial parents to determine the timing and accuracy of the State's disbursements. *Arrington*, 438 F.3d at 1349; *Barnes*, 980 F.2d at 575.

In *Barnes*, the Ninth Circuit applied *Mathews* and required California's notices to provide detailed, case-specific information. It first concluded that each notice must display the legal date of collection, which determined the calculation of pass-through payments. 980 F.2d at 578. This information had "great value" in reducing the risk of erroneous deprivation, while California failed under the *Mathews* standard to show a "significant administrative burden to outweigh the probable value" of this safeguard. *Id*. at 578–79.

The court also concluded that, when California does not make a pass-through payment, its notice must explain why. *Id*. at 579–80. Weighing the *Mathews* factors,

38

the court explained that the "administrative burden of providing an explanation" was "minimal in light of the added potential for spotting erroneously withheld payments." *Id*. at 579. The fact that a parent with questions could call for more information was irrelevant, since California bore "the burden of notice comporting with due process." *Id*.

The outcome in *Arrington* was starkly different. This Court applied the *Mullane* standard and concluded that Alabama's notices—which disclosed only the amounts collected, retained, and disbursed—were sufficient. 438 F.3d at 1350–51. Parents who had concerns or questions were free to call, write, fax, email, or visit an office. *Id*. at 1350. In contrast to the Ninth Circuit, this Court did not require Alabama to add case-specific details to its notices absent evidence of a significant administrative burden.

The district court incorrectly distinguished *Arrington* and *Jordan* (and *Adams*) and erroneously relied on *Goldberg* and out-of-circuit decisions with "little persuasive value." *Arrington*, 438 F.3d at 1349 n.13. Because *Arrington*'s and *Jordan*'s application to this case is direct and straightforward, this Court need not remand for further consideration by the district court. Rather, it should reverse to the extent the Injunction requires Florida's termination notices to display case-specific, individualized details.

## II.   THE DISTRICT COURT INCORRECTLY CONCLUDED THAT FLORIDA'S NOTICES DO NOT COMMUNICATE THE STATE'S INTENDED ACTION WITH SUFFICIENT CLARITY TO SATISFY DUE PROCESS.

Next, the district court concluded that Florida's notices do not communicate the State's intended action with sufficient clarity. Op. 207–18. The court reasoned that notices may contain multiple sections and discuss multiple programs and household members, that multiple individuals are sometimes grouped in one section, and that the section that communicates the State's intent to terminate Medicaid benefits appears last. *Id.* The court concluded that these "structural flaws" obscure even the most basic information: what the State intends do to (*i.e.*, terminate benefits), to whom the State's decision applies, and the reason for the termination (*i.e.*, income). Op. 217; Doc. 198 at 7 n.3.

The district court erred for three reasons. *First*, because the class-certification order did not identify the structural claim among the claims the court would decide on a class basis, the district court should not have considered the structural claim. *Second*, because the structure of the notices varies from notice to notice, the facts that support the court's finding of structural flaws are not common to all class members and do not establish a classwide injury or violation. *Third*, the notices communicate the State's decision with more than enough clarity to satisfy the minimum requirements of due process.

40

### A.     The District Court's Class-Certification Order Did Not Identify the Structural Claim as a Class Claim.

After the discovery period closed, and less than three months before the outset of trial, the district court rewrote Plaintiffs' proposed class definitions and certified a class and subclass. Doc. 122. Its class-certification order defined three questions for classwide resolution. None asked whether the structure of the notices causes general confusion or makes Florida's intent to terminate Medicaid benefits difficult to discern. The district court therefore erred when it decided that question on a classwide basis.

An order that certifies a class must define "the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B). It must include a "readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187–88 (3d Cir. 2006), *quoted in Drazen v. Pinto*, 106 F.4th 1302, 1336 (11th Cir. 2024); *accord* WILLIAM B. RUBENSTEIN, 3 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 7:26 (6th ed.) ("[A] court certifying a class suit [must] clearly define . . . the claims that will be encompassed by the action.").

Rule 23(c)(1)(B) recognizes that a class representative may assert some claims that satisfy Rule 23's requirements—and others that do not. *Simpson v. Dart*, 23 F.4th 706, 713 (7th Cir. 2022). The "class claims" are the "legal claims for which the class satisfies all of Rule 23's certification requirements." *Id*. A "claim" is the "aggregate of operative facts giving rise to a right enforceable by a court." BLACK'S LAW

41

DICTIONARY 281 (9th ed. 2009), *quoted in Doe v. Drummond Co.*, 782 F.3d 576, 586 (11th Cir. 2015).

A class-certification order must therefore provide a "full and clear articulation of the litigation's contours at the time of class certification." *Wachtel*, 453 F.3d at 186. This full and clear articulation of class claims "helps district courts, appellate courts, attorneys, and parties all proceed with more information and mutual understanding." *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 40 (1st Cir. 2009).

Here, the class-certification order identified only two class claims: whether the notices must include individualized findings and calculations (such as the recipient's income) and whether the notices adequately inform recipients of their hearing rights. *See* Doc. 122 at 64 ("Plaintiffs' claims and those of the class are based on the same practice—the uniform omission of certain types of information from the notices and the standard fair hearing language."); *id.* at 64–65 ("If Plaintiffs prevail in showing that individualized information is . . . required to be included in the notice, or that the fair hearing language is impermissible, then Plaintiffs and the members of the proposed class will have suffered the same legal injury from the same uniform practice.").

It also identified one subclass claim: whether the standardized reason code—or "Designated Reason"—printed on income-based termination notices must expressly reference income as the eligibility criterion the recipient failed. *Id.* at 39–40 ("[S]ome notices reflect an additional omission in the lack of a Designated Reason identifying

42

income as the basis for the ineligibility determination. As such, the Court finds it appropriate to certify a subclass encompassing individuals who received this form of notice.").

The court's class-certification order thus identified three questions—and only three questions—for resolution on a class or subclass basis. *Id*. at 57 n.18 ("Plaintiffs' claims are premised on their challenge to certain uniform practices—the omission of certain types of individualized information from termination notices, the reliance on Designated Reasons which do not identify any eligibility criteria, and the standardized fair hearing information."); *id*. at 63 ("If the uniform omission of individualized income information and the form language regarding fair hearings is unlawful as to Plaintiffs, it is unlawful as to the entire class and subclass. And if the use of broad Designated Reasons in the notices of termination that are based on income is unlawful as to Plaintiffs, it is unlawful as to the entire subclass." (citation omitted)); *see also id*. at 50, 52, 55–57, 68.

Whether the structure of the notices is confusing and renders Florida's decision difficult to discern was not among the class claims the court identified. This omission is the all more striking because the State urged the district court, if it grants the motion for class certification, to clearly define the issues to be decided on a class basis, Doc. 93 at 26–27, and the court's order repeatedly identified the same three claims. In fact, the court balked at Florida's request for clarity and considered it "unnecessary" to

"delineate the issues to be tried as class issues" beyond the three claims described above. Doc. 122 at 57 n.18.

Despite Rule 23(c)(1)(A), which requires courts to dispose of class-certification motions at "an early practicable time," the court ruled on class certification more than three weeks after the discovery period closed, eleven days after the parties disclosed their initial exhibit and witness lists, six days before the parties filed their Joint Pretrial Statement, and less than three months before trial commenced. *See* Doc. 72 at 2; Docs. 115, 116, 117, 122, 128, 142. The class-certification order was the final word on the claims to be resolved on a class basis, and the State relied on the order's definition of class claims as it prepared for trial and briefed the questions framed by the court. *See* Docs. 131, 174. Tellingly, in the lengthy pretrial briefs the parties filed only two weeks after the court issued its class-certification order, the parties did not brief the structural question decided by the court. *See* Docs. 131, 132. Plaintiffs raised that question six weeks after trial in a two-page section of their 166-page post-trial brief. Doc. 173 at 134–36.

The district court's classwide resolution of the structural claim contravenes the fairness principle that Rule 23(c)(1)(B) embodies. A court must confine its classwide determinations to the claims, issues, or defenses defined in its class-certification order. This Court should reverse to the extent the district court found, on a class basis, that

44

the structure of Florida's notices obscures Florida's intended action and thus violates due process.

> **B.      The Structural Claim Neither Satisfies Rule 23's Commonality Requirement Nor Reveals a Classwide Injury or Violation.**

The structural claim does not satisfy Rule 23's certification requirements. As the district court's own findings demonstrate, the length, structure, and complexity of each notice depends on the number of individuals in the household, the number of public-assistance programs in which those individuals participate, and the number of decisions the notice conveys. Because the structure of each notice is different, the notice structure does not present a common question or a classwide injury or violation.

To establish commonality, a plaintiff must identify a question that is common to the class. Fed. R. Civ. P. 23(a)(2). But not any common question will do. A common question will suffice only if it generates common answers that are likely to "drive the resolution of the litigation." *Wal-Mart Stores*, *Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The claims of class members must depend on a common contention that will resolve at once an issue "central to the validity" of each class member's claims, while dissimilarities within the proposed class can impede the generation of common answers. *Id*.

Here, the district court determined that the three class claims identified in its class-certification order satisfy commonality. For example, because the omission of case-specific findings or calculations (such as the recipient's income) was "uniform,"

45

the court concluded that commonality was satisfied. *See, e.g.*, Doc. 122 at 52, 59. Likewise, because the fair-hearing language on Florida's notices was "standardized," the court concluded that its sufficiency could be determined on a class basis. *See, e.g., id*. at 56–58. But the court did not consider whether the structural claim—which its class-certification order did not identify, *see supra* Part II.A.—satisfies commonality.

After trial, the district court concluded that various structural characteristics of Florida's notices cause confusion and obscure the State's intended action. The court observed that the challenged notices contain multiple sections, group multiple household members together, and display the Medicaid termination section last. Op. 208–12.

These structural characteristics vary from notice to notice. As the court recognized, a single notice communicates all actions taken with respect to each household member and each public-assistance program for which DCF determines eligibility, including food assistance and cash assistance. Op. 44 ¶ 110. The number of sections contained in a notice is therefore not uniform or standardized, but rather depends on the number of household members and the number of public-assistance programs in which those individuals participate. Thus, it is "possible," but not guaranteed, that an individual will receive a notice that draws from multiple notice templates. Op. 45 ¶ 113.

46

The court observed that a notice "may" contain more than one section entitled "Medicaid" or "Medically Needy." Op. 46 ¶ 115; *accord* Op. 208. But A.V.'s and K.H.'s notices contained only one "Medicaid" section each. Docs. 155-68, 155-90. Because A.V. has multiple siblings, her notice contained seven "Medically Needy" sections, Doc. 155-68, while K.H.'s notice contained only two, Doc. 155-90. K.H.'s notice contained a "Cash Assistance" section because he and his mother, Ms. Taylor, received cash assistance. Doc. 155-90. A.V.'s notice contained no sections related to programs besides Medicaid and Medically Needy. Doc. 155-68. K.H.'s notice refers to only two household members, Doc. 155-90, while A.V.'s refers to seven, Doc. 155-68.

The notices that Ms. Mezquita received were mistakenly divided into multiple notices and therefore are not reflective of the notices received by the class as a whole. Doc. 162 at 114:1–10; *see also* Docs. 155-98, 155-99, 155-105, 155-106. Apart from these erroneously formatted notices, the trial record contains only three notices[4] that communicated an income-based termination of Medicaid benefits—all of which were sent no later than June 2023. *See* Docs. 155-38, 155-68, 155-90. Even the three notices in this small sample differ widely in the number of sections, programs, and household members.

---

[4] The Injunction discusses some notices that are not income-based termination notices and therefore were not challenged in this case. *See*, *e.g.*, Op. 154–57 ¶¶ 452–61; Op. 164–68 ¶¶ 490–501; Op. 179–82 ¶¶ 543–50.

47

The district court's own findings recognize that the structural characteristics of notices vary from notice to notice. *See* Op. 210–11, 213 (finding that notices "may" or "often" contain certain features). For example, the district court recognized that, before Reason Code 241's placement on notices was automated, Florida expected its caseworkers to manually input Reason Code 241, which specifically refers to income, whenever a recipient was terminated for income. Op. 67–68 ¶¶ 166, 168. Nothing in the record indicates how often caseworkers failed to do so. The court therefore made only the limited finding that "Reason Code 241 does not *always* appear" in the notices, Op. 68 ¶ 169 (emphasis added)—a finding that does not begin to establish a classwide omission.

After trial, the parties stipulated that Florida had put into production a system enhancement designed to automate the display of Reason Code 241 on *all* income-based termination notices. Doc. 172; Op. 68 ¶¶ 170–71; Doc. 165 at 208:03–210:5, 261:13–17; Doc. 166 at 18:10–19:19, 88:25–89:3. By definition, the omission of Reason Code 241 is not—and never was—common to all class members' notices. A finding that some unknown number of class members received notices in the past that did not display Reason Code 241 does not prove a classwide injury or classwide violation.

As to the structural claim, the district court never found commonality, and its findings confirm that Plaintiffs did not establish a classwide injury or violation. Still, despite the variations in notice structure, the court made a classwide finding that the

"confusing structure of the document" obscures the decision to terminate benefits, the reason for that decision, and the individuals to whom the decision applies. Op. 238. Thus, the Injunction directs Florida to revise its notices to more clearly identify "the State's intent to terminate Medicaid benefits" and "the person or persons whose benefits will be terminated." Op. 271. The court has recognized that revisions to the notice structure are "more difficult" than "adding individualized details." Doc. 198 at 7 n.3.

Far from establishing a common question capable of classwide resolution, the trial record's small sample of income-based termination notices establishes significant variation in the structural elements of notices provided to class members. This Court should accordingly reverse the district court's classwide resolution of the structural claim.

## C.    The Notices Are Reasonably Calculated to Communicate Florida's Intended Action.

Even if the district court properly decided the structural claim on a classwide basis, its conclusion that Florida's notices do not communicate the State's intended action with sufficient clarity to satisfy due process is erroneous. The State's intended action is sufficiently clear to satisfy the minimum requirements of due process. In fact, Plaintiffs' own witnesses understood the State's decision when they read their notices.

Each notice that informs recipients of an income-based termination of Medicaid benefits begins with the following sentence: "The following is information about your eligibility." Doc. 155-38 at 1; Doc. 155-68 at 1; Doc. 155-90 at 1. That sentence alerts

49

recipients at the very outset that the notice contains important eligibility information.

Each notice that informs recipients of an income-based termination of Medicaid benefits contains a single Medicaid termination section entitled "Medicaid." Op. 52 ¶ 127. The section heading is bolded and underlined. Doc. 155-38 at 8; Doc. 155-68 at 5; Doc. 155-90 at 5. The first sentence under that prominent heading states: "Your Medicaid benefits for the person(s) listed below will end on" a date certain. Op. 52 ¶ 127. That sentence specifies the date on which benefits will end. Doc. 155-38 at 8; Doc. 155-68 at 5; Doc. 155-90 at 5. "This language indicates a termination decision." Op. 52 ¶ 127.

Immediately below that sentence, the notice names the individual or individuals whose benefits will end. Doc. 155-38 at 8; Doc. 155-68 at 5; Doc. 155-90 at 5. Thus, the notice clearly informs the recipient what will happen (*i.e.*, that benefits will end), when, and to whom.

Immediately below the names of the affected individuals, the notice displays the word "REASON" followed by a colon and, in standardized text, a reason for the termination of benefits. Doc. 155-38 at 8; Doc. 155-68 at 5–6; Doc. 155-90 at 5. When a recipient was terminated because of income, DCF's caseworkers were expected to input Reason Code 241, which generates the following text: "YOUR HOUSEHOLD INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM." Op. 67–68 ¶¶ 166, 168.

50

The court found that "Reason Code 241 does not always appear" in the notice. Op. 68 ¶ 169. But with only a small sample of income-based termination notices in evidence, the record does not reveal how often caseworkers did not input Reason Code 241. Reason Code 241's omission from *some* notices does not prove classwide effect. And as discussed below, even notices that did not include Reason Code 241 contained other standard text to explain that the recipient's income exceeded Medicaid's income limit.

Soon after trial, the parties stipulated that DCF had put into production a system change designed to display Reason Code 241 on all income-based termination notices. Doc. 172; Op. 68. Hari Kallumkal, the managing director at Deloitte Consulting who oversees operations, maintenance, and enhancements of the ACCESS Florida System, Op. 35 n.18; Doc. 165 at 204:9–205:7, testified at trial about Deloitte's work on the system enhancement to auto-generate Reason Code 241 when a recipient is terminated for income. Doc. 165 at 207:20–210:5; Doc. 166 at 18:10–19:19, 88:25–89:3, 92:10–14.

Recipients who are terminated from Medicaid for income are simultaneously enrolled in the Medically Needy Program. Op. 62 ¶ 155; Doc. 162 at 13:2–6, 180:3–8; Doc. 164 at 120:13–122:22. When this happens, the notice includes, in addition to a single Medicaid termination section, a "Medically Needy" section that informs the recipient of the recipient's enrollment in the Medically Needy Program. Op. 62 ¶ 155;

51

Doc. 164 at 122:23–123:5. The notice states: "We have reviewed your eligibility for full Medicaid benefits and have determined you are not eligible because your income exceeds the limit for Medicaid." Op. 62 ¶ 155; Doc. 164 at 132:24–133:22, 145:7–148:6; Doc. 155-38 at 3, 5; Doc. 155-68 at 3; Doc. 155-90 at 2. This sentence—which the district court called the "Income Exceeds Sentence," Op. 62 ¶ 155—also informs recipients that their Medicaid benefits will terminate because their income is too high.

Until April 2024, the Income Exceeds Sentence appeared immediately above the heading of the "Medically Needy" section that informed the recipient of his or her enrollment in the Medically Needy Program. Doc. 164 at 133:23–25, 145:7–18; Doc. 155-38 at 3, 5; Doc. 155-68 at 3; Doc. 155-90 at 2. Since April 2024, this sentence has been located immediately below the "Medically Needy" heading as that section's very first sentence. Op. 62 ¶ 156; Doc. 164 at 134:1–4, 145:7–146:9; Doc. 156-92 at 1.

The notice's "Medically Needy" section also contains an explanation of the Medically Needy Program. That explanation states in part: "Individuals enrolled in the Medically Needy Program have income or assets that exceed the limits for regular Medicaid." Doc. 164 at 135:3–12; Doc. 155-38 at 3, 5; Doc. 155-68 at 4; Doc. 155-90 at 3; Doc. 156-92 at 2. This sentence likewise communicates to recipients that their Medicaid benefits will be terminated because of income or assets. Doc. 164 at 135:13–17.

52

Publicly available information also explains that any person who is enrolled in the Medically Needy Program is not financially eligible for Medicaid. DCF's website states that the Medically Needy Program serves individuals "who are not eligible for 'full' Medicaid because of income or asset limits." Doc. 155-212 (PX-285 at 00:47–00:58); Doc. 165 at 13:14–14:8, 16:2–17:12. It provides a link to the Medically Needy Brochure, which explains that the program serves "individuals who would qualify for Medicaid except for having income that is too high." Doc. 165 at 14:15–15:24; Doc. 155-201 at 2. For purposes of notice, the public is charged with knowledge of a state agency's website and other publicly available information. *See Arrington*, 438 F.3d at 1350–53.

Since April 2024, the State's notices have explained that DCF's public website provides "information about Medicaid eligibility" and included a link to the website's Medicaid page. Doc. 164 at 144:8–24; Doc. 156-92 at 3. The notices provide multiple listings of DCF's call-center number, a link to DCF's office locations, and information about free legal services. Doc. 164 at 130:6–131:13, 139:22–140:17; Doc. 156-92 at 3.

The district court expressed concern that notices contain multiple sections, Op. 210, but it found that each notice contains *only one* section that terminates Medicaid benefits, Op. 52 ¶ 127. And while it expressed concern that the Medicaid termination section might list individuals to whom the termination decision does not apply, *id.*,

53

the court did not identify a single Medicaid termination section that listed individuals whom the State found eligible to receive Medicaid benefits after the termination date.

The district court observed that the Medicaid termination section appears "near the end" of the notice, only after what the court characterized as a "morass" of other information. Op. 209. But each section has a bolded and underlined heading, and the first sentence of the termination section—under the prominent heading "**Medicaid**"—states the decision. Op. 52 ¶ 127. Courts should not assume that recipients cannot use headings or read the entirety of a notice that affects "critical need-based benefits." Op. 230.

All class members who testified at trial *understood* from the notices that their Medicaid benefits were ending. Chianne D. understood her notice to mean that her and her daughter's benefits would end because of income. Op. 135 ¶ 389. She also knew *when* the benefits would end: "I would say it's pretty clear." Doc. 163 at 22:14–21. She understood the Income Exceeds Sentence to mean that her income was too high. Doc. 163 at 24:9–15. Having reported $70,000 in income on her tax returns for 2022, she never claimed that her income was below the limit. Doc. 163 at 25:11–13, 42:11–13, 46:21–23.

Likewise, Ms. Mezquita understood that her Medicaid benefits were about to end, and, while she did not read the entire notice, she believed that the decision was incorrect. Doc. 163 at 128:8–14, 161:12–162:13, 177:7–178:6. She understood the

Income Exceeds Sentence to mean that her income exceeded the limit. Doc. 163 at 161:12–23.

When Jennifer V. read her notice, she understood that A.V.'s Medicaid benefits would be terminated, but she assumed that, consistent with her past experience, A.V. would be enrolled in another program (KidCare). Doc. 163 at 73:10–74:25. Jennifer V. admitted that she only skims Florida's notices initially and then later reads them more thoroughly. Doc. 163 at 72:22–73:3. When she reread the notice, she "figured it out." Doc. 163 at 74:5–14. Jennifer V. understands the Income Exceeds Sentence to mean that she makes too much money for Medicaid. Doc. 163 at 110:18–24, 111:6–19.

Kimber Taylor provided conflicting testimony but *twice* clearly testified that, when she read her notice, she understood that her and her son's Medicaid benefits were about to end. Doc. 143 at 29:16–22, 30:13–18, 51:8–11. The court discounted these concessions because Ms. Taylor "was thirty-eight weeks pregnant" and "visibly tired and easily confused on the witness stand," Op. 150 n.51, but simultaneously credited broad swaths of testimony that Ms. Taylor provided in support of Plaintiffs' claims, Op. 149–57. Even if Ms. Taylor was confused, however, it does not matter. "The question is not whether a particular individual failed to understand the notice but whether the notice is reasonably calculated to apprise intended recipients, as a whole, of their rights." *Jordan*, 876 F.2d at 1459. The notice here easily meets that standard.

Florida's notices communicate the termination decision with more than enough clarity to satisfy due process. The notices plainly inform recipients that their Medicaid benefits will end on a date certain and that their income disqualifies them. Plaintiffs' witnesses understood as much. This Court should therefore reverse as to the structural claim.

## CONCLUSION

This Court should reverse the judgment below and remand with directions to enter judgment for Florida.

Dated April 17, 2026.                              Respectfully submitted,

                                                   /s/ *Andre Bardos*
                                                   Andy Bardos (FBN 822671)
                                                   James Timothy Moore, Jr. (FBN 70023)
                                                   Ashley H. Lukis (FBN 106391)
                                                   GRAYROBINSON, P.A.
                                                   301 South Bronough Street, Suite 600
                                                   Tallahassee, Florida 32301
                                                   Telephone: 850-577-9090
                                                   andy.bardos@gray-robinson.com
                                                   tim.moore@gray-robinson.com
                                                   ashley.lukis@gray-robinson.com
                                                   *Attorneys for Appellants*

56

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this document contains 13,000 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

/s/ *Andre Bardos*
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.