No. 26-10419-G

# United States Court of Appeals for the Eleventh Circuit

———————————

CHIANNE D., *ET AL.*,

*Plaintiffs-Appellees,*

v.

SECRETARY, FLORIDA AGENCY FOR
HEALTH CARE ADMINISTRATION, *ET AL.,*

*Defendants-Appellants.*

———————————

Appeal from the United States District Court
for the Middle District of Florida,
No. 3:23-cv-00985 (Howard, J.)

———————————

**RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES**

———————————

Sarah Grusin
Katy DeBriere
Amanda Avery
Jane Perkins
National Health Law Program
1512 E. Franklin St., Ste. 110
Chapel Hill, NC 27541
(919) 968-6308

Lynn Hearn
Florida Health Justice Project
581 N. Park Ave., #933
Apopka, FL 32712
(850) 778-8444

*Counsel for Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs concur oral argument is appropriate in this case given the importance of the issues.

**TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT...................................i

TABLE OF CONTENTS ........................................................................ii

TABLE OF CITATIONS .....................................................................iv

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE................................................................2

    A.   Medicaid and Medically Needy Eligibility ........................................2

    B.   Errors in Florida's Income-Eligibility Determinations ........................4

    C.   Florida's Medicaid Termination Notices.............................................5

    D.   Alternate Sources of Information.......................................................9

        i.    Call Center ...................................................................................9

        ii.   Family Resource Centers............................................................ 11

        iii.  Supervisory Review.................................................................... 12

        iv.  Other Publicly Available Materials.............................................. 13

    E.   The Effect of Florida's Medicaid Termination Notice Practices ......... 13

    F.   Procedural Posture............................................................................ 18

    G.   Standard of Review.......................................................................... 19

SUMMARY OF THE ARGUMENT......................................................... 21

ARGUMENT ...................................................................................... 23

    I.    The District Court Applied the Correct Standard to Decide the Required Content of Florida's Medicaid Notices............................... 23

        A.   The Court Applied the Correct "Accuracy" Standard, Following *Mullane*, as Clarified by *Goldberg*. ............................... 23

        B.   The Court's Analysis of Out-of-Circuit Cases Did Not Import a More Stringent Standard. ........................................... 27

        C.   *Arrington* and *Jordan* Do Not Establish a Different Standard. ......... 29

II.   The District Court Properly Applied the "Accuracy" Standard to Find Florida's Income-Based Medicaid Termination Notices Inadequate… 36

   A.   The Court Properly Concluded that Florida Must Disclose the Income Information Used so the Recipient can Detect and Correct Errors in Florida's Income-Based Decisions. ................................. 36

   B.   The District Court Did Not Clearly Err in Finding Case-Specific Income Information is Not Reliably Available from Any Source… 39

   C.   The District Court Did Not Clearly Err in Finding the Notices Do Not Clearly Convey the Decision to Terminate Medicaid. ............ 45

III.  Florida's Attacks on Class Are Unfounded. ...................................... 50

   A.   The District Court Satisfied Rule 23(c)(1)(B) by Certifying Plaintiffs' Single Due Process Claim, which Necessarily Includes the Question of Whether the Notices Clearly Communicate the Action. ............ 50

   B.   Even Assuming a Separate "Structural Claim" Had to Be Certified, It Would Satisfy Commonality. ................................................. 57

CONCLUSION.................................................................................... 60

CERTIFICATE OF COMPLIANCE ....................................................... 62

iii

# TABLE OF CITATIONS

**Page(s)**

## CASES

*Adams v. Harris,*
643 F.2d 995 (4th Cir. 1981)....................................................................32

*Anderson v. City of Bessemer,*
470 U.S. 564 (1985)..................................................................................19

*Anderson v. Garner,*
22 F. Supp. 2d 1379 (N.D. Ga. 1997)........................................................59

*\*Arrington v. Helms,*
438 F.3d 1336 (11th Cir. 2006).........................................21, 27, 29-35

*Atkins v. Parker,*
472 U.S. 115 (1985)..................................................................................30

*Barnes v. Healy,*
980 F.2d 572 (9th Cir. 1992).....................................................................29

*Barry v. Lyon,*
834 F.3d 706 (6th Cir. 2016).....................................................................27

*Bell v. Burson,*
402 U.S. 535 (1971)........................................................................... 24, 30

*Billington v. Underwood,*
613 F.2d 91 (5th Cir. 1980)................................................................ 24, 28

*Boddie v. Connecticut,*
401 U.S. 371 (1971)..................................................................................24

*Bonner v. City of Prichard,*
661 F.2d 1206 (11th Cir. 1981).................................................................28

*Brock v. Roadway Express, Inc.*,
  481 U.S. 252 (1987)...............................................................................24

*Cooper v. Harris*,
  581 U.S. 285 (2017)...............................................................................50

*Cox v. American Cast Iron Pipe Co.*,
  784 F.2d 1546 (11th Cir. 1986)..............................................................57

*DG ex rel. Stricklin v. Devaughn*,
  594 F.3d 1188, (10th Cir. 2010) ............................................................59

*Dilda v. Quern*,
  612 F.2d 1055 (7th Cir. 1980)................................................................27

*Dorman v. Aronofsky*,
  36 F.4th 1306 (11th Cir. 2022) ..............................................................30

*Drazen v. Pinto*,
  106 F.4th 1302 (11th Cir. 2024) ....................................................... 54, 57

*Ellis v. England*,
  432 F.3d 1321 (11th Cir. 2005)..............................................................34

*Febus v. Gallant*,
  866 F. Supp. 45 (D. Mass. 1994)....................................................... 27, 28

*Fuentes v. Shevin*,
  407 U.S. 67 (1972)........................................................................... 24, 37

*Gaines v. Hadi*,
  No. 06-60129-CIV, 2006 WL 6035742 (S.D. Fla. Jan. 30, 2006).................27

*Goldberg v. Kelly*,
  397 U.S. 254 (1970)................................................... 21, 23-29, 31-34

*Goss v. Lopez*,
  419 U.S. 565 (1975)..................................................................... 23, 31, 37

v

*Grayden v. Rhodes*,
   345 F.3d 1225 (11th Cir. 2003)..................................................29-31, 36, 45, 51

*Greene v. McElroy*,
   360 U.S. 474 (1959) ..................................................................................24

*Hamby v. Neel*,
   368 F.3d 549 (6th Cir. 2004)................................................................ 24, 27

*Henry v. Gross*,
   803 F.2d 757 (2d Cir. 1986)........................................................................27

*Hodges v. United States*,
   78 F.4th 1365 (11th Cir. 2023) ...................................................................19

*ICare Child Dev. Ctr. LLC v. Cicero-Brown*,
   No. 24-14186, 2026 WL 1693784 (11th Cir. June 11, 2026).........................31

*In re Pharm. Indus. Avg. Wholesale Price Litig.*,
   588 F.3d 24 (1st Cir. 2009) .......................................................................53

*Jordan v. Benefits Review Board of United States Department of Labor*,
   876 F.2d 1455 (11th Cir. 1989)..................................................21, 27-32, 34-36

*Kapps v. Wing,*
   404 F.3d 105 (2d Cir. 2005).......................................................................28

*Kelly v. Wyman*,
   294 F. Supp. 893 (S.D.N.Y. 1968)................................................................26

*Kilgo v. Bowman Transp., Inc.*,
   789 F.2d 859 (11th Cir. 1986)......................................................................54

*League of Women Voters, Inc. v. Fla. Sec'y of State*,
   66 F.4th 905 (11th Cir. 2023) ......................................................................43

*L.W. v. Comm'r of Ga. Dep't of Cmty. Health*,
   176 F.4th 635 (11th Cir. 2026) .....................................................................42

*Lubin v. Starbucks Corp.*,
122 F.4th 1314 (11th Cir. 2024) .................................................. 34, 52

*M.D. ex rel. Stukenberg v. Perry*,
675 F.3d 832 (5th Cir. 2012) .............................................................. 58-60

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........................................................ 21, 27-29, 31

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ....................................21, 23-30, 32, 33, 35, 39, 43, 52, 60

*Ortiz v. Eichler,*
794 F.2d 889 (3d Cir. 1986) ................................................................. 28

*Simpson v. Dart*,
23 F.4th 706 (7th Cir. 2022) ........................................................ 53, 57

*Smith v. Org. of Foster Fams. For Equal. & Reform*,
431 U.S. 816 (1977) ............................................................................. 24

*Soberal-Perez v. Heckler*,
717 F.2d 36 (2d Cir. 1983) ................................................................. 27

*Spaziano v. Singletary*,
36 F.3d 1028 (11th Cir. 1994) ........................................................... 19

*U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*,
583 U.S. 387 (2018) ............................................................................. 19

*U.S. v. Watkins*,
10 F.4th 1179 (11th Cir. 2021) .......................................................... 43

*Vargas v. Trainor*,
508 F.2d 485 (7th Cir. 1974) ............................................................. 27

*Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*,
453 F.3d 179 (3d Cir. 2006) ........................................................ 53, 57

vii

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ...................................................................................57

*Walters v. Nat'l Ass'n of Radiation Survivors*,
473 U.S. 305 (1985) ...................................................................................31

*Weinstein v. 440 Corp.*,
146 F.4th 1046 (11th Cir. 2025) ...............................................................49

*West Covina v. Perkins*,
525 U.S. 234 (1999) ...................................................................................29

*Williams v. Mohawk Indus., Inc.*,
568 F.3d 1350 (11th Cir. 2009) .................................................................57

*Wolff v. McDonnell*,
418 U.S. 539 (1974) .......................................................................... 23, 37

## CONSTITUTIONAL PROVISIONS

*U.S. Const., amend. XIV .............................................................. 1, 18, 51, 55

## RULES

Fed. R. Civ. P. 23 ................................................. 51-54, 56, 57, 59, 60
Fed. R. Civ. P. 56(e)..................................................................................34

## STATEMENT OF THE ISSUES

This case concerns whether the notices Florida sends to terminate an individual's Medicaid coverage based on income comply with due process. The district court held they do not and required Florida to amend its notices to (i) unambiguously state the State's intent to terminate Medicaid benefits, (ii) identify whose benefits will be terminated and, (iii) display four pieces of individualized income information necessary to assess the accuracy of the State's decision: countable income, income limit, eligibility category, and household size. Florida's issue (1) incorrectly claims the court also required the notices to display "calculations." Plaintiffs thus restate issue (1) in two parts:

1.a.    Whether due process requires Medicaid termination notices to provide sufficient detail to allow the recipient to assess the accuracy of the decision, and, if so,

1.b.    Whether the individualized income information is necessary to assess the accuracy of Florida's income eligibility decisions.

Florida's issues (2) and (3) incorrectly suggest the court identified a new "structural claim" after trial. But Plaintiffs advanced, and the court resolved, only one claim: a violation of due process under the Fourteenth Amendment. Thus, there is no issue to be resolved on appeal.

1

## STATEMENT OF THE CASE

### A.   Medicaid and Medically Needy Eligibility

Medicaid provides health coverage to low-income people. Op.10.[1] The Agency for Health Care Administration administers Florida's Medicaid program but delegates responsibility for eligibility determinations and notices to the Department of Children and Families (DCF) (collectively "Florida" or the "State"). Op.11, 34.

DCF distinguishes between "family-related Medicaid" and "SSI-related Medicaid." Op.14. This case involves the former, which covers the following eligibility categories: parents and caretakers, pregnant women, infants, and children. Op.14-15.

To assess Medicaid eligibility, DCF first evaluates whether an individual meets non-financial criteria such as citizenship, residency, and falling within a covered eligibility category. Op.15. An individual who meets these requirements is assessed for financial eligibility. Op.15.

To determine financial eligibility, DCF evaluates whether an individual's countable income is above or below the applicable income limit. Op.16-17.

---

[1] Op.__ refers to the Opinion under review, Doc. 186. Doc. __ refers to other district-court documents. Br.__ refers to Florida's opening brief. PX refers to Plaintiffs' Exhibits. The trial transcript is cited by volume, for example T(2) refers to volume 2. ECF __ refers to appellate court documents.

2

Computing an individual's countable income requires several calculations, including averaging fluctuating income, converting income into a monthly amount if it is received on a different frequency, and disregarding certain income. Op.18-20, 31. Although individuals report income information, Florida routinely relies on third-party data, which is often several months old and does not reflect the information needed to apply certain disregards. Op.29-30.

The applicable income limit varies by eligibility category and household size. Op.16. For some categories—children, pregnant, and postpartum enrollees—once income eligibility is established, individuals are entitled to 12 months of continuous coverage notwithstanding income fluctuations. Op.27-28.

All individuals found over-income are moved to a program called "Medically Needy." Op.25. Individuals in this program "do[] not receive Medicaid benefits unless and until the beneficiary incurs a certain amount of allowable medical expenses each month," referred to as a "share of cost." Op.26.

When determining eligibility, Florida relies on an outdated computer system, called FLORIDA. Op.33. Once income data is entered, FLORIDA automatically applies eligibility rules. Op.35-36. When FLORIDA finds an individual over-income for Medicaid, it proceeds with the Medically Needy assessment. Op.37. It deletes the budget calculation that was used to deny Medicaid, and once completed, only the Medically Needy budget screen is

saved. Op.37-38. While the household size and countable income are also shown on the Medically Needy screen, DCF cannot see the eligibility categories under which the individual's eligibility was assessed or the income limit used in the Medicaid decision. Op.37-38, 265.

## B.    Errors in Florida's Income-Eligibility Determinations

There is a "significant risk" of error when DCF determines Medicaid income eligibility. Op.254 n.89. Indeed, there are multiple "known recurring errors in the FLORIDA system." Op.244 n.85. One recurring error prematurely terminates continuous coverage for postpartum women before the 12-month eligibility period expires. Op.143, 151-52, 170. This error affected three of the Medicaid enrollees who testified at trial: Chianne D., Kimber Taylor, and Lily Mezquita. [2] *Id.* Another recurring error causes household members to be erroneously excluded from the household size, resulting in a lower income limit. Op.244 n.85. This error affected A.V., whose mother Jennifer V. testified at trial. Op.162. This is an incomplete list of errors; one State witness admitted "there are others," though he could not specify what they are. Op.244 n.85 (quoting T(2) at 92-93, 147-50).

---

[2] "For an unknown reason, the FLORIDA system" also prematurely terminated continuous coverage for Ms. Taylor's infant son, K.H. Op.152.

Caseworkers can also mistype income data, designate the wrong pay frequency, average pay incorrectly, rely on outdated, third-party data, or fail to apply income disregards. Op.29-32. Any of these errors can cause DCF to attribute excess income to an individual. *Id.* DCF incorrectly attributed excess income to Ms. Taylor, Ms. Mezquita, and A.V. causing them to be found over-income erroneously. Op.152, 162-63, 170-71.

## C.    Florida's Medicaid Termination Notices

When DCF finds someone ineligible for Medicaid based on income, it issues a notice of case action ("NOCA" or "notice"). Op.44. This is "the only communication that DCF affirmatively sends to a beneficiary to explain its decision." *Id*. Notices are automatically generated using templates and are not reviewed by any human prior to being sent. Op.44, 77.

The notices are constructed by combining different sections from the templates. Op.44-45. There are template sections for Medicaid approvals, denials, and terminations, as well as for Medically Needy approvals, and other need-based programs such as food and cash assistance. Op.45-46.

When someone is found over income for Medicaid, and moved to Medically Needy, the template splits the decision into two sections: a Medicaid termination section and a Medically Needy approval section. Op.52, 62. An individual losing Medicaid due to income will also receive a Medicaid *denial*

5

section whenever FLORIDA evaluates that individual for coverage in a different eligibility category than the one they are currently enrolled in (*e.g.*, a woman losing postpartum coverage who is tested for eligibility in the parent/caretaker category). Op.46, 49-52, 60, 210; Op.36 (FLORIDA evaluates each individual for all eligibility categories).

Although different sections may address different eligibility categories, DCF uses the same "Medicaid" heading without differentiation. Op.46-47. There are only two exceptions that name the category: "Medicaid for Unborn Babies" and "Medicaid for Newborn Babies." Op.47 n.21. Thus, the "reader cannot tell . . . that the identically titled sections actually refer to different Medicaid eligibility categories, much less which one." Op.47.

The notices also use the same "Medicaid" heading whether a section approves, denies, or terminates Medicaid coverage. Op.48-49. The notices do not explain how to distinguish between the sections, but denial sections appear earlier in the notice and include the word "ineligible" next to names on the list:

**Medicaid**

Your Medicaid application/review  dated April 21, 2023 is **denied** for the following months:

| Name | Apr, 2023 | May, 2023 | Jun, 2023 |
|---|---|---|---|
| S███ D███ | Ineligible | Ineligible | Ineligible |
| C███ D███ | Ineligible | Ineligible | Ineligible |
| Chianne D███ | Ineligible | Ineligible | Ineligible |
| Chandler D███ | Ineligible | Ineligible | Ineligible |

6

Op.48 (showing PX 40). The termination section is the last section in the notice, and it lists names underneath the phrase "Your Medicaid benefits for the person(s) listed below will end on" a date certain. Op.48-49, 52.

**Medicaid**

Your Medicaid benefits for the person(s) listed below will end on May 31, 2023.

**Name**

C███████ D███████

Chianne D███████

Chandler D███████

Op.52 (showing PX 40).

Within any given section, the names listed underneath are not necessarily limited to the individual whose eligibility was evaluated in that section. Op.49-50. "Individuals are routinely included in sections of the NOCA that do not pertain to them." Op.209. This is true for denial and termination sections. Op.49, 52, 210. The list of names in each section is "seemingly random," and the notices do not explain how to interpret the groupings. Op.49-50, 208-09. In fact, DCF does not know how the groupings are constructed. *Id.*

Florida's notices also rely on standardized "Designated Reasons" or "reason codes" to convey "why DCF is taking a particular action." Op.56. Each section may contain up to three codes. Op.54-55. Caseworkers "don't really receive a lot of training" beyond where to find the list of reason codes. Op.55.

7

Nor does Florida "engage in any regular monitoring or review of notices to ensure that case workers are using appropriate reason codes." Op.77.

In Medicaid income termination notices, Florida permits reason codes that "do not inform the reader that financial ineligibility is the reason for the State's decision and often affirmatively mislead the reader." Op.211. One code states "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM"; another, "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP." Op.69-71, 73-75, 211-12, 212 n.68.

Only one code (241) is specific to income. Op.67. It reads: "YOUR HOUSEHOLD INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM." Op.67. But it "does not always appear" in an income termination notice. Op.67-68. Post-trial, DCF endeavored to automate Reason Code 241. Op.68-69. But there is "no evidence" this "is functioning as intended." *Id.* Previously, DCF had similarly asserted this code was "populated by the system whenever it" finds someone over-income, but it was not. Op.67-68. The post-trial change did not prevent caseworkers from adding other misleading reason codes with code 241. Op.212-13.

8

The notice template automatically populates legal citations based on the reason codes included in the notice. These citations often reference "irrelevant or unhelpful legal authority." Op.213-14. For example, the citation paired with code 241 "concerns Temporary Cash Assistance, not Medicaid." Op.58.

### D.    Alternate Sources of Information

The notices do not contain the countable income, household size, eligibility category, or applicable income limit (collectively "income information"). Op.57. Individuals must contact DCF for this information. Op.232.

### i.    Call Center

"[O]btaining assistance through the call center is challenging at best." Op.97. "[T]he call center receives far more calls with requests for live agents than it is equipped to handle." Op.100. In April 2024 (the most recent month with complete data), of the 1.38 million calls asking to speak with a live agent, only 32% succeeded. Op.100. Over half were blocked—that is, disconnected instead of being placed on hold. Op.92.

Of calls placed on hold, 30 to 40% are abandoned each month. Op.93. The average wait time in April 2024 was 20 minutes. Op.91. Individual wait times can be significantly longer. Op.91, 100. The average wait times do not include transfer wait times. Op.91. Transfers are necessary for income questions,

because only the more experienced "Tier 3" agents or supervisors may answer them. Op.85-86.

Callers that reach an agent "likely receive confusing, inaccurate, incomplete, or contradictory information from call center agents on a regular basis." Op.98. Even Tier 3 agents are not trained "eligibility specialists" who can make eligibility determinations. Op.86, 130 n.45. Agents do not have scripts to rely on and—because the Medicaid budget screen is deleted—they must navigate an outdated computer system to re-create eligibility decisions under significant time pressure. Op.95 n.42, n.43. Mr. Ramil, a community advocate with extensive experience calling the call center, has learned to use "specific language," asking for the "income budget," to obtain income information. Op.99. His clients, however, have different experiences and can "come out more confused than they are going in." Op.98. As a result, he does not advise individuals to contact the call center. *Id.*

Audio recorded calls revealed "egregious errors," including an agent telling Chianne D. her infant son was losing coverage when he was not, several agents and a supervisor failing to recognize Chianne D. (who had an infant son) was eligible for postpartum coverage, a supervisor providing wrong information about share-of-cost calculations, agents identifying the wrong eligibility group for Ms. Mezquita and twice misstating the income standards, and an agent

misstating the rules about continuous coverage. Op.98-99, 130 n.45, 234 n.81. Several of these errors were committed by supervisors directly or despite the agent "conferring with her 'support queue' for assistance." Op.99. Errors like these "are very likely common occurrences." Op.234 n.81.

### ii.    Family Resource Centers

"[A]side from the call center, a Family Resource Center is the only other source an individual can turn to for information directly from DCF about his or her specific case." Op.105. There are approximately 40 Centers "throughout the entire state of Florida," open weekdays from 8 a.m. to 5 p.m. Op.105-06. Each Center has at least one employee to answer case questions, but they receive shorter training than call center agents. Op.106-07.

The notices link to the Center locations but say only that the Centers can "help completing your review online." Op.105. The Family Resource Center webpage "does not mention Medicaid." *Id.* Florida does not "advise enrollees to visit a Family Resource Center for assistance interpreting a NOCA or for more information." Op.233. Each month, 105,000 customers from all DCF programs, not just Medicaid, visit Family Resource Centers. Op.107, T(5) at 197:7-23. Across all programs, only 23% inquire about case status. Op.107.

### iii.   Supervisory Review

Supervisory Review occurs after an individual affirmatively requests a fair hearing. Op.115, 232 n.80. This "comes too late in the process to provide the enrollee with the information she needs to decide whether to appeal." Op.232 n.80. When this case was filed, notices warned enrollees they "will" have to repay benefits if they lose. Op.64. "This was not and is not an accurate statement of DCF policy," and it "discourag[es] individuals from appealing a decision they do not understand." Op.64, 232 n.80. Florida did change "will" to "may" in October 2023, and then, in April 2024, to "you will not be responsible to repay benefits unless we find that you engaged in fraud or an intentional program violation." Op.64-66.

Even now, however, Florida threatens that individuals will have to repay benefits in several places: (i) the "Rights and Responsibilities" document all applicants must acknowledge and that is displayed every time a user logs into their online account, (ii) the online account help center, (iii) the notice DCF sends to confirm a fair hearing request, and (iv) DCF's Policy Manual and ESS Statewide Fair Hearing Procedural Guide, which instruct supervisors, during the Supervisory Review, to inform recipients they will be liable for overpayments if they lose. Op.113-14.

### iv.    Other Publicly Available Materials

Florida's "other sources of general Medicaid eligibility information . . . are flawed in numerous ways." Op.236 n.82. The primary source for income limits is Appendix A-7 of DCF's Policy Manual. Op.16. Appendix A-7 is not "self-explanatory." Op.22 n.15. The Manual itself is "very difficult, if not impossible, for a lay person to decipher." Op.104. Mr. Ramil required several months and help from colleagues to understand these materials. Op.104. Moreover, "none of the publicly available resources fully and coherently explain how to calculate an enrollee's [countable income] and apply it to Appendix A-7." Op.236 n.82.

Other publicly available sources are "inaccurate or inapplicable," and "at times they are contradictory or misleading." *Id.* Remarkably, "the Florida Statutes and Administrative Code are not always consistent with each other or current policy"; for example, certain income standards in the Florida Administrative Code do not match Appendix A-7. Op.108-09.

### E.    The Effect of Florida's Medicaid Termination Notice Practices

The notice template produces "what appear to be contradictory determinations," requiring individuals to guess at "what portions of the NOCA convey pertinent information and what statements the reader should disregard." Op.210, 214. Notices include reason codes and legal citations that mislead

13

individuals and undermine the effectiveness of publicly available resources. Op.211-13. "The pertinent information that is provided is buried and obscured." Op.238. "[T]he State has had notice of concerns regarding the vague and confusing nature of the NOCAs since at least 2018." Op.252 n.88; Op.47.

At trial, the notices confused DCF's own witnesses. Op.51 n.24, 215, 268. Call recordings revealed call center agents misinterpreting the notices. Op.130 n.45. The court itself was confused by the notices. Op.268. And each enrollee witness at trial received "[v]ague, convoluted, and misleading" notices. Op.124. Each was harmed in concrete ways. Op.144, 154, 166, 178-79.

*Chianne D.* DCF terminated Chianne D.'s and her two-year-old daughter's coverage when Chianne D. was 4-months postpartum. Op.125. "Nothing in the NOCA informed Chianne D. that DCF had terminated her postpartum continuous coverage" or that it had evaluated her under a different eligibility category. Op.143; PX 40. Chianne called DCF's call center six times but received conflicting information. Op.126-41. The first agent assured her she and her daughter were *not* losing coverage. Op.126. Later, a Tier 3 agent correctly said she and her daughter were losing coverage, but incorrectly said her infant son, S.D., was losing coverage as well. Op.129-30, 132. After a fifth call, Chianne submitted a fair hearing request. Op.142. But once her daughter obtained other coverage, she withdrew her hearing request without identifying

14

or correcting the error in her own coverage. Op.142-43.

***Kimber Taylor***. DCF terminated Kimber Taylor's and her son, K.H.'s coverage mere weeks after K.H. was born. Op.146-47. Both were eligible for continuous coverage. Op.152. DCF also relied on outdated, third-party data rather than credit Ms. Taylor's report of zero income while on unpaid leave. Op.151-52. Her notice contained none of this information, and Ms. Taylor was confused. Op.151-52. The notice had multiple sections and two Designated Reasons: (1) "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM"; and (2) "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP." Op.147-48; PX 112. A call center agent said, "her income level was too high," but did not provide the income limits for her and K.H., the income attributed to her, her household size, or the eligibility categories used. Op.150. Had the notice "reflected the State's determination of her countable income, Taylor could have readily identified this error." Op.196-97 n.58. Without that information, she declined to pursue a fair hearing, worrying "she would have to pay back benefits if she lost." Op.151.

***A.V.*** DCF issued a notice terminating two-year-old A.V.'s coverage that contained seven Medically Needy sections and one Medicaid section. Op.159. The Medicaid section is a termination section with seven names, including

A.V.'s mother, father, and siblings, with the Designated Reason "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP." Op.160; PX 81. When Jennifer V. read the notice, "she understood it to mean that DCF was changing the amount of their Medically Needy share of cost." Op.160. She did not initially see where the notice was terminating A.V.'s Medicaid, but eventually "she figured it out." Op.160-61. Even then, she thought DCF was transferring A.V. to another insurance affordability program, KidCare. Op.161. She found the notice "redundant and confusing." Op.161. She called DCF "two or three times," experienced "long hold times—at least forty-five minutes—as well as dropped calls," and "did not succeed in talking to a person." Op.161.

Florida's witness, Mr. Roberts, "could not determine why DCF found A.V. ineligible for Medicaid based on her family's income by looking at the [notice], [online] account, or the DCF website." Op.163. The actual reasons— undisclosed to Jennifer V.—were that Florida used (1) the wrong household size; and (2) outdated, third-party data, attributing $1,730 more in earned income than the household reported. Op.162-63. Including the household size and countable income in the notice "may have allowed Jennifer V. to realize the State had made an error." Op.196-97 n.58. Instead, A.V. went without coverage

16

for months and Jennifer V. used credit cards to pay for A.V.'s medical care and skipped a screening and vaccination because of cost. Op.164.

*Lily Mezquita.* DCF terminated 10-year-old G.M.'s Medicaid in May 2023. His mother, Lily Mezquita, questioned the decision, but when she "visited a DCF office in person," the staff "confirmed that G.M. was ineligible, although they did not provide clarification on the decision." Op.169. She "accepted the finding." Op.169. DCF then terminated Ms. Mezquita's Medicaid in July 2023 when she was seven months pregnant. Op.170-71. DCF sent two notices. One contained a single Medicaid section stating her Medicaid (and that of her son, G.M., and her husband Jimardo, who also was not receiving coverage at the time) would end on July 31, 2023. Op.171-72. The Designated Reason is "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM." Op.172. Income is not mentioned. *Id.* Ms. Mezquita "had no idea what the stated Designated Reason meant and did not know from what other program she was purportedly receiving assistance." Op.172.

Ms. Mezquita's second notice mentioned income, but in a section denying coverage for two prior months when she had, in fact, been receiving Medicaid. Op.172-73. Ms. Mezquita was "[c]onfused, scared, and desperate to find out or fix it because [she] was so far along in [her] pregnancy." Op.176 (quoting T(3) at 130). She called the call center seven times in one day and, due to wait times,

17

two calls lasted over two hours. Op.176. Another time, she was advised to call back the next day because "there was no supervisor available." Op.177-78. When she finally did get through, the information provided was "astounding in its inaccuracies." Op.99.

Ms. Mezquita eventually filed a fair hearing request with counsel's assistance. Op.178-79. The hearing request did not challenge G.M.'s termination because she had accepted DCF's decision. Op.178-79. Although Ms. Mezquita requested coverage pending her appeal, DCF terminated her coverage. Op.179. During her lapse in coverage, she experienced preterm labor and paid for medications out-of-pocket. Op.179. DCF later corrected Ms. Mezquita's coverage and re-evaluated her income using previously ignored pay stubs, finding G.M. had been eligible all along. Op.179. In October 2023 and March 2024, DCF once again sent Ms. Mezquita termination notices even though she should have remained continuously eligible through September 2024. Op.179-88, 180-181.

### F.    Procedural Posture

Plaintiffs filed this action in 2023 alleging Florida's notices violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the Medicaid Act. Doc. 1. Plaintiffs moved for a preliminary injunction and class certification. Doc. 2, 3. The court denied the preliminary injunction and

certified a class and subclass. Doc. 62, Doc. 122.

The district court conducted a six-day bench trial, after which, Plaintiffs withdrew their Medicaid Act claim. Op.2-3, n.1. In January 2026, the court issued a decision resolving Plaintiffs' single, remaining due process claim and entered judgment for Plaintiffs. Op.273; Doc. 187. Florida appealed that final decision and sought a stay, which this Court denied. ECF 1, ECF 23.

## G.    Standard of Review

A district court's factual findings following a bench trial are reviewed for clear error. *See, e.g.*, *Hodges v. United States*, 78 F.4th 1365, 1374 (11th Cir. 2023). This standard applies to facts drawn from testimony, documents, and inferences. *Spaziano v. Singletary*, 36 F.3d 1028, 1032 (11th Cir. 1994) (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)). A factual finding is clearly erroneous only "if, after viewing all the evidence, [the court is] left with the definite and firm conviction that a mistake has been committed." *Hodges*, 78 F.4th at 1374 (quote omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Spaziano,* 36 F.3d at 1032 (quote omitted). The district court's conclusions of law are reviewed *de novo*, *Hodges*, 78 F.4th at 1374, as are mixed questions of law and fact, *U.S. Bank Nat'l Ass'n v.*

*Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 n.4 (2018).

Here, for example, the court's determinations that Medicaid enrollees, call center agents, and State witnesses at trial were all confused by the notices are factual findings reviewed for clear error. The court's conclusion that these confusing notices are not "reasonably calculated under all the circumstances" is reviewed *de novo*.

**SUMMARY OF THE ARGUMENT**

In resolving Plaintiffs' single due process claim, the district court properly concluded Florida's Medicaid termination notices are "fundamentally insufficient to satisfy the requirements of due process," because they neither apprise individuals of "the State's ultimate decision" or the "reasons for that decision." Op.268-69. Florida's assertions of error rely on misreading the governing law and ignoring the court's meticulous factual findings. This Court should affirm.

1. The district court applied the correct standard to evaluate the content of the notices. Following *Mullane* and *Goldberg*, the court asked whether they include sufficient information to assess the accuracy of the State's decision. The out-of-circuit cases the court cited apply *Goldberg*, not *Mathews*, and the court did not unwittingly import a different standard. Nor does this Court's approval of other notices in other circumstances, in *Arrington* and *Jordan*, establish a different standard; rather, each supports the "accuracy" standard the court applied.

2. The district court correctly applied the accuracy standard to the circumstances of this case. First, the court concluded that, to assess whether a Medicaid income eligibility decision is accurate, notices must disclose the income information DCF used. This conclusion is supported by robust fact-finding regarding how DCF determines Medicaid eligibility and the prevalence

21

of errors—findings Florida does not challenge. The court's conclusion that the required information is unavailable to Medicaid enrollees, even through the call center, Family Resource Centers, or Supervisory Review, is amply supported by the record. Florida's quibbles with isolated data points are unfounded, ignore countervailing evidence, and fail to meet the high bar for reversing factual findings.

3. Florida's final assertion of error relies on inventing a "structural claim" that does not exist. Whether notices clearly communicate the action is part and parcel of the due process claim the court certified. And Florida was—or should have been—aware the trial would address its persistent refusal to fix known problems with the notices' structure. Even if Florida's complaints were viable, they would warrant only remand for the district court to belabor why Florida's uniform inaction would satisfy commonality.

## ARGUMENT

**I.    The District Court Applied the Correct Standard to Decide the Required Content of Florida's Medicaid Notices.**

**A.    The Court Applied the Correct "Accuracy" Standard, Following *Mullane*, as Clarified by *Goldberg*.**

In deciding the required content for Florida's notices, the court applied the following standard: whether the enrollee has "sufficient information to evaluate the accuracy of the State's decision and make an informed decision whether to challenge it." Op.227. That is the correct standard under both *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) and *Goldberg v. Kelly*, 397 U.S. 254 (1970).

*Mullane* requires notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. at 314. To meet this standard, the notice must "reasonably . . . convey the required information," such that an individual "can choose for himself whether to appear or default, acquiesce or contest." *Id.* This is the fundamental purpose of a notice. *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 583 (1975) ("requiring effective notice" is necessary to "provide a meaningful hedge against erroneous action."); *Wolff v. McDonnell*, 418 U.S. 539, 564 (1974) ("Part of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges

23

are, in fact."); *Greene v. McElroy*, 360 U.S. 474, 496 (1959) (where "the action depends on fact findings, the evidence used to prove the Government's case must be disclosed"); *Billington v. Underwood*, 613 F.2d 91, 94 (5th Cir. 1980) (notice "must be sufficiently specific for it to enable an applicant to prepare rebuttal evidence"). Otherwise, the right to a hearing "has little reality or worth." *Mullane*, 339 U.S. at 314.

*Mullane* articulates the framework. However, it evaluated the adequacy of notice by publication to trustees of common trust funds and did not specify the required content of income-based Medicaid termination notices. Thus, the district court turned to *Goldberg*, which, like this case, addresses notices terminating critical, need-based public benefits. Op.219. The court properly read *Goldberg* as an application of *Mullane*'s flexible due process standard. *See, e.g.*, *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 261 (1987) (citing *Goldberg* and *Mullane* in discussion of standard for determining "what process is due"); *Smith v. Org. of Foster Fams. For Equal. & Reform*, 431 U.S. 816, 848 (1977) (confirming *Mullane* requires a hearing "appropriate to the nature of the case," and citing *Goldberg* as a specific example); *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972) (citing *Goldberg* as example of *Mullane*'s principle that due process "tolerates variances."); *Bell v. Burson*, 402 U.S. 535, 542 (1971) (same); *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (same); *Hamby v. Neel*, 368 F.3d 549, 560 (6th Cir.

2004) (*Goldberg* "further clarified" the *Mullane* standard as applied to need-based benefit termination notices).

*Goldberg* held that, prior to terminating public benefits, due process requires "timely and adequate notice detailing the reasons for a proposed termination." 397 U.S. at 267-68. There are numerous indicia that *Goldberg* requires case-specific information beyond the word "detail." *Contra* Br.32. For example, *Goldberg* held notice must allow an individual to challenge a decision as "resting on incorrect or misleading factual premises or on misapplication of rules . . . to the facts of particular cases." 397 U.S. at 267-68. Certainly, it would be impossible to mount such a challenge without disclosing the specific factual premises the state relied on. *Id*. Moreover, *Goldberg* approved use of "both a letter and a personal conference with a caseworker," during which the recipient was "evidently told the legal and factual bases for the Department's doubts," and "the precise questions raised about his continued eligibility." *Id.* at 266, 268. Notably, the personal conference was mandatory, and it occurred *prior to* the written notice. *Id.* at 258. The Court concluded this "combination" was effective. *Id.* at 268; *see also* Op.233-34 n.80.

Florida's notices do not line up with those in *Goldberg*. Florida ignores the mandatory personal conference and compares the written notices in isolation. Br.33. There is no indication *Goldberg* would have approved the written notices

25

alone.[3] In fact, the three-judge district court decision, affirmed by the Court, was explicit it did not: "the very summary form of notice of proposed terminations makes an intelligent reply difficult," and something more was necessary "to inform [the recipient] of the evidence on which" the decision is based. *Kelly v. Wyman*, 294 F. Supp. 893, 904 (S.D.N.Y. 1968). The district court squarely rejected an alternate procedure which "merely provides for notice'" absent the mandatory personal conference, because it "clearly falls far short of giving the recipient sufficient notice of the case against him so that he may ascertain its basis and contest it effectively." *Id.*

Thus, *Goldberg* clarifies that before terminating critical need-based benefits, due process demands the State must—through some method—inform the individual of the legal and factual bases for the decision in "his case" with sufficient specificity so the individual can effectively challenge the decision. 397 U.S. at 267-68. In asking whether the enrollee has sufficient information to evaluate the accuracy of the State's Medicaid termination decision, the district court correctly articulated the *Mullane/Goldberg* standard. Op.227.

---

[3] Nor did the Supreme Court credit plaintiffs' factual allegations concerning the caseworker conferences. *Contra* Br.33. It stated those conferences "evidently" supplied the precise questions about the recipient's eligibility. *Goldberg*, 397 U.S. at 268. Here, the district court found, conversely, the "evidence establishes" the additional sources do not reliably provide the necessary information. Op.232-33; *infra* pp. 39-45.

26

**B.    The Court's Analysis of Out-of-Circuit Cases Did Not Import a More Stringent Standard.**

Florida observes that in *Arrington v. Helms*, 438 F.3d 1336 (11th Cir. 2006), this Court specified that *Mullane*, not *Mathews v. Eldridge*, 424 U.S. 319 (1976), sets the standard for notice cases. Br.34. So far, so good. But Florida then asserts that, by citing out-of-circuit cases, the district court somehow imported the *Mathews* test. *Id.* This blatantly mischaracterizes the opinion. The court explicitly "returns to the *Mullane* standard," when evaluating the notice content and explained the cited cases are persuasive because they "apply[] *Goldberg*" to circumstances similar to this case. Op.218, 226-27.

Indeed, a review of the cited cases refutes Florida's claim that the court "follow[ed] decisions that apply the *Mathews* standard." Br.36. Half do not cite *Mathews* at all. *See Barry v. Lyon*, 834 F.3d 706 (6th Cir. 2016);[4] *Dilda v. Quern*, 612 F.2d 1055 (7th Cir. 1980); *Vargas v. Trainor*, 508 F.2d 485 (7th Cir. 1974); *Gaines v. Hadi*, No. 06-60129-CIV, 2006 WL 6035742 (S.D. Fla. Jan. 30, 2006); *Febus v. Gallant*, 866 F. Supp. 45 (D. Mass. 1994).[5]

---

[4] In fact, the Sixth Circuit applies *Mullane* as "clarified" by *Goldberg*. *Hamby*, 368 F.3d at 560.

[5] Florida criticizes *Febus* for citing *Henry v. Gross*, 803 F.2d 757 (2d Cir. 1986), which in turn cites *Mathews*. This attenuated chain does not mean the district court imported the wrong test. *Jordan v. Benefits Review Board of United States Department of Labor*, 876 F.2d 1455, 1460 (11th Cir. 1989), for example, cites a Second Circuit decision, *Soberal-Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir. 1983),

27

Others cite *Mathews* without applying its balancing test to the content of the notice. *Billington*—which is binding precedent[6]—cites *Mathews'* ultimate conclusion approving procedures where "the information relevant to the entitlement decision is identified with particularity and the disability recipient's representative is allowed full access to all information relied upon by the state." 613 F.2d at 94.

*Kapps v. Wing* relied on *Goldberg* when evaluating the notice content, concluding recipients must "be afforded enough information to understand the basis for the agency's action." 404 F.3d 105, 124 (2d Cir. 2005). It turned to *Mathews* only to evaluate the method of delivery, and observed, consistent with *Mullane*, that "the specific type of notice required will vary depending on the circumstances of each given case." *Id*. *Ortiz v. Eichler* too relies primarily on *Goldberg* because it concerns "claimants facing termination of public assistance benefits." 794 F.2d 889, 893 (3d Cir. 1986). It discusses *Mathews* only in a footnote to rebuff defendants' administrative burden complaints. *Id.* at 893 n.4.

---

that applies the *Mathews* test, but Florida insists *Jordan*'s approach is distinct. Regardless, *Febus* does not discuss the *Mathews* factors, framing the question instead as *Mullane* does: whether notice provides an "adequate basis to contest" the decision. 866 F. Supp. at 46.

[6] *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all former Fifth Circuit decisions prior to September 30, 1981).

Because the district court did not import the *Mathews* test, Florida's extended analysis of the differences between *Mathews* and *Mullane* as applied in *Barnes v. Healy*, 980 F.2d 572 (9th Cir. 1992) and *Arrington* is immaterial. Br.38-39.

### C.    *Arrington* and *Jordan* Do Not Establish a Different Standard.

Florida never explains why the district court's *Mullane/Goldberg* accuracy standard is wrong or what other purpose constitutionally required notice would serve. Instead, it argues that because this Court approved similar, standardized notices in *Arrington* and *Jordan* the district court was "bound to do the same." Br.37. Not so. First, those cases address different circumstances: *Arrington* concerned child support payment notices. *Jordan* concerned Black Lung Benefit denial notices. Second, a correct reading of *Arrington* and *Jordan* confirms the notices here are not, in fact, similar and the "accuracy" standard is the right one.

1. Under *Mullane*'s circumstance-driven test, the outcome of a prior case is not controlling when, as here, cases address different circumstances. Indeed, this Court has squarely rejected the argument that a prior case approving a similar form of notice "compels" the same outcome in a later case. *Grayden v. Rhodes*, 345 F.3d 1225, 1242-44 (11th Cir. 2003) (observing the decision "may, at first glance, appear to conflict with the Supreme Court's reasoning in *West Covina* [*v. Perkins*, 525 U.S. 234 (1999)]" but was proper under *Mullane* "given the circumstances.").

*Grayden* is no anomaly. Case after case confirms approval of notice in one context does not automatically extend to others. *See, e.g.*, *Atkins v. Parker*, 472 U.S. 115, 131 n.35 (1985) (while standardized notice could communicate a change from recently enacted legislation, "[t]his, of course, would be a different case if the reductions were based on changes in individual circumstances, or . . . individual factual determinations."); *Bell*, 402 U.S. at 540 ("A procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case."); *Dorman v. Aronofsky*, 36 F.4th 1306, 1317-18 (11th Cir. 2022) (approving notice by publication on prison kiosk notwithstanding *Mullane*'s rejection of notice by publication "because the circumstances here are very different."); *Arrington*, 438 F.3d at 1351-53, n.16. (approving non-individualized notice of remedial procedures, notwithstanding *Grayden*'s requiring individualized notice, and observing that "individualized notice" may be "mandated" in other circumstances). Given the different circumstances, the district court was not bound to approve Florida's notices even if they were similar to those approved in *Arrington* and *Jordan*.

Florida suggests when notice content is at issue, *Mullane*'s command to consider "all circumstances" somehow excludes consideration of the type of benefits and, in any event, that Medicaid benefits are similar to the benefits at issue in *Arrington* and *Jordan*. Br.18, 29-30. Neither suggestion is accurate. "[T]he

timing *and content* of the notice . . . will depend on appropriate accommodation of the competing interests involved." *Goss*, 419 U.S. at 579 (emphasis added). Indeed, *Grayden* relied on differences in the "specific deprivation at issue," to explain why it was not bound by the Supreme Court's approval of a similar form of notice. 345 F.3d at 1242-44.

As for the benefits themselves, Florida observes that Black Lung Benefits (addressed in *Jordan*) and child support payments (*Arrington*) are important to their recipients. Br.18, 29. But that does not convert them into the type of benefit considered here. The Supreme Court and this Court have held the interest in benefits akin to Black Lung Benefits—such as veterans' disability benefits and Social Security benefits—is lower than the interest in need-based public benefits like those considered in *Goldberg* (and here). *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 333 (1985) (distinguishing benefits "not granted on the basis of need"); *ICare Child Dev. Ctr. LLC v. Cicero-Brown*, No. 24-14186, 2026 WL 1693784, at *4 (11th Cir. June 11, 2026) (distinguishing "extremely strong" interest in "welfare benefits" considered in *Goldberg* from "disability benefits . . . not based on financial need" considered in *Mathews*); *see also* Op.226 n.77 (noting difference between disability benefits and "Medicaid benefits . . . based on financial need"). As for the child support payments in *Arrington*, while the plaintiffs were active or prior cash assistance recipients, the notices were

31

communicating the amount of separate, additional, private child support payments, not the termination of public cash assistance benefits.

In sum, while it is true the district court remarked on the differing circumstances in *Arrington* and *Jordan*, its analysis reflects the proper application of *Mullane*—not a failure to follow precedent.[7]

2. Additionally, the notices here do not mirror those in *Arrington* and *Jordan*, and both cases support the "accuracy" standard the district court applied.

Starting with *Arrington*, Florida repeatedly insists the *Arrington* notices "did not provide case-specific details," but repetition does not make it true. Br.32; *see also* Br.18, 30. The "amounts collected, retained, and disbursed," which Florida agrees are in the *Arrington* notices, Br.17-18, 39, are not standardized; they reflect the particulars of individual child support payments. *See Arrington*, 438 F.3d at 1350. This Court held the notices were adequate precisely because parents could compare these amounts to figures "on their court

---

[7] The same goes for *Adams v. Harris*, 643 F.2d 995 (4th Cir. 1981): it was not error to note the differing circumstances. *See* Op.223-25. Indeed, the district court observed *Adams* "by its own terms," did not consider the same circumstances as *Goldberg*, meaning *Adams* would agree its reasoning "does not apply to a case such as this." Op.226. The court further noted *Adams* approved notices although they "may not be helpful to claimants trying to decide whether to request a hearing." Op.225 (quoting *Adams*, 643 F.3d at 998). That cannot be squared with *Mullane*'s requirement that notices must permit an individual to choose whether to contest a decision.

order," and "on their payment check," to confirm the "accuracy" of their child support payments. *Id.*

Thus, as the district court observed, *Arrington* "explained in detail how the state's written notices *did* contain sufficient case-specific information to allow the recipients to confirm the accuracy of the state's payments by cross-referencing it with information in their possession." Op.229. Far from distinguishing *Arrington*, the court applied its accuracy test concluding that "unlike *Arrington*, the NOCAs do not provide enough information to allow a recipient to independently assess the accuracy of the State's determination," and, instead, recipients must "contact the State *to obtain* that case-specific information in the first place." Op.229-30.

Florida utterly misreads *Arrington* to say it is "incompatible" with the *Mullane/Goldberg* standard the district court applied. Br.16. While *Arrington* does not cite *Goldberg*, it adopts an entirely consistent approach. Both cases acknowledge due process is flexible and circumstantial. Both examine whether notices provide sufficient information to challenge an inaccurate decision. Both approve notice procedures that supply the recipient with necessary case-specific information. Nothing in *Arrington* suggests—either explicitly or implicitly— *Goldberg* is no longer good law; nor does Florida argue it does not apply here. Br.32 (arguing only that the district court "misapplied" and "misread" *Goldberg*);

33

*see also* Op.226 n.77 ("The State makes no attempt to argue that *Goldberg* does not apply to this case.").[8] Rather, as the district court explained, the fact that *Arrington* (and *Jordan*) did not apply *Goldberg* to evaluate the notice content is further evidence those cases did not concern *Goldberg*-type benefits. Op.230. At the very least, it is nonsensical for Florida to suggest the court applied a "contrary interpretation" of *Goldberg*, Br.23, when *Arrington* did not reference *Goldberg* at all.

Florida also tries to relitigate the facts of *Arrington*, highlighting allegations plaintiffs made but the panel did not mention. For example, Florida recounts at length the *Arrington* plaintiffs' complaints about the quality of Alabama's hotline, inferring the panel endorsed them. Br.19. Yet, the *Arrington* panel said only that the "record indicates" the hotline was widely used, citing the state's data, without mentioning or explaining its views on plaintiffs' allegations. 438 F.3d at 1350 n.15. Given *Arrington* was decided on summary judgment, *id.* at 1340, an equally plausible, if not better, explanation is that plaintiffs' hotline allegations were unsupported by the record.[9] *See* Fed. R. Civ. P. 56(e); *Ellis v.*

---

[8] Florida has waived any argument *Goldberg* is inapplicable here. *See Lubin v. Starbucks Corp.*, 122 F.4th 1314, 1324 (11th Cir. 2024).

[9] Indeed, the panel rejected many of the *Arrington* plaintiffs' allegations—including those about errors in the "parent's share," *see* Br.18—as lacking evidentiary support. *See* 438 F.3d at 1348–49.

*England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion").

Ultimately, Florida's reading of *Arrington* turns on what the Court did not say. But substantive legal standards are not developed from silence. What matters is what *Arrington* did say, which is child support notice procedures are adequate under *Mullane* when notices containing individual payment amounts "combined with the additional information sources—give . . . parents ample information with which to determine whether they have received their full child support payments in a timely manner." *Arrington*, 438 F.3d at 1350–51. The district court's analysis of whether the notices here supply "sufficient information to evaluate the accuracy of the State's decision and make an informed decision whether to challenge it," faithfully follows the *Arrington* Court's approach. Op.227.

Turning to *Jordan*, as the district court observed, that case follows *Mullane* and confirms the standard is objective—the question turns on whether notice is reasonable "as a whole," rather than on any given individual's actual understanding. Op.194 (quoting *Jordan*, 876 F.2d at 1459). *Jordan* treads no new ground; rather, it reflects the flexibility of due process, confirming that where standardized notice supplies "sufficient detail" to assess the accuracy of the

35

decision, it suffices. *Jordan*, 876 F.2d at 1459. *Jordan*, however, "does not stand for the converse proposition that [standardized] notice is always sufficient to satisfy due process." *Grayden*, 345 F.3d at 1244. The district court's inquiry into whether notice supplies "sufficient information" aligns with *Jordan*'s "sufficient detail" approach. Op.216.

In fact, the district court found "it helpful to compare" Florida's notices to those in *Jordan*, ultimately finding Florida's wanting: "[u]nlike *Jordan* the NOCAs do not plainly and succinctly state the decision and the reason for the decision as to each enrollee," or "the requirements an enrollee must meet." Op.216-17, 217 n.71. Reaching a different *conclusion* about the adequacy of the notices, based on the different facts before it, does not mean the court applied the wrong *test*. While Florida has identified the different outcomes, it has not articulated any legal error.

II.    **The District Court Properly Applied the "Accuracy" Standard to Find Florida's Income-Based Medicaid Termination Notices Inadequate.**

  A.    **The Court Properly Concluded that Florida Must Disclose the Income Information Used so the Recipient can Detect and Correct Errors in Florida's Income-Based Decisions.**

The district court correctly applied the accuracy standard in this case. The court found that to detect errors in Florida's Medicaid income decisions, four case-specific pieces of information must be disclosed: countable income, income

36

limit, eligibility category, and household size.[10] The court's conclusion was amply supported, and Florida makes no attempt to argue an individual *could* assess the accuracy of the State's income-determination without this information.

For starters, logic dictates that to evaluate an assertion an individual is over a particular income limit both the limit and countable income must be disclosed. Moreover, where, as here, third-party data is used and risks of errors are high, more detailed notice may be required. *See, e.g.*, *Goss*, 419 U.S. at 579–80 (requiring more detailed notice where "[t]he risk of error is not at all trivial"); *Wolff*, 418 U.S. at 564 (requiring more notice where "further investigation" reshapes "the evidence relied upon"); *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) ("fairness can rarely be obtained by secret, one-sided determination of facts" and notice is the best instrument "for arriving at truth") (quote omitted).

Florida outright ignores the district court's extensive findings regarding the prevalence and type of errors, which include: miscalculating household size (and thus the applicable income limit), failing to disregard certain income, relying on outdated, third-party data, and prematurely terminating continuous coverage for children, pregnant, and postpartum enrollees by imposing an income limit when none should apply. Op.29-32, 143, 151-52, 162, 170, 197

---

[10] The court did not require "calculations." *Contra* Br.14, 16, 32.

n.58, 244, 254 n.89. Given these errors, the court reasoned a conclusory statement an individual is over-income is insufficient because "the enrollee will not know whether the State's decision is premised on a perceived increase in her income or on a change in her eligibility category subjecting her to a higher income standard." Op.264 n.94. On the other hand, equipped with information about the eligibility category, an enrollee can compare this information to "her knowledge of the enrollee's personal circumstances."[11] Op.230. Likewise, the countable income the State relied upon is necessary so an enrollee can "compare this information to her household finances to determine its accuracy." Op.230. This information would have assisted the individual enrollees who testified at trial, enabling them to identify DCF's errors. Op.196-97 n.58.

Perhaps most significantly, the court found Florida's own witnesses could not evaluate the accuracy of a decision without case-specific information. Op.208, 215. Despite their deep knowledge of Medicaid eligibility, these witnesses consistently acknowledged they would need the case-specific information within the FLORIDA computer system (a system accessible only to State employees), to determine whether a given eligibility decision was

---

[11] Acknowledging Florida's technological limitations in populating the income limit into the notice, the court adapted and permitted Florida to link to a table with the income limits listed by household size and eligibility category. Op.265. Notices must list household size and eligibility category, since that is the only way to use the table.

correct. Op.49 n.23, 117, 163. The court was, thus, well-founded in concluding that someone "desirous of actually informing," *Mullane*, 339 U.S. at 315, Medicaid recipients of the information necessary to assess the State's decision would disclose the same case-specific information on which the State relies for that task.

### B.      The District Court Did Not Clearly Err in Finding Case-Specific Income Information is Not Reliably Available from Any Source.

The court then evaluated whether the income information is reliably provided. Florida does not dispute that "prior to filing a request for a fair hearing, the only available means by which an individual can learn the details supporting the State's termination decision are through the call center or a Family Resource Center." Op.232. The court did not, however, dismiss these sources as "of no consequence." Br.18-19. It held the income information "does not necessarily" need to be in the notices, so long as it is provided "in some form" reasonable under *Mullane*. Op.228 (quote omitted). To pass muster, these sources must be "reasonably certain to inform those affected" rather than leave to "chance alone" who gets the information. *Mullane*, 339 U.S. at 315. Thus, the court found that while such sources "can satisfy due-process notice requirements," Br.19, the "extensive testimony about the operation of these resources," demonstrated that, here, they do not. Op.232-33.

The court's fact-finding here is reviewed for clear error. It made a factual determination, based on its review of the record as a whole, that enrollees have only a small chance of reaching an employee at either the call center or Family Resource Centers, and even then, they can "come out more confused than they are going in." Op.98 (quote omitted). Florida is incorrect to imply the court's factual assessment of whether Medicaid enrollees are likely to obtain the information is reviewed *de novo*. Br.13.

In any event, the record is replete with evidence demonstrating the failings of each source Florida highlights:

***The Call Center.*** Florida disputes the court's finding that the call center is inaccessible by nit-picking two data points in isolation, starting with the 20-minute wait time in April 2024. Br.22. Florida ignores numerous interrelated factual findings it does not challenge, including critically, "Florida manages hold times" by blocking calls rather than place them on hold. Op.91-92. In April 2024 over *half* the calls that asked to speak with an agent were simply disconnected without being placed on hold. Op.92-93. Of calls placed on hold, over 30% were abandoned that month. Op.93. Moreover, the average wait time excludes additional transfer times which are necessary for income questions. Op.91, 94. Finally, individual times can be significantly longer than the average: Ms. Mezquita's phone records showed multiple two-hour wait times; and Mr.

40

Ramil and Ms. Solomon, DCF's Director of Call Center Services, both testified about hours-long wait times. Op.91, 176. This Court may not re-weigh this evidence.

Second, Florida argues the court confused calls with callers. Br.22. But at no point did Florida object to the use of per-call data, argue it was inaccurate, or present the per-caller data they now contend is necessary to measure call center accessibility. In fact, DCF itself measures its call center performance by calls, not callers. Op.93; T(4) at 205:11-17 (discussing PX 284, which displays performance metrics by calls). This is also how it reports data to the federal Centers for Medicare & Medicaid Services (CMS). *See* Op.93 (noting DCF reports "abandoned calls" to CMS). Ms. Solomon admitted this data shows the call center does not have as much "capacity . . . as we would like." Op.100. It was certainly plausible for the court to rely on the very data DCF uses to measure its own performance.

In any event, Florida's desired inference assumes that after placing multiple calls individual callers eventually reach someone who can provide the needed information. The court found otherwise: Jennifer V. made multiple calls without ever reaching an agent; there are a limited number of Tier 3 agents who can answer income questions; and both Chianne D. and Ms. Mezquita experienced calls where, despite reaching a Tier 1 agent, they were not

successfully transferred to a higher-level employee. Op.126-28, 177-78. "At the very least, nothing requires the district court to draw that inference in favor of" Florida. *L.W. v. Comm'r of Ga. Dep't of Cmty. Health*, 176 F.4th 635, 645 (11th Cir. 2026).

Next, Florida contends the court's finding that callers "likely receive confusing, inaccurate, incomplete, or contradictory information from call center agents on a regular basis," Op.98, is insufficiently supported because it comes from just two callers. Br.23. This was enough: these examples were "egregious" and "astounding in their inaccuracies," notwithstanding the active participation of supervisors who are the very employees responsible for quality control. Op.87, 96, 99, 177, 234 n.81. Moreover, Florida offered nothing to rebut this inference. Op.254 n.89.

Regardless, Florida ignores the litany of other evidence the court relied on for this finding. Mr. Ramil advises clients not to use the call center. Op.98. Ms. Solomon acknowledged occasions when incorrect information was provided. *Id*. And numerous operational constraints make call center errors likely, including that agents are not trained "eligibility specialists" who make eligibility decisions, an absence of scripts, time pressure, and the complexity of interpreting incomplete information in FLORIDA, forcing agents to apply Medicaid's complex eligibility rules on the spot to recreate the basis for an eligibility

42

decision. Op.97-98, 130 n.45, 234 n.81; *see U.S. v. Watkins*, 10 F.4th 1179, 1184 (11th Cir. 2021) ("A preponderance of the evidence is evidence which is more convincing than the evidence offered in opposition to it.") (quote omitted).[12]

*Family Resource Centers.* Florida challenges the finding that the "hours and locations" of these Centers "are so limited as to be impracticable," Op.233, insisting they are *per se* accessible because they maintain the same schedule as the district court. Br.21. They made no such argument below and, regardless, this is an inapt comparison. The district court fulfills a different governmental function, primarily serving legal professionals whose daily work schedule is accommodated by the courthouse hours. *Cf.* Op.151 (Ms. Taylor did not visit a Center while "[n]ewly postpartum and caring for a weeks-old infant.").

As to locations, Florida states the obvious: Centers are closer to some Medicaid enrollees than others. Br.21. But that variation makes them *un*reliable, leaving to "chance" whether someone can obtain the necessary information, when they "could easily be informed by other means at hand," namely the written notice DCF affirmatively sends to everyone. *Mullane*, 339 U.S. at 314, 319; *see* Op.235 ("whether an individual receives the notice to which she is

---

[12] *League of Women Voters*, *Inc. v. Florida Secretary of State*, *see* Br.24, concerns how plaintiffs must prove disparate impact through a statistical disparity for equal protection claims. 66 F.4th 905 (11th Cir. 2023). It does not speak to the burden of proof here.

constitutionally entitled depends on whether she can devote the time and effort necessary to seek it out . . .").

Plus, data show low-usage rates for visitors seeking individualized information: 105,000 monthly visitors across all DCF programs, not just Medicaid, less than a quarter of whom ask about their case status. Op.107, T(5) at 197:7-23. Given DCF does not advise Medicaid notice recipients—in the notice or elsewhere—that these Centers can provide income information, it was reasonable to infer few Medicaid recipients utilize them. *See* Op.233.

Finally, Florida disregards the court's finding that, as with the call center, visitors likely receive inaccurate or incomplete information. Center employees receive less training than call center agents and must utilize the same "antiquated technology" to interpret notices. Op.98, 106-07. In fact, when Ms. Mezquita "visited a DCF office in person," the staff "confirmed that [her son] G.M. was ineligible, although they did not provide clarification on the decision." Op.169. This led her to "accept[] the finding," even though G.M. was eligible and DCF had used the wrong income. Op.169.

***Supervisory Review.*** As to Supervisory Reviews, Florida wholly ignores the central reason the court found them inadequate: they "occur[] only *after* an individual makes the decision to appeal." Op.232 n.80. Of course, "forms of notice . . . provided after the" decision "do not satisfy the requirement of

44

contemporaneous notice," and are "not sufficient to remedy the procedural deprivation." *Grayden*, 345 F.3d at 1238 n.18. Moreover, Florida glosses over the fact that public materials discussing the review process continue to incorrectly threaten that individuals will have to repay benefits. Op.113-14, 232 n.80. Under these circumstances, it was not error to find that the review process is not a reasonable means of notice.

### C.    The District Court Did Not Clearly Err in Finding the Notices Do Not Clearly Convey the Decision to Terminate Medicaid.

Florida asks this Court to conclude the notices clearly communicate the termination decision itself. Br.49-50. This would throw the district court's fact-finding overboard. The court found the notices "confusing, vague, convoluted, antiquated, contradictory, inaccurate, and ambiguous." Op.218. The court exhaustively explained why, summarizing that the notice template splits the information pertaining to an income-based Medicaid termination across multiple sections. Op.208. Thus, a reader must "cross-reference" various parts of the notice trying to guess at "which statements to focus on and which to ignore." Op.214.

On appeal, Florida again urges the Court to "disregard all of this incoherency and focus instead on particular isolated sentences[.]" Op.214. But the district court's findings were amply supported by its review of the notices as a whole.

45

1. The court explained that, while all termination notices do include a single termination section with the heading "**Medicaid**," Br.50, 53-54, it is one of many sections with the same heading and the notices do not explain "how or why the sections are distinct." Op.46-47, 49, 208.

2. Looking at the face of three notices, Florida argues that the termination section "names the individual or individuals whose benefits will end." Br.50. However, Florida's own witnesses revealed "this assumption is wrong. Individuals are routinely included in sections of the NOCA that do not pertain to them." Op.209; *see also* Op.49 ("there may be individuals listed for whom the decision being communicated in that section is not pertinent") (citing testimony of Ms. Anderson, Mr. Roberts, and Mr. Kallumkal), 52 ("individuals may be listed in the termination section as members of the applicant's SFU [standard filing unit] to whom the termination decision does not apply.") (citing Mr. Roberts' testimony). Indeed, Mr. Roberts testified about one of the notices Florida cites: PX 81 (Doc. 155-68 at 5-6). That notice lists seven names in the termination section, but when asked if it is "saying that Medicaid benefits will be closed or terminated for all seven people?," Mr. Roberts responded "I don't believe so." T(2) at 86:13-15; *see also* T(2) at 142:18-143:2 (two individuals listed in termination section of PX 130 were not both losing coverage); T(3) 124:10-11 (Though listed in termination section of PX 123, Jimardo was not enrolled and,

46

thus, not losing coverage). In fact, "not one DCF witness was able to provide this Court with a universal rule for how the groupings are constructed." Op.209.[13]

3. Turning to Reason Code 241, other than Florida's stated intentions, there is "no evidence" this code is reliably provided "in practice." Op.212. Even if it were, the court found Reason Code 241 cannot erase the confusion created by Florida's practice of using it in combination with other misleading reason codes. Op.212-13. And no evidence suggests the post-trial change addressed this ongoing problem or fixed the table that populates "irrelevant or unhelpful legal authority" with this code. Op.212-14.

The same goes for the "Income Exceeds Sentence" and other publicly available information about the Medically Needy program. *See* Br.52-53. The reader must discern that she should credit this "fine print in the Medically Needy sections," and "ignore[e] the prominent Designated Reasons in the Medicaid sections." Op.214-15. Nor do these general statements about the Medically

---

[13] Florida asserts the court did "not identify a single Medicaid termination section that listed individuals whom the State found eligible to receive Medicaid benefits after the termination date." Br.54. It is unclear exactly what this means or why it matters. For instance, Chianne D. was listed in the termination section of PX 40 and the State later corrected its error, finding her eligible for Medicaid after the termination date. Op.144. Regardless, for an uninitiated reader, the denial sections read like a termination because they list currently enrolled individuals as "ineligible."

Needy program remedy the "actively misleading" reason codes or legal citations, which in turn "affirmatively undermine[] the recipient's ability to use . . . publicly available sources to decipher the meaning of the" notice. Op.214, 216, 235-36.

4. Finally, the trial witnesses confirmed the notices do not clearly convey the action. Florida seeks to re-write the record regarding the enrollee witnesses. Br.54-55. But after observing their live testimony, the court made explicit factual findings that each witness was confused about the action taken. Chianne D. "had questions about what it meant to receive the same assistance from another program and what the 'mystery program' was from which they were receiving the same assistance." Op.135. She "questioned the reason for the back-and-forth approvals and denials" and "stayed awake late into the night . . . 'writing a question for every single thing that was on the notice,'" and started her next call by asking about the "other program." Op.130, 135-36. "Jennifer V. was confused about the conflicting messages between KidCare and Medicaid . . . It was unclear to [her] what was happening from these two" notices. Op.165. Ms. Mezquita "had no idea what the stated Designated Reason meant and did not know from what other program she was purportedly receiving assistance." Op.172.

Florida takes particular issue with Ms. Taylor's testimony. Br.55. But based on the court's observation of her "demeanor" and "testimony as a whole," the court found Ms. Taylor "assumed at first that [her infant son] K.H. was still enrolled in regular Medicaid," and "did not understand" the phrase stating she "was receiving the same type of assistance from another program and assumed it meant Medicaid . . . Ultimately, Taylor could not be certain from the notice whether or not she or K.H. still had Medicaid benefits." Op.149-50 (quoting T(1) at 28, 57). To challenge these findings, Florida highlights Ms. Taylor's affirmative answers to two questions on cross-examination. Br.55. But as the court explained, the wording created confusion "about the timeframe in the question when she provided her answer." Op.150 n.51. Elsewhere, Ms. Taylor gave more detailed explanations about what she understood and when, namely that she did not understand DCF's mistake until "later, after speaking with family, friends, and a Healthy Start nurse." *Id.* Thus, the court credited Ms. Taylor's more descriptive answer over her one-word responses to confusing questions when she was "visibly tired." *Id.* These are precisely the types of nuanced credibility determinations to be respected on appeal. *Weinstein v. 440 Corp.*, 146 F.4th 1046, 1053 (11th Cir. 2025) ("This Court will not disturb the district court's credibility findings regarding the witness testimony it heard at trial. . ."). And even if it were plausible (and it is not) that these witnesses

49

understood the action, choosing among plausible alternatives is not clear error. *See Cooper v. Harris*, 581 U.S. 285, 299 (2017) ("the very premise of clear error review is that there are often two permissible—because two plausible—views of the evidence.") (quote omitted).

In any event, the court did not, as Florida implies, rely solely on the enrollees' testimony. The court observed confusion abounds: call center agents were confused by the notices' "organization and structure." Op.130 n.45. "[E]xperienced DCF witnesses struggled at times to interpret the meaning of provisions in the NOCAs reviewed at trial." Op.215. The court itself struggled to interpret the notices, even after hearing substantial testimony regarding how the notices are produced. Op.207-08. There is no basis to disregard the ample evidence of confusion in the record in favor of Florida's self-serving assurances the notices are "sufficiently clear." Br.49.

## III.    Florida's Attacks on Class Are Unfounded.

### A.    The District Court Satisfied Rule 23(c)(1)(B) by Certifying Plaintiffs' Single Due Process Claim, which Necessarily Includes the Question of Whether the Notices Clearly Communicate the Action.

Despite not appealing the class certification order, *see* ECF 1, Florida raises a Rule 23(c)(1)(B) challenge. According to Florida, when the court's final decision evaluated whether the notices "apprise interested parties of the

50

pendency of the action," that somehow created a new, separate "structural claim" that needed to be certified. Br.41-45. But there is no new claim; that question is part and parcel of the single due process claim the court already certified. Florida mistakes both Rule 23(c)(1)(B) and the substance of Plaintiffs' claim.

Rule 23(c)(1)(B) requires a class certification order to "define . . . the class claims, issues, or defenses." The court did so. The certification order identifies the claim—procedural due process under the Fourteenth Amendment—and sets out its three elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Doc. 122 at 26 (quoting *Grayden*, 345 F.3d at 1232). It then explains "the issue in resolving this claim will be whether the State provided constitutionally-inadequate process," and specifies the issue will address Medicaid income-termination notices. *Id.* at 26, 55–56.

The identified issue adds further specificity by naming which element of the claim was at issue, and within that element, which part of the process is relevant (*i.e.*, notices, rather than hearings, and income-termination notices rather than other termination notices).[14] The court also specified the standard to

---

[14] True, the court "balked" at Florida's request to certify "particular issues" under Rule 23(c)(4). Br.43-44. But that rule permits certification where a whole claim cannot be certified. Because, here, "class certification is appropriate as to

be applied to decide that issue: whether notice is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 26 (citing *Mullane*, 339 U.S. at 314).

Importantly, the question whether the notices communicate the action is not a "claim" within the meaning of Rule 23(c)(1)(B); nor is it an issue.[15] It is a factual question embedded in the *Mullane* standard to resolve the identified issue. And whether Florida's notice structure obscures the action is an even more granular version of that question, which accounts for the facts proved at trial. Given *Mullane*'s command to evaluate whether notices "apprise interested parties of the pendency of the action," 339 U.S. at 314, the court's analysis of these questions in its final decision demonstrates the proper application of *Mullane* to the claim and issue it certified, not the addition of a new, uncertified claim. Since these questions are not claims (nor issues), the court did not need to "define" them under Rule 23(c)(1)(B).

---

Plaintiffs' claims rather than merely 'particular issues,'" the court properly reasoned Rule 23(c)(4) certification was unnecessary. Doc. 122 at 57 n.18. Refusing to rely on Rule 23(c)(4)'s vehicle for "issue" certification does not, however, mean the court failed to define the issues under Rule 23(c)(1)(B).

[15] Florida consistently casts the action question as a "structural claim," Br.1, 15, 40-41, 44-46, 48-49, 56 and has, thus, waived any argument that the court needed to define it as an "issue." *Lubin*, 122 F.4th at 1324.

Florida's attempt to invent a new "structural claim" misunderstands the meaning of "claim." As Florida's own cases demonstrate, a "claim" in Rule 23 refers to the cause of action and its "constituent elements"—not every factual contention or sub-question along the way. *See Simpson v. Dart*, 23 F.4th 706, 713 (7th Cir. 2022) (defining contours of class litigation "should begin by identifying the elements of the plaintiff's various claims"); *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 189 (3d Cir. 2006) (certification order must state "particular claims asserted by Plaintiffs," including the "legal provisions allegedly violated"). Citing only Black's Law dictionary, Florida asserts "claim" means the "aggregate of operative facts giving rise to a right enforceable by a court." Br.41-42. This expansive definition is infeasible in the Rule 23 context and would require courts to inventory every operative fact in advance of trial. Indeed, given Rule 23(c)(1)(A)'s direction to resolve class certification at "an early practicable time," it would often require identifying every operative fact before the close of discovery. Rule 23 imposes no such obligation. *See In re Pharm. Indus. Avg. Wholesale Price Litig.*, 588 F.3d 24, 38 (1st Cir. 2009) (rejecting argument Rule 23(c)(1)(B) requires court to "exhaustively explain and justify the certification decision").

53

Ultimately, the crux of Florida's complaint is that it was surprised the trial and decision addressed whether its notices communicate the intended action and it wanted more detailed notice so it could prepare a defense. Br.44. Plaintiffs agree sufficiently detailed notice is necessary to prepare an adequate defense. *See Drazen v. Pinto*, 106 F.4th 1302, 1335 (11th Cir. 2024) (requirement to define the "claims, issues, or defenses" serves to "fulfill the fundamental requirements of due process.").

But Florida's claim of surprise is not credible. Florida's pretrial brief begins with this very question: "[w]hether, under due process, the State provides notice reasonably calculated under all the circumstances to apprise Medicaid recipients of the termination of their coverage[.]" Doc. 131 at 1. Florida argued it provides "written notice advising that Medicaid coverage is ending" which "contain[s] enough information to put recipients on notice of the intended action." *Id.* at 4-5. Having already made these arguments at the district court, Florida identifies no additional evidence or argument it would have presented had it received whatever additional notice it now claims it was owed. *See Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878–79 (11th Cir. 1986) (finding no prejudice from post-trial class definition amendment where additional evidence would not have affected the outcome). Absent any prejudice, Florida's assertions of procedural error fail.

Regardless, any genuine surprise was not the fault of the district court. The court framed "the central question" for liability as "what information and degree of detail must be included in a Medicaid termination notice to satisfy the Due Process Clause." Doc. 122 at 52. The court specified that "to resolve the class claim[]," it "must consider the adequacy of the notice in its entirety and under the totality of the circumstances . . . ." *Id.* at 51. It also noted any injunctive relief would require it to "determine and define what constitutes adequate notice," alerting Florida these questions are also part of fashioning appropriate relief. *Id.* at 53.

Florida claims the court's discussion of two common practices concerning the *reasons* for the action—the omission of case-specific income information and use of generic Designated Reasons—misled them to believe these would be the only common practices addressed at trial. Br.43-44. But discussing whether these practices obscure the reason for the action did not eliminate the district court's obligation to address whether the notices communicate the action itself. Nor can the questions meaningfully be separated. Plainly, a notice cannot clearly state the reason coverage is ending if it is unclear whether coverage is ending or not. *See* Br.12 (quoting Op.209 where court found the notice structure "obscures the reason for that decision.").

Moreover, Florida has been on notice from the outset that the "action" question is part of Plaintiffs' claim. Plaintiffs' complaint alleges "the notices do not adequately explain the eligibility decision" or "why particular household members are or are not listed in a given section." Doc. 77, ¶¶ 67, 69; *id.* at ¶¶ 5, 7, 21(b)(i)(B)(iii), 70-71, 94. Plaintiffs' class briefing states "the notices do not provide a clear statement explaining the intended action." Doc. 85 at 2. Plaintiffs asked Florida's corporate representatives about the "section headings" and "organization of the various sections." Doc. 167-13 at 10. At the preliminary injunction hearing, the district court pointedly observed "[t]he notice is terrible. The notice does not give a Medicare [sic] recipient clear notice of the specific action being taken. You can read the notice five times and not know what action is being taken or why." Doc. 64, 4:19-23. Plaintiffs' pretrial briefing reiterates "notices—like DCF's Medicaid termination notices—that obfuscate the action . . . do not accomplish the most basic purpose of due process," and attributed this to the structure of the notice, including the use of "the same section heading 'Medicaid'" and the "different combinations of household members" within each section. Doc. 132 at 7, 20. Florida's assertion this was not raised until "six weeks after trial," Br.44, is false.

Finally, even assuming arguendo the district court did not comply with Rule 23(c)(1)(B), this would not support reversal on the merits. Generally,

56

noncompliance with Rule 23(c)(1)(B) results only in remand for further consideration of the certification. *See e.g.*, *Wachtel*, 453 F.3d at 181; *Simpson*, 23 F.4th at 709*; Drazen*, 106 F.4th at 1352.

### B. Even Assuming a Separate "Structural Claim" Had to Be Certified, It Would Satisfy Commonality.

After inventing a non-existent claim, Florida attacks its commonality. But the district court's decision is properly understood as resolving a single due process claim, and therefore, the court's commonality analysis need not be revisited. Rule 23(a) requires only a single common question per claim. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009); *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986). The court identified two: whether Florida's uniform omission of individualized income information (as to the primary class), and its use of Designated Reasons that fail to identify income as the basis for termination (as to the subclass) render Florida's income-based termination notices constitutionally inadequate. Doc. 122 at 55–56. Florida does not dispute those questions establish commonality for the due process claim. This Court need go no further.

However, even if some "structural claim" existed, it would survive a commonality analysis. *Contra* Br.45-49. The failure of the notices to

communicate the action is the predictable (and automatic) consequence of Florida's notice templates which produce "seemingly random" groupings of names and populate undifferentiated section headings, misleading reason codes, and statutory cites. Op.208-14.

These standard problems were based on far more than three notices and were established by common proof. *Contra* Br.47. They are based on the State's *template* notices PX 156 (Doc. 155-128) and extensive, uncontroverted testimony about how these templates function. Op.44-60. The court also cited DCF's inaction in the face of known problems, such as not updating them despite knowing for many years the notices are "chunky," do not "flow," and that individuals report confusion. Op.47, 252 n.88. As for the reason codes, DCF provides "limited training, confusing guidance, and minimal oversight." Op.78. Any additional analysis would simply reiterate what the court already held: commonality is satisfied by "a refusal to act on grounds applicable to the entire class." Doc. 122 at 68. *See M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 847-48 (5th Cir. 2012) (commonality satisfied by "allegation that the State engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency.").

Florida's observations about variations in how these deficiencies manifest in particular notices—such as differing numbers of "Medicaid" and "Medically

58

Needy" sections and differences in reason codes, Br.46-48—do not make the underlying deficiencies less uniform. *See, e.g.*, Doc. 122 at 59 ("The factual variations the State identifies among the class members do not undermine the existence of the challenged practices."). For example, while Florida stresses omitting Reason Code 241 "is not – and never was – common to all class members' notices," Br.48, this variation does not erase the agency's deficient training, guidance, and oversight of reason codes.[16]

The district court also properly rejected Florida's claim that variations in the notices mean individuals have not suffered the same "class-wide injury," observing that for a Rule 23(b)(2) class, "[a]ll the class members need not be aggrieved by or desire to challenge the defendant's conduct," so long as they are subject to the same common practices. Doc. 122 at 44–45 (quoting *Anderson v. Garner*, 22 F. Supp. 2d 1379, 1386 (N.D. Ga. 1997)). Indeed, this cycle of uniform inaction at the agency level producing varying individual harms is precisely what Rule 23(b)(2) is designed to address. *M.D.*, 675 F.3d at 847-48; *see also DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010)

---

[16] Florida's argument also confuses the class with the subclass. The primary class consists of enrollees whose notices omit the income and income limit. Doc. 122 at 40. The subclass is limited to those whose notices also "do not provide a Designated Reason" identifying income. *Id.* The only consequence for a class member who received Reason Code 241, is the loss of subclass membership.

(affirming class certification where the state "allegedly fail[ed] to ensure [caseworkers] do not carry caseloads so demanding that they cannot monitor class members adequately").

Moreover, notice cases ask an objective question: whether notice is reasonably calculated on the whole and the "answer to this objective question is therefore common to all members of the class." Doc. 122 at 60. Liability, thus, does not turn on whether notice "in fact . . . fails to reach everyone." *Mullane*, 339 U.S. at 319. Finally, as if more were needed, the court's single, indivisible injunction (the substance of which Florida has not challenged) confirms that commonality is satisfied. *See* Fed. R. Civ. P. 23(b)(2) (rule satisfied where "final injunctive relief . . . is appropriate respecting the class as a whole."); *M.D.*, 675 F.3d at 848. Florida's post-hoc attempt to dismantle certification is unavailing.

## CONCLUSION

Notices that confuse Medicaid enrollees, Florida's employees, and the court itself, and which fail to clearly communicate the action and omit the basic facts undergirding the decision cannot be considered "reasonably calculated under all the circumstances," as required by *Mullane.* This Court should affirm.

Date: June 17, 2026

/s/ Sarah Grusin

**NATIONAL HEALTH LAW PROGRAM**
Sarah Grusin (IL Bar No. 6316896)
Katy DeBriere (FL Bar No. 58506)
Amanda Avery (NC Bar No. 445889)
Jane Perkins (NC Bar No. 9993)
1512 E. Franklin St., Ste. 110
Chapel Hill, NC 27541
(919) 968-6308

grusin@healthlaw.org
debriere@healthlaw.org
avery@healthlaw.org
perkins@healthlaw.org

**FLORIDA HEALTH JUSTICE PROJECT**
Lynn Hearn (FL Bar No. 0123633)
581 N. Park Ave., 933
Apopka, FL 32712
(850) 778-8444

hearn@floridahealthjustice.org

*Counsel for Appellees*

61

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), undersigned counsel certifies that this brief complies with the applicable type-volume limitation because this brief contains 13,000 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

Undersigned counsel further certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Caslito MT font.

*/s/ Sarah Grusin*
Sarah Grusin (IL Bar No. 6316896)
National Health Law Program
*Counsel for Appellees*

62