**No. 26-10419-G**

---

# In the United States Court of Appeals
# for the Eleventh Circuit

---

CHIANNE D., *ET AL.*,

*Plaintiffs/Appellees*,

v.

SECRETARY, FLORIDA AGENCY FOR
HEALTH CARE ADMINISTRATION, *ET AL.*,

*Defendants/Appellants*,

---

On Appeal From the United States District Court
For the Middle District of Florida
No. 3:23-cv-00985-MMH-LLL

---

**APPELLANTS' REPLY BRIEF**

---

James Timothy Moore, Jr.
Ashley H. Lukis
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
Telephone: 850-577-9090

Andy Bardos
SHUTTS & BOWEN LLP
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
Telephone: 850-201-6269

*Attorneys for Appellants*

# **TABLE OF CONTENTS**

TABLE OF CITATIONS ............................................................................ ii

ARGUMENT ..........................................................................................1

    I.      DUE PROCESS DOES NOT REQUIRE FLORIDA'S NOTICES TO DISPLAY CASE-SPECIFIC FINDINGS OR CALCULATIONS................................................1

    II.    THE DISTRICT COURT INCORRECTLY CONCLUDED THAT FLORIDA'S NOTICES DO NOT COMMUNICATE THE STATE'S INTENDED ACTION WITH SUFFICIENT CLARITY TO SATISFY DUE PROCESS.............................20

        A.    The District Court's Class-Certification Order Did Not Identify the Structural Claim as a Class Claim...................................20

        B.    The Structural Claim Neither Satisfies Rule 23's Commonality Requirement Nor Reveals a Classwide Injury or Violation.................24

        C.    The Notices Are Reasonably Calculated to Communicate Florida's Intended Action.......................................................27

CONCLUSION........................................................................................30

CERTIFICATE OF COMPLIANCE..................................................................31

i

# TABLE OF CITATIONS

## Cases

*Adams v. Harris*,

    643 F.2d 995 (4th Cir. 1981)................................................................2, 12

\* *Arrington v. Helms*,

    438 F.3d 1336 (11th Cir. 2006)..................................... 1–7, 9–12, 14–16

*Barnes v. Healy*,

    980 F.2d 572 (9th Cir.1992).........................................................14

*Barry v. Lyon*,

    834 F.3d 706 (6th Cir. 2016)..........................................................8

*Billington v. Underwood*,

    613 F.2d 91 (5th Cir. 1980)..........................................................10

*Birdwell v. City of Gadsden*,

    970 F.2d 802 (11th Cir. 1992).......................................................10

*Coleman v. Director, OWCP*,

    345 F.3d 861 (11th Cir. 2003).......................................................28

*Dilda v. Quern*,

    612 F.2d 1055 (7th Cir. 1980)........................................................8

*Drazen v. Pinto*,

    106 F.4th 1302 (11th Cir. 2024).....................................................24

*Dusenbery v. United States*,

    534 U.S. 161 (2002)................................................................................5

*Febus v. Gallant*,

    866 F. Supp. 45 (D. Mass. 1994) ..........................................................8

*Gaines v. Hadi*,

    No. 06-60129-CIV, 2006 WL 6035742 (S.D. Fla. Jan. 30, 2006).......................2, 9

*General Telephone Company of Southwest v. Falcon*,

    457 U.S. 147 (1982).................................................................. 25, 27

*Goldberg v. Kelly*,

    397 U.S. 254 (1970)................................................... 2–4, 6, 7, 11, 15

*Grayden v. Rhodes*,

    345 F.3d 1225 (11th Cir. 2003)........................................... 9, 12, 13, 19

*iCare Child Development Center LLC v. Cicero-Brown*,

    177 F.4th 1302 (11th Cir. 2026)...........................................................11

*Jamie S. v. Milwaukee Public Schools*,

    668 F.3d 481 (7th Cir. 2012)...............................................................21

\* *Jordan v. Benefits Review Board of United States Department of Labor*,

    876 F.2d 1455 (11th Cir. 1989)........................................... 1–3, 5, 7, 9, 10, 12–14

*Kapps v. Wing*,

    404 F.3d 105 (2d Cir. 2005).............................................................2, 8

*League of Women Voters of Florida, Inc. v. Florida Secretary of State*,

    66 F.4th 905 (11th Cir. 2023)................................................................18

*Mathews v. Eldridge*,

    424 U.S. 319 (1976)............................................... 4, 5, 8, 9, 11, 13–15

*Mielo v. Steak 'n Shake Operations, Inc.*,

    897 F.3d 467 (3d Cir. 2018)...............................................................21

\* *Mullane v. Central Hanover Bank & Trust Co.*,

    339 U.S. 306 (1950)............................................................. 1–12, 14

*Nalubega v. Cambridge Housing Authority*,

    No. 1:12-cv-10124, 2013 WL 5507038 (D. Mass. Sept. 30, 2013).......................19

*Ortiz v. Eichler*,

    616 F. Supp. 1046 (D. Del. 1985) .........................................................2

*Ortiz v. Eichler*,

    794 F.2d 889 (3d Cir. 1986)................................................................8

*Perdue v. Gargano*,

    964 N.E.2d 825 (Ind. 2012) ...............................................................2

*Rodriguez v. Chen*,

    985 F. Supp. 1189 (D. Ariz. 1996)........................................................8

*Schaffer ex rel. Schaffer v. Weast*,

    546 U.S. 49 (2005)..........................................................................28

*Schroeder v. Hegstrom*,

590 F. Supp. 121 (D. Or. 1984)..................................................................8

*Simpson v. Dart*,

23 F.4th 706 (7th Cir. 2022)............................................................... 22, 23

*Soberal-Perez v. Heckler*,

717 F.2d 36 (2d Cir. 1983)..........................................................................9

*Vargas v. Trainor*,

508 F.2d 485 (7th Cir. 1974).......................................................................8

\* *Wachtel ex rel. Jesse v. Guardian Life Insurance Co. of America*,

453 F.3d 179 (3d Cir. 2006)......................................................................21

\* *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338 (2011)................................................................. 21, 25, 26

*Walters v. National Association of Radiation Survivors*,

473 U.S. 305 (1985)...................................................................................11

*Wehunt v. Ledbetter*,

875 F.2d 1558 (11th Cir. 1989)...................................................................6

*West Covina v. Perkins*,

525 U.S. 234 (1999)...................................................................................13

## **Rules**

Fed. R. Civ. P. 23.............................................................................. 22–24, 26

Fed. R. Civ. P. 23(c)(1)(B) ....................................................... 20, 21, 23, 24

**Regulations**

42 C.F.R. § 431.221(d) ...................................................................................7

Fla. Admin. Code r. 65-2.046(1) ...................................................................7

**Other Authorities**

OXFORD ENGLISH DICTIONARY (2d ed. 1989)...........................................................21

## ARGUMENT

I.    **DUE PROCESS DOES NOT REQUIRE FLORIDA'S NOTICES TO DISPLAY CASE-SPECIFIC FINDINGS OR CALCULATIONS.**

Plaintiffs declare that the district court applied this legal standard: "whether the enrollee has 'sufficient information to evaluate the accuracy of the State's decision and make an informed decision whether to challenge it.'" Br.23 (quoting Op.227).

This standard—which Plaintiffs call the "accuracy" standard—cannot be found in this Court's precedents. It is not the *Mullane* standard. *Mullane* asks whether notice is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). *Mullane* does not ask whether the notice includes the individualized details needed to replicate the State's decisional process.

This Court did not apply the "accuracy" standard in *Arrington v. Helms*, 438 F.3d 1336 (11th Cir. 2006), or *Jordan v. Benefits Review Board of United States Department of Labor*, 876 F.2d 1455 (11th Cir. 1989). In *Arrington*, the notices told recipients how much Alabama withheld. 438 F.3d at 1350. They did not explain *why* Alabama withheld that amount—or any amount—or how Alabama calculated that number. *Id*. They did not enable recipients to evaluate the "accuracy" of Alabama's decision. In *Jordan*, the notice identified the eligibility criterion the applicant

1

failed—equivalent to saying that Medicaid benefits will end because of income—but provided no individualized details to explain *why*. 876 F.3d at 1459.

The district court quoted passages from two decisions to support its "accuracy" standard. Op.227. One—a 41-year-old district-court decision from Delaware—never cited *Mullane*. *See Ortiz v. Eichler*, 616 F. Supp. 1046 (D. Del. 1985). The other—an Indiana Supreme Court decision—expressly rejected the *Mullane* standard. *Perdue v. Gargano*, 964 N.E.2d 825, 832 n.10 (Ind. 2012). This Court has explained, however, that out-of-circuit precedents that do not apply the *Mullane* standard have "little persuasive value." *Arrington*, 438 F.3d at 1349 n.13.

Of the six cases the district court cited to support its "accuracy" standard, *see* Op.227, three do not cite *Mullane*, one rejects it (*Perdue*), and one cites *Mullane* once, for an unrelated proposition (*Kapps v. Wing*, 404 F.3d 105, 120 (2d Cir. 2005)). The sixth case—*Gaines v. Hadi*, No. 06-60129-CIV, 2006 WL 6035742, at *14, *18 (S.D. Fla. Jan. 30, 2006)—*upheld* a notice under *Mullane* and recognized that even "stock" notices can satisfy *Mullane*.

Tellingly, Plaintiffs fail to cite a single case that applied the *Mullane* standard and found a notice inadequate because it did not include explanatory findings and calculations. None of the notices approved in *Arrington* or *Jordan*—or *Goldberg v. Kelly*, 397 U.S. 254 (1970), or *Adams v. Harris*, 643 F.2d 995 (4th Cir. 1981)—contained such information.

2

In search of support for the "accuracy" standard, Plaintiffs first look to *Mullane* itself. Br.23. Plaintiffs confusingly blend two statements from *Mullane* to create an implication that *Mullane* required disclosure of individualized details. Br.23. It did not. The dispute in *Mullane* concerned the method of service—*i.e.*, notice by publication—rather than the informational content of notices. 339 U.S. at 315–20. If *Mullane* had required the disclosure of individualized findings and calculations, then this Court would have decided *Arrington* and *Jordan* differently.

Ultimately, Plaintiffs' argument boils down to this: *Goldberg* modified *Mullane* and created a two-tiered system of notice. *Arrington* and *Jordan* are all well and good (Plaintiffs say) for coal miners with black-lung disease and financially needy single mothers whose welfare payments the State recoups, but *Goldberg* imposes a more demanding standard of disclosure in favor of Medicaid recipients. Br.31–32. Notices that concern what Plaintiffs deem "*Goldberg*-type benefits," Br.34, must disclose individualized details, they say. Plaintiffs coin this heightened standard the "*Mullane*/*Goldberg* standard," Br.26, 29, 33—a term no court has ever used.

Below, Florida demonstrates that, under *Mullane*, this dichotomy is arbitrary and unfounded. The Court should reject it.

**A.**

Nothing in the *Mullane* standard differentiates between public-assistance programs to create a two-tiered system of notice. Plaintiffs argue that *Goldberg* modified *Mullane* to require States to disclose individualized findings and calculations in notices that terminate "critical need-based benefits," Br.26, but not otherwise. *Goldberg* did no such thing, and *Arrington* refutes that theory.

The question in *Goldberg* was whether a State must provide an opportunity for an evidentiary hearing before it terminates welfare benefits. 397 U.S. at 255. The Court answered affirmatively. It explained that welfare recipients depend on welfare benefits "for daily subsistence" and that pre-hearing termination "may deprive an eligible recipient of the very means by which to live." *Id*. at 264.

Six years later, in *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Court concluded that due process does not require a similar opportunity for an evidentiary hearing before disability benefits are terminated. While welfare recipients live on the "margin of subsistence," a recipient of disability benefits might receive income from "many other sources." *Id*. at 340–42.

This distinction in favor of benefits that provide daily subsistence was relevant to the recipient's hearing rights under the *Mathews* standard. It spoke to the first *Mathews* factor: "the private interest that will be affected." *Id*. at 335, 339–43.

The private interest was weightiest where the State proposed to terminate benefits on which recipients depended for their subsistence.

Courts have not applied the same distinction under the separate *Mullane* standard. The *Mathews* standard identifies the "specific dictates of due process," including hearing procedures, *id*. at 335, while *Mullane* standard applies when courts evaluate the adequacy of notice, *Arrington*, 438 F.3d at 1349–50 & n.13.

Dependence on welfare benefits for daily subsistence was a key consideration that, under the *Mathews* standard, required a pre-termination evidentiary hearing. But it does not follow that, under the *Mullane* standard, the same consideration imposes heightened notice requirements. Unlike *Mathews*, *Mullane*'s "more straightforward test," *Dusenbery v. United States*, 534 U.S. 161, 167 (2002), does not ask courts to weigh the importance of benefits. Rather, it asks whether notice is reasonably calculated to (1) inform recipients of the "pendency of the action"; and (2) afford recipients an "opportunity to present their objections." *Mullane*, 339 U.S. at 314.

The same rule applies to all benefits: black-lung benefits (*Arrington*), welfare benefits (*Jordan*), and Medicaid. While the content of notices might differ to reflect differences in a State's intended action, *Arrington* and *Jordan* confirm that, to communicate the information that *Mullane* requires, individualized findings and calculations are unnecessary.

Plaintiffs cannot distinguish *Arrington*. *Arrington* concerned the same benefits at issue in *Goldberg*: welfare benefits. Plaintiffs assert that *Arrington* "concerned child support payment notices" and that, although the recipients also received welfare benefits, the "notices were communicating the amount of separate, additional, private child support payments." Br.29, 31–32. That is incorrect. The notices communicated the amount that Alabama deducted from child-support payments to offset or recoup welfare benefits. 438 F.3d at 1350 (explaining that the notices communicated the amount "withheld as reimbursement" for welfare payments); *see also Wehunt v. Ledbetter*, 875 F.2d 1558, 1560 (11th Cir. 1989) (explaining that States withhold child-support collections to "offset welfare expenditures").

If *Goldberg* applied heightened notice requirements to welfare recipients, then this Court would have applied those requirements in *Arrington*, where Alabama clawed back welfare payments from single mothers. Surely welfare recipients in Alabama in 2006 were no less dependent on welfare benefits for daily subsistence than those in New York in 1970. At bottom, *Goldberg* did not create a modified *Mullane* standard applicable only to certain benefits—and *Arrington* confirms it.

Plaintiffs scour *Goldberg* for "indicia" that *Goldberg* required disclosure of individualized details, Br.25—an unusual way to discern the Court's holding.

6

Plaintiffs do not dispute, however, that the very notices the Court in *Goldberg* approved in "form and content," 397 U.S. at 268, did not include such information.

Plaintiffs emphasize that *Goldberg* commended New York's practice of holding conferences with recipients before written notices were issued. Br.25. Indeed, the Court remarked that this combination was "probably the *most* effective"—*i.e.*, more than adequate—method of notice. 397 U.S. at 268 (emphasis added). And a pre-notice conference was important in *Goldberg* because New York allowed recipients only seven days to appeal. *Id*. at 258–59, 268. Florida allows the federal maximum of **90 days**—ample time for recipients to evaluate their options, seek out information, and request an appeal. 42 C.F.R. § 431.221(d); Fla. Admin. Code r. 65-2.046(1); Doc. 155-38 at 10. And of course, Plaintiffs already know their own income, without Florida telling them.

### B.

Rather than follow *Arrington* and *Jordan*, the district court followed out-of-circuit, non-*Mullane* decisions. Br.34–36. *Arrington* cautioned against that precise mistake, explaining that such decisions have "little persuasive value." 438 F.3d at 1349 n.13. Plaintiffs try but fail to explain away the court's reliance on non-*Mullane* decisions.

Early in its analysis, the district court declared that it "returns to the *Mullane* standard." Op.218. But it then conducted a nationwide survey of notice cases,

Op.220–23, and did not mention *Mullane* again until it had already decided what specific items of information Florida's notices must contain, Op.227–28. The court acknowledged the cases that found "standardized notice" sufficient but also noted that some cases required "individualized details." Op.220. It then engaged in "weighing" the "persuasive value" of these competing precedents, Op.223, and found the cases that required individualized details "more applicable and persuasive," Op.226–27, even though they did not apply *Mullane*.

Plaintiffs do not dispute that *Rodriguez v. Chen*, 985 F. Supp. 1189 (D. Ariz. 1996), and *Schroeder v. Hegstrom*, 590 F. Supp. 121 (D. Or. 1984), applied the *Mathews* standard. Contrary to Plaintiffs' argument, *Kapps* and *Ortiz v. Eichler*, 794 F.2d 889 (3d Cir. 1986), did too. Br.28. In *Kapps*, the court analyzed each *Mathews* factor in determining that New York must include individualized "budgetary information" in home-energy assistance notices. 404 F.3d at 123–27 & n.27. It said so: "we apply the Supreme Court's familiar *Mathews v. Eldridge* test." *Id*. at 118. In *Ortiz*, the court discussed each *Mathews* factor seriatim and concluded that due process required Delaware to include its "calculations" in its notices. 794 F.2d at 893 & n.4.

Plaintiffs argue that *Barry v. Lyon*, 834 F.3d 706 (6th Cir. 2016); *Dilda v. Quern*, 612 F.2d 1055 (7th Cir. 1980); *Vargas v. Trainor*, 508 F.2d 485 (7th Cir. 1974); and *Febus v. Gallant*, 866 F. Supp. 45 (D. Mass. 1994), are not *Mathews*

cases, Br.27, but more to the point, they are not *Mullane* cases either. None even cites *Mullane*.

That leaves *Gaines*, which applied *Mullane* to *uphold* a notice and recognized that even "stock" notices can satisfy *Mullane*. 2006 WL 6035742, at \*14, \*18. *Gaines* in no way contradicts Florida's position.

The problem is not that the district court *cited* out-of-circuit, non-*Mullane* decisions, Br.27, but that it did precisely what *Arrington* cautioned against: it relied on them to determine what Florida's notices should say. While this Court has explained that, in notice cases, "we eschew the balancing test in *Mathews*," *Grayden v. Rhodes*, 345 F.3d 1225, 1242 (11th Cir. 2003), the district court did not eschew, but embraced *Mathews* decisions and other non-*Mullane* decisions. Under *Grayden* and *Arrington*, that was error.

Plaintiffs claim that *Jordan* also cited an out-of-circuit *Mathews* decision. Br.27 n.5. But *Jordan* cited *Soberal-Perez v. Heckler*, 717 F.2d 36 (2d Cir. 1983), for a proposition unrelated to the *Mathews* standard—*i.e.*, that non-English speakers with a "special problem of comprehension" have a duty of inquiry. 876 F.2d at 1460. *Soberal-Perez*, moreover, ultimately applied the *Mullane* standard. 717 F.2d at 43. Contrary to Plaintiffs' assertions, this Court did not contradict its own admonition against reliance on *Mathews* precedents.

9

Finally, *Billington v. Underwood*, 613 F.2d 91 (5th Cir. 1980), was not even a due-process case. It construed federal regulations and avoided "reaching the constitutional issues." *Id.* at 93. The notice in *Billington* was extremely cryptic, referencing only the public-housing applicant's "detrimental effect on tenants and project environment." *Id.* at 92. And the applicant had no access to additional information before the final hearing. *Id. Billington* is inapposite.

## C.

Plaintiffs' maneuverings to avoid *Arrington* and *Jordan* are unpersuasive.

*First*, Plaintiffs contend that, because *Mullane* considers the totality of circumstances, one court's approval of a notice does not compel the same outcome in other cases. Br.29–30. *Stare decisis* applies, however, and requires courts to follow binding precedent absent a legally significant factual distinction. *See Birdwell v. City of Gadsden*, 970 F.2d 802, 807 (11th Cir. 1992) ("*Stare decisis* means that like facts will receive like treatment in a court of law."). Plaintiffs have not shown a material distinction between the circumstances here and those in *Arrington* and *Jordan*.

*Second*, Plaintiffs argue that the benefits at issue in *Arrington* and *Jordan* were not need-based benefits and therefore are treated differently under *Mullane*. Br.31. Both components of this argument are misguided. As explained above, *Arrington* concerned the recoupment of welfare benefits—the same need-based

10

benefits at issue in *Goldberg*. And while the *Mathews* standard's private-interest factor weighs critical, need-based benefits differently from other benefits, the *Mullane* standard does not.

Indeed, both cases that Plaintiffs cite to support their proposed distinction in favor of critical, need-based benefits are *Mathews* cases, and neither concerned the adequacy of notice. *See* Br.31; *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 307, 333 (1985) (applying *Mathews* to determine whether a $10 cap on attorney's fees violated due process); *iCare Child Dev. Ctr. LLC v. Cicero-Brown*, 177 F.4th 1302, 1307 (11th Cir. 2026) (applying *Mathews* to determine whether a daycare provider was entitled to a pre-deprivation hearing). Even as Plaintiffs insist the district court did not rely on *Mathews* cases, they offer two more.

*Third*, Plaintiffs incorrectly claim that the notices in *Arrington* enabled parents to "confirm the 'accuracy' of their child support payments." Br.32–33. The notices disclosed the amount of child-support payments Alabama collected, retained, and disbursed. 438 F.3d at 1350. Parents could review their child-support orders to determine whether Alabama *collected* the right amount and their child-support checks to determine whether Alabama *disbursed* what it said it would. *Id*. But the notices neither explained Alabama's decision to *retain* money nor provided individualized details to support Alabama's calculation of its share. *See id*. (explaining that notices disclosed the amount the parent was "purportedly" owed).

11

As to the portion withheld, the notice simply disclosed the amount, without explanation.

The standard the district court applied is indeed "incompatible" with *Arrington*. Br.33. Alabama's notices did not enable parents to evaluate the accuracy of Alabama's decision. *Arrington* therefore refutes Plaintiffs' contention that notices must enable recipients to replicate a State's calculations.

*Fourth*, to distinguish *Jordan*, Plaintiffs present two quotations in misleading ways. According to Plaintiffs, this Court concluded in *Jordan* that a notice is sufficient when it "supplies 'sufficient detail' to assess the accuracy of the decision." Br.35–36. *Jordan* said no such thing. Rather, *Jordan* said the challenged notices contained "sufficient detail *to pass the notice requirement of due process*." 876 F.2d at 1459 (emphasis added); *accord Adams*, 643 F.2d at 999 (finding a notice that presented "basic reasons for denial" but no "findings of fact" sufficient under *Mullane*). The notices did not present sufficient detail to assess the accuracy of the decision, but were constitutional nonetheless.

The second misleading statement is even more egregious. Plaintiffs make this assertion:

> *Jordan*, however, "does not stand for the converse proposition that [standardized] notice is always sufficient to satisfy due process." *Grayden*, 345 F.3d at 1244.

12

Br.36. But this is what *Grayden* actually said: "<u>West Covina</u> does not stand for the converse proposition that <u>statutory</u> notice is always sufficient to satisfy due process." 345 F.3d at 1244 (underlining added). The statement in *Grayden* did not address *Jordan* or standardized notices. To force *Grayden* fit their argument, Plaintiffs substituted "*Jordan*" for "*West Covina*" and "standardized" for "statutory."

Finally, Plaintiffs praise the notices in *Jordan* for being written "succinctly" and reciting the standard "requirements an enrollee must meet." Br.36 (quoting Op.216–17 & n.71). The notices were succinct because they contained no individualized details. And the "requirements an enrollee must meet" are standardized information—the *opposite* of the individualized details that Plaintiffs seek here. Plaintiffs cannot euphemize the simple and generic notices upheld in *Jordan* and condemn Florida because its notices omit individualized findings and calculations.

## D.

Without announcing it, Plaintiffs' brief proceeds sequentially through the *Mathews* factors. In Part I, Plaintiffs argue that Medicaid provides "critical, need-based public benefits," Br.24, which speaks to the first *Mathews* factor, the private interest. *See Mathews*, 424 U.S. at 339–43 (concluding that the private interest in welfare benefits, which are need-based, is greater than in disability benefits).

13

In Part II.A., Plaintiffs focus on the risk of error in Medicaid eligibility determinations and the potential that more information might enable recipients to identify errors. These considerations come straight from the second *Mathews* factor: "the risk of an erroneous deprivation . . . and probable value, if any, of additional or substitute procedural safeguards." *Id*. at 334.

The more straightforward *Mullane* standard does not entail these same inquiries. In *Jordan*, this Court did not discuss the "prevalence and type of errors" committed in eligibility determinations for black-lung benefits or consider whether more information would have enabled applicants to "identify . . . errors." Br.37–38.

Likewise, in *Arrington*, this Court did not weigh the risk of error in Alabama's calculation of welfare-benefit recoupments or consider the error-detecting value of more robust notices. Conversely, in *Barnes v. Healy*, 980 F.2d 572, 578–80 (9th Cir.1992), which this Court refused to follow in *Arrington*, the Ninth Circuit applied the *Mathews* standard and repeatedly weighed the "risk of erroneous nonpayment" and the probable value of more information toward "spotting erroneously withheld payments."

These are *Mathews* questions, and *Mathews* is the wrong legal standard. Plaintiffs' focus on the risk of erroneous deprivation and the probable value of additional safeguards underscores their and the district court's continual gravitation toward *Mathews*.

14

Even if the second *Mathews* factor were relevant, the record would not support the injunction. It identifies *types* of errors that Florida has made and rectified, but contains no evidence of error rates classwide. Nor do Plaintiffs explain how the information the injunction mandates would enable recipients to detect these specific errors. For example, Plaintiffs do not explain how that information would enable recipients to determine that their pregnancy status entitles them to 12 months of uninterrupted coverage without regard to income. Br.37.

### E.

Florida's notices are constitutional, separate and apart from alternative sources of information. They inform recipients of the intended action and the reason behind it (income). But even if this Court concludes it must look beyond the notices and consider the sufficiency of alternative sources such as the call center, it should reverse. While Plaintiffs portray the parties' disagreement over alternative sources as a factual question, it is *mostly* a mixed question subject to *de-novo* review: whether these alternative sources, such as they are, help Florida satisfy due process, or whether, as the district court concluded, they are so illusory as to count for nothing.

Like the district court, Plaintiffs would impose a far more stringent standard on Florida than the Supreme Court imposed on New York in *Goldberg* or this Court imposed on Alabama in *Arrington*. In *Goldberg* and *Arrington*, the record clearly

15

chronicled the shortcomings of the alternative sources available to welfare recipients: unanswered calls, obsolete telephone systems, inconsistent explanations, and hostile caseworkers. Appellants' Br.19, 33. Far from condemning those resources as illusory, both courts commended their availability.

Plaintiffs, however, view Florida's alternative sources through a harsh and critical lens that magnifies perceived imperfections into disqualifying defects. Plaintiffs even echo the district court's astonishing suggestion that family resource centers are useless because they maintain *only* full business hours. Br.43. This Court should evaluate Florida's alternative sources by the same standard of reasonableness that applied to New York and Alabama.[1]

**Family Resource Centers.** Plaintiffs grumble that Florida's customer-service offices, known as family resources centers, are "closer to some Medicaid enrollees than others" and that this intolerable "variation" leaves to "chance" whether recipients can obtain information. Br.43. But no office is omnipresent; all physical locations are closer to some than to others. *Arrington* explained that parents can "visit" Alabama's offices "during regular business hours." 438 F.3d at 1350. It did

---

[1] Plaintiffs speculate that the record in *Arrington* did not support the critiques of Alabama's hotline. Br.34. Ample record citations, including two affidavits, supported those critiques. Br. for Appellants at 14 & 25 & nn.21 & 22 (No. 04-15078), 2005 WL 4814962. This Court construed the record in the "light most favorable" to the plaintiffs, 438 F.3d at 1341, and *still* affirmed summary judgment for the defendants.

not demand that Alabama maintain offices on every street corner, open day and night.

Plaintiffs offer no benchmark to support their conclusion that 105,000 monthly visitors represents "low-usage rates." Br.44. It does not. Nor do usage rates change the fact that family resource centers are one resource available to recipients with questions.

Plaintiffs gripe that Florida does not specifically tell recipients that family resource questions can answer questions about income, Br.44, but even the injunction does not require Florida's notices to provide an exhaustive list of every topic that family resource centers can address. The *very section* of the notice that communicates income-based terminations invites recipients to visit family resource centers. Doc. 155-68 at 5–6. That is impossible to misunderstand.

Plaintiffs complain that self-service representatives receive less training than Tier-3 call-center agents, Br.44, although the record establishes only that their training is "probably shorter," Doc. 165 at 196:23. Plaintiffs cite no evidence, however, of the training's content or sufficiency. Br.44.

**The Call Center.** Plaintiffs concede that the only evidence of mistakes made by call-center agents consists of "two callers out of millions." Op.234 & n.81. Yet they insist that their cherry-picked, anecdotal evidence of two mistakes is "enough" to taint the call center. Br.42. That is illogical and highlights the double-standard: the

17

punishing standard applied against Florida and the reasonable standard applied to New York and Alabama.

Plaintiffs argue that *League of Women Voters of Florida*, *Inc. v. Florida Secretary of State*, 66 F.4th 905 (11th Cir. 2023), was an equal-protection case, Br.43 n.12, but that makes no difference to mathematical principles. Just as a small sample was unrepresentative there, an even tinier sample is unrepresentative here. By extrapolating from a sample of two, the district court committed legal error.

To avoid their failure to present a representative sample, Plaintiffs endorse the district court's legal error and incorrectly claim that Florida bore the burden to "rebut" the inference from Plaintiffs' limited evidence. Br.42. But Plaintiffs cite no support for their contention that evidence of two mistakes out of millions of opportunities (1) yields any inference at all; or (2) shifts the burden to Florida to disprove liability.

The closest thing to survey evidence on this issue comes from Plaintiffs' own witness, Mr. Ramil, who has called the call center more than 1,000 times and received incorrect income information "only . . . a handful of times." Doc. 164 at 96:9–97:7. Mr. Ramil advises his clients not to use the call center, Br.42, because it is *his job* to call on their behalf, Doc. 164 at 102:7–17. He continues to call because he finds it beneficial. *Id*. at 96:9–24.

18

Plaintiffs do not deny that the district court misunderstood the call-center data presented at trial, but curiously argue that Florida cannot object to the court's reliance on the data. Br.41. The problem is not that the court *relied* on the data, but that it *misunderstood* it. Plaintiffs do not defend the court's objectively incorrect assertion that only 32 percent of callers who sought to speak with a live agent succeeded.

Calls are not "simply disconnected." Br.40. If call volumes are excessive and the queue is full, then, before a call is disconnected, the caller is informed that all representatives are busy and invited to try back later. Op.91–92. And while there have been anomalous instances of two-hour hold times, Br.40, the *average* hold time is approximately 20 minutes, Op.91 ¶ 238. Sometimes, the hold time is "as little as two minutes." Doc. 164 at 97:8–10.

**Supervisory Conferences.** Plaintiffs discount supervisory conferences because they occur after the recipient appeals. Br.44. Specifically, Plaintiffs cite *Grayden* for the proposition that post-deprivation notice is insufficient. But the filing of an *appeal* is not a *deprivation*. In *Grayden*, tenants received notice of their rights only *after* their evictions—*i.e.*, after the deprivation. 345 F.3d at 1238 n.18. Supervisory conferences are not *post-deprivation* notices merely because they occur after the recipient appeals. *See Nalubega v. Cambridge Hous. Auth.*, No. 1:12-cv-10124, 2013 WL 5507038, at *5, *16–18 (D. Mass. Sept. 30, 2013) (concluding that

informal conference held *after* recipient requested a hearing remedied any insufficiency in written notice).

## II. THE DISTRICT COURT INCORRECTLY CONCLUDED THAT FLORIDA'S NOTICES DO NOT COMMUNICATE THE STATE'S INTENDED ACTION WITH SUFFICIENT CLARITY TO SATISFY DUE PROCESS.

### A. The District Court's Class-Certification Order Did Not Identify the Structural Claim as a Class Claim.

The class-certification order defined three questions for classwide resolution: (1) whether the notices must include individualized details; (2) whether the notices adequately inform recipients of their hearing rights; and (3) whether the notices must include a reason code that references income. Appellants' Br.42–43. After trial, the court decided a question not identified in its class-certification order: whether the structure of the notices is confusing and impedes a reader's comprehension of the information the notices contain.

Plaintiffs maintain that the court was free to decide any question of procedural due process on a class basis, despite the class-certification order's repeated recitations of three questions the court would decide.

Plaintiffs' contention hollows out Rule 23(c)(1)(B). It allows courts to define class claims at the most stratospheric level of generality and even to exceed any questions they clearly and discretely define. Rule 23(c)(1)(B) would afford neither clarity nor certainty, undermining reliance on class-certification orders.

20

Plaintiffs are mistaken. Rule 23(c)(1)(B) requires "comprehensiveness and specificity, rather than illustrative or partial treatment." *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 185 (3d Cir. 2006). The word "define" requires a court to "state precisely or determinately" the boundaries of class treatment and to "frame or give a precise description" of the class claims. *Id.* (quoting OXFORD ENGLISH DICTIONARY (2d ed. 1989)).

In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), when discussing commonality, the Court explained that, because the same provision of law "can be violated in many ways," a broad contention that class members "suffered a violation of the same provision of law" is insufficient for class certification. *Id.* at 350; *accord Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 489 (3d Cir. 2018) (same); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012) (noting that a "bottom-line liability question" cannot satisfy commonality).

The same is true here. To define class claims, a court must do more than say "procedural due process." Due process has many applications and can be violated in many ways. Contrary to Plaintiffs' caricature of Florida's arguments, a court need not "inventory every operative fact." Br.53. But a virtually boundless reference that sweeps into the class action all possible due-process challenges affords neither clarity nor certainty. Despite Plaintiffs' assertions, neither *Wachtel* nor *Simpson v.*

21

*Dart*, 23 F.4th 706 (7th Cir. 2022), held that a recitation of the elements of a cause of action suffices. Br.53.

Even if a general statement were sufficient, once the court specified three questions for classwide resolution, it was not free to exceed its own parameters absent a proper amendment to its class-certification order and a determination that the new question satisfies Rule 23's prerequisites. Florida was entitled to rely on the court's delineation of the questions to be accorded class treatment.

Plaintiffs dispute this conclusion. First, they point to the class-certification order's broadest formulation of the class claims: its statement that the "central question" is "what information and degree of detail" the notices must contain. Br.55 (quoting Doc. 122 at 52). But the court further defined the boundaries of the class claims when, over and over again, it identified three distinct questions for classwide resolution. Moreover, even this broadest formulation does not encompass the structural question. That question does not ask "what information or degree of detail" the notices must contain, but how that information is displayed: whether the structure confuses readers and impedes their comprehension of information the notices already contain.

Next, Plaintiffs incorrectly claim the structural question cannot "meaningfully be separated" from the three questions the court identified. Br.55. The court itself analyzed it separately in a different section of its injunction. Op.206. Whether

22

notices must include specific items of information, and whether their structure obscures the information the notices contain, are distinct and separable questions.

Plaintiffs argue that, "from the outset," Florida was on notice of concerns over the notice structure. Br.56. But not all claims satisfy Rule 23's prerequisites. *Simpson*, 23 F.4th at 713. The whole point of Rule 23(c)(1)(B) is to provide clarity and certainty so that all parties know, without guesswork, which claims or issues cleared the Rule 23 hurdle. If potential challenges not mentioned in the class-certification order remain candidates for classwide resolution, then litigants cannot rely on class-certification orders.

Florida need not show prejudice, as Plaintiffs claim, Br.54, but it would be easy enough. If Florida had known that the court would scrutinize the notice structure, then it could have offered evidence to explain the sections and groupings in the notices and to show how frequently or infrequently certain structural characteristics appear in its notices. This evidence might have established the absence of commonality and of a classwide injury or violation. *See infra* Part II.B. Florida could have presented expert testimony regarding the effect, if any, of the notice structure on the ability of recipients to comprehend information in the notices.

The proper remedy is not a redo, Br.56–57, but rather reversal of those portions of the injunction that exceed the defined scope of class certification. Of the three cases that Plaintiffs cite in support of remand, two were interlocutory appeals,

23

which of course culminate in remand, and the third—*Drazen v. Pinto*, 106 F.4th 1302 (11th Cir. 2024)—involved no violation of Rule 23(c)(1)(B).

### B.    The Structural Claim Neither Satisfies Rule 23's Commonality Requirement Nor Reveals a Classwide Injury or Violation.

After trial, the district court concluded on a classwide basis that the notice structure obscures the information the notices contain. But the court never conducted a Rule 23 certification analysis on that question. Rather, in response to Florida's request for a clear specification of all class claims and issues, Doc. 93 at 26–27, the court stated:

> Plaintiffs' claims are premised on their challenge to certain uniform practices—the omission of certain types of individualized information from termination notices, the reliance on Designated Reasons which do not identify any eligibility criteria, and the standardized fair hearing information. *Based on these common practices*, *the Court finds it appropriate to certify a class* . . . .

Doc. 122 at 56–57 n.18 (emphasis added). Thus, the court did not certify a class based on alleged structural deficiencies. And as Florida has demonstrated, there are significant variations in the structure of income-based termination notices. Appellants' Br.46–48.

Plaintiffs insist that none of this matters. According to Plaintiffs, it is sufficient that the court found two common questions: whether notices must include individualized details and whether notices must include a reason code that references income. Br.57. But those questions are foreign to the notices' structure. A court's

24

identification of a common question does not justify its classwide resolution of other, unconnected questions that it never analyzed for commonality.

Plaintiffs claim the notices contain random groupings of individuals, multiple sections with identical headings, and incorrect reason codes. Br.58–59. But these very features differ from notice to notice: the sections, section headings, and groupings depend on such variables as the number of household members and the number of programs in which those individuals participate. Appellants' Br.46–48. Meanwhile, the record contains no evidence of the frequency with which notices display incorrect reason codes, rather than Reason Code 241.

The district court used "structure" as an umbrella term to capture a range of characteristics in Florida's notices—including groupings, sections, headings, reason codes, and legal citations—each of which might differ from notice to notice. Variations in each will produce different combinations of characteristics across notices.

This is the opposite of commonality. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). What matters is "the capacity of a class-wide proceeding to generate common *answers* . . . . Dissimilarities within the proposed class . . . have the potential to

impede the generation of common answers." *Id*. at 350 (citation omitted; emphasis in original).

Because of dissimilarities in structure, the question whether the structure obscures the State's decision does not yield a common answer. A determination of its "truth or falsity" will not resolve "in one stroke" an "issue that is central to the validity of each one of the claims." *Id*.

Plaintiffs contend that, although the structure varies, commonality can be found in the training and templates that Florida employs. Br.58–59. But the district court did not articulate a common question on these topics, *see* Doc. 122 at 55–58, nor did Plaintiffs ask it to, *see* Doc. 85 at 18–20. Instead, Plaintiffs argued that "the 'glue' that holds the class together is the uniform omission of 'any case-specific information that explains the basis for [Florida's] eligibility determination.'" Doc. 122 at 52 (quoting Doc. 100 at 1). The record contains no evidence of the content or sufficiency of the State's training.

Plaintiffs suggest that the court's entry of an injunction cures or proves compliance with commonality. Br.60. It does neither. A district court cannot immunize its class-certification errors from appellate review by compounding its error and entering an injunction in favor of a class it should not have certified.

The court never engaged in a Rule 23 certification analysis with respect to the structural question. Had it done so, it would have found, upon a "rigorous analysis,"

*Falcon*, 457 U.S. at 161, that commonality was absent. The dissimilarities in structure across notices preclude a finding that all class members suffered the same injury. This Court should reverse.

### C.    The Notices Are Reasonably Calculated to Communicate Florida's Intended Action.

Florida's opening brief explained why the challenged notices communicate the State's intended action with sufficient clarity to satisfy the minimum requirements of due process. Plaintiffs fail to overcome that explanation and instead rely largely on factual misstatements, hyperbole, and an improper allocation of the burden to Florida where their own evidence falls short.

Plaintiffs first assert that the notices split "information pertaining to an income-based Medicaid termination across multiple sections." Br.45. Not so. The district court itself recognized that each notice contains a single Medicaid-termination section. Op.52 ¶ 127.

Plaintiffs assert that the Medicaid-termination section, entitled "Medicaid," is "one of many sections with the same heading." Br.46. That too is incorrect. Of the three income-based termination notices in the record,[2] two have no other sections with the same heading, let alone many. Docs. 155-68, 155-90.

---

[2] Plaintiffs do not dispute that, apart from the erroneously formatted notices sent to Ms. Mezquita, the record contains only three income-based termination notices.

Plaintiffs claim the Income Exceeds Sentence appears in "fine print." Br.47. That's not true either. It appears in the same font size as the rest of the notice. Docs. 155-38 at 3, 5; 155-68 at 3; 155-90 at 2; *see also Coleman v. Dir*., *OWCP*, 345 F.3d 861, 865 (11th Cir. 2003) (rejecting due-process challenge based on font used in notice). And since April 2024, this sentence has appeared prominently as the very first sentence under the "Medically Needy" heading. Appellants' Br.52.

Plaintiffs argue there is "no evidence" that Florida consistently uses Reason Code 241, which references income. Br.47. But it is Plaintiffs' burden to prove that Florida uses the *wrong* reason code—not Florida's burden to prove that it uses the *right* one. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (explaining that generally "plaintiffs bear the burden of persuasion regarding the essential aspects of their claims"). If there is "no evidence" of the consistency or inconsistency with which Florida uses Reason Code 241, then Plaintiffs have failed to prove their case. Caseworkers were expected to input Reason Code 241 when a recipient was terminated for income, Op.67–68 ¶¶ 166, 168, and Florida has since automated that process, Doc. 172; Op.68–69.

Plaintiffs assert that Florida uses "actively misleading" reason codes, alone or in combination with Reason Code 241. Br.47–48. But again, Plaintiffs presented no evidence of the frequency with which particular reason codes or combinations of reason codes appear on income-based termination notices. None of the three

income-based termination notices in the record contains multiple reason codes in the Medicaid-termination section. Docs. 155-38 at 8, 155-68 at 6, 155-90 at 5.

Plaintiffs claim that recipients must "discern" for themselves that they should "ignore" reason codes. Br.47. That is pure hyperbole. Florida does not want recipients to ignore reason codes.

It is true that the Medicaid-termination section sometimes includes names of household members who are not Medicaid recipients. Br.46. The record does not say how often that happens. But as Will Roberts noted, recipients know which household members are not Medicaid recipients and therefore which names are superfluous. Doc. 162 at 86:17–87:4. The record offers no evidence that any individual who was found *eligible* for Medicaid ever appeared in the Medicaid-termination section. Nor do Plaintiffs cite any evidence that the inclusion of unnecessary names confused any class member.

Finally, Plaintiffs dispute Florida's assertion that the class members who testified at trial understood from their notices that their Medicaid benefits were ending. Br.48–50. In doing so, Plaintiffs contradict the district court's finding that "Chianne D. understood that Medicaid benefits for her and C.D. were ending . . . because their income was too high." Op.135 ¶ 389. Jennifer V.'s confusion about KidCare, Br.48, does not mean she was confused about the termination of her Medicaid benefits. And while Plaintiffs claim that Ms. Taylor was confused by the

29

wording of cross-examination, there is nothing even remotely confusing about the

question she was asked, which drew no objection from Plaintiffs' counsel:

> Q.    When you read the June 8th, 2023, notice, you understood it to mean that you and K.H. were losing Medicaid coverage, right?
>
> A.    Yes.

Doc. 143 at 51:8–11.

## **CONCLUSION**

This Court should reverse the judgment below and remand with directions to

enter judgment for Florida.

| | |
|---|---|
| | /s/ *Andre Bardos* |
| James Timothy Moore, Jr. (FBN 70023) | Andy Bardos (FBN 822671) |
| Ashley H. Lukis (FBN 106391) | SHUTTS & BOWEN LLP |
| GRAYROBINSON, P.A. | 215 South Monroe Street, Suite 804 |
| 301 South Bronough Street, Suite 600 | Tallahassee, Florida 32301 |
| Tallahassee, Florida 32301 | Telephone: 850-201-6269 |
| Telephone: 850-577-9090 | abardos@shutts.com |
| tim.moore@gray-robinson.com | |
| ashley.lukis@gray-robinson.com | |

*Attorneys for Appellants*

30

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this document contains 6,500 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

/s/ *Andre Bardos*
Andy Bardos (FBN 822671)
SHUTTS & BOWEN LLP

31